**Opinion issued April 20, 2023.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-17-00316-CV

————————————

**WESLEY GILBREATH, JR., STACEY GILBREATH POWELL, ELLIOT GILBREATH, AND MARK RITTER; SIGNAD, LTD., SIGNAD GP, LLC, BEN NEVIS WEST, LTD., CULCREUCH WEST, LLC, BIG SIGNS & LEASING #1, LTD., BIG SIGNS & LEASING #2, LTD., BIG SIGNS & LEASING #3, LTD., BIG SIGNS & LEASING #4, LTD., BIG SIGNS & LEASING #5, LTD., AND BIG SIGNS & LEASING #6, LTD., BIG EASTEX #1, LTD., REALTY ACQUISITIONS & HOLDINGS, LLC, AND BIG LEASING, LLC**

Appellants

V.

**LISA R. GILBREATH HORAN, INDIVIDUALLY AND AS TRUSTEE OF THE LISA GILBREATH HORAN 2001 IRREVOCABLE TRUST, Appellee**

---

On Appeal from the 80th District Court
Harris County, Texas
Trial Court Case No. 2013-74857

---

## OPINION ON REHEARING

Appellee Lisa Gilbreath Horan, Individually and as Trustee of the Lisa Gilbreath Horan 2001 Irrevocable Trust, filed a motion for rehearing and a motion for en banc reconsideration of our July 14, 2022 opinion and judgment.[1] Appellants SignAd, Ltd., SignAd GP, LLC, Ben Nevis West, Ltd., Culcreuch West, LLC, Big Signs & Leasing #1, Ltd., Big Signs & Leasing #2, Ltd., Big Signs & Leasing #3, Ltd., Big Signs & Leasing #4, Ltd., Big Signs & Leasing #5, Ltd., Big Signs & Leasing #6, Ltd., Big Leasing, LLC, Big Eastex #1, Ltd., and Realty Acquisitions & Holdings, LLC also filed a motion for rehearing.[2] We deny the motions for rehearing, withdraw our opinion and judgment of July 14, 2022, and issue this opinion and judgment in their stead. Our disposition remains the same.

We dismiss the motion for en banc reconsideration as moot.[3]

---

[1] *See* TEX. R. APP. P. 49.1, 49.5.

[2] Appellants Wesley Gilbreath, Jr., Stacey Gilbreath Powell, Elliot Gilbreath, and Mark Ritter also filed a motion for rehearing of our July 14, 2022 opinion and judgment. We issued an order on October 20, 2022 denying their motion for rehearing.

[3] Because we issue a new opinion, the motion for en banc reconsideration is moot. *In re Wagner*, 560 S.W.3d 311, 312 (Tex. App.—Houston [1st Dist.] 2018, orig. proceeding) ("Because we issue a new opinion in connection with the denial of rehearing, the motion for en banc reconsideration is rendered moot."); *see also Poland v. Ott*, 278 S.W.3d 39, 41 (Tex. App.—Houston [1st Dist.] 2008, pet. denied) (stating motion for en banc reconsideration rendered moot by withdrawal and reissuance of opinion and judgment); *Brookshire Bros., Inc. v. Smith*, 176 S.W.3d 30, 41 n.4 (Tex. App.—Houston [1st Dist.] 2004, pet. denied) (supp. op. on reh'g) (noting that motion for en banc reconsideration rendered moot when motion for rehearing granted and new opinion and judgment issue).

Wesley Gilbreath, Jr., Stacey Gilbreath Powell, Elliot Gilbreath, and Mark Ritter (collectively, "Individual Appellants") and SignAd, Ltd., SignAd GP, LLC, Ben Nevis West, Ltd., Culcreuch West, LLC, Big Signs & Leasing #1, Ltd., Big Signs & Leasing #2, Ltd., Big Signs & Leasing #3, Ltd., Big Signs & Leasing #4, Ltd., Big Signs & Leasing #5, Ltd., Big Signs & Leasing #6, Ltd., Big Leasing, LLC, Big Eastex #1, Ltd., and Realty Acquisitions & Holdings, LLC (collectively, "Company Appellants") appeal the trial court's amended final judgment rendered against them on a jury verdict following a four-week trial. The Individual and Company Appellants collectively raise 25 issues (many with multiple sub-parts) challenging the judgment rendered against them on a host of claims including malicious prosecution, defamation, breach of fiduciary duty, and others.

We affirm in part, reverse in part, and remand in part.

## Background

In 1964, Wesley Gilbreath, Sr. ("Wes, Sr."), the patriarch of the Gilbreath family, founded an advertising company focused on constructing, owning, and leasing billboards in prime locations throughout Texas and parts of Louisiana. Although the company was at first a sole proprietorship, it was later incorporated in 1966 as SignAd, Inc., and then converted into a limited partnership known as SignAd, Ltd. In August 2000, SignAd GP, LLC, a Texas limited liability company,

3

was formed in connection with this corporate conversion to act as the general partner of SignAd, Ltd.

Over the years, Wes, Sr. transferred his original ownership interests in the business in equal parts to his children—Lisa Gilbreath Horan ("Lisa"), Wesley Gilbreath, Jr. ("Wes, Jr."), Elliott Gilbreath ("Lee"), Stacey Gilbreath Powell ("Stacey"), and Brett Gilbreath ("Brett")—through nearly identical irrevocable trusts. Although he also initially transferred an equal interest in the business to his daughter Sheree Gilbreath ("Sheree"), he repurchased Sheree's interest and placed the proceeds in a trust for her benefit after she was diagnosed with paranoid schizophrenia in her twenties.[4] Wes, Sr. then sold that interest to a separate trust he established for the benefit of his grandchildren ("Grandchildren's Trust"). Wes, Jr., Lee, Brett, and Mark Ritter ("Mark") served as trustees of the Grandchildren's Trust. Lisa's daughter, Noelle, has a one-fourteenth interest in the Grandchildren's Trust.

The Gilbreath family business consists of nine Texas limited partnerships, each with a general partner organized as a Texas limited liability company. The limited partnerships are: SignAd, Ltd., Big Signs & Leasing #1 to #6, Ltd. (six numbered partnerships), Big Eastex #1, Ltd., and Ben Nevis West, Ltd. (collectively,

---

[4] Sheree, who is no longer able to care for herself, lives in a mental health facility. Wes, Jr. is the trustee of Sheree's trust.

"Limited Partnerships").[5]   The general partners are: SignAd GP, LLC (general partner for SignAd, Ltd.), Culcreach West, LLC (general partner for Ben Nevis West, Ltd.), Realty Acquisitions & Holdings, LLC (general partner for Big Eastex #1, Ltd.), and Big Leasing, LLC (general partner for the Big Signs & Leasing partnerships) (collectively, "General Partners").  The General Partners are managed by their respective Board of Managers consisting of Wes, Jr., Lee, Lisa, and Stacey, each serving a lifetime appointment.[6]  The parties refer to the Limited Partnerships and General Partners collectively in their briefs as "SignAd Outdoor," "SignAd Outdoor Advertising," or the "SignAd Enterprise."  For purposes of this opinion, we refer to the entities together as "SignAd Outdoor."

The Grandchildren's Trust and Lisa, Wes, Jr., Stacey, Lee, and Brett, as trustees of their respective irrevocable trusts, are each limited partners in the Limited Partnerships, with each owning an equal one-sixth interest in the partnerships.  The Limited Partnerships are all taxed as S-Corporations, meaning the limited partners— Wes, Jr., Lee, Stacey, Lisa, Brett, and the Grandchildren's Trust—are taxed directly for the partnerships' income.  Each year, SignAd, Ltd. distributes profits to the

---

[5]   According to the Individual Appellants, Big Signs & Leasing #1 to #6, Ltd. construct billboard signs and Big Eastex #1, Ltd. and Ben Nevis West, Ltd. both hold real estate interests.

[6]   Brett and Wes, Sr. formerly served on the Board of Managers as well.

limited partners in equal shares at an amount determined in advance by SignAd GP, LLC's Board of Managers.

Wes, Sr. expected all his children to be involved with the family business, even at a young age.[7] Wes, Jr. started helping his father at what was then SignAd, Inc. when he was ten years old. After he attended college, Wes, Jr. returned to the family business and by the age of 25, he was the president of the company in 1984 or 1985. Wes, Jr. became the President of SignAd GP, LLC in 2000, when the entity was created, and he has served in that role ever since. Other siblings also served as corporate officers for the Company Appellants, including Lee, who served as SignAd GP, LLC's accountant and controller from the early 1980s until he retired in 2000, and Brett, who served as the Vice President of real estate until 2011.

Unfortunately, the siblings did not always work well together. Wes, Jr. and Brett had a contentious working relationship that Lisa described as "very strained." In 2004, Brett, who had been the Vice President of real estate, resigned because of his conflicts with Wes, Jr. According to Brett, Wes, Jr. "likes to be really involved with every single employee," and had been giving orders to employees who should otherwise have been reporting to Brett on real estate matters.

---

[7] According to Wes, Jr., the sons generally started in labor-intensive roles, such as construction and billboard maintenance, while the daughters performed more clerical duties. Many of Wes, Sr.'s fourteen grandchildren also worked at SignAd Outdoor over the years, as well as other extended family members.

Lisa hired a corporate psychologist, Dr. George Dempsey ("Dr. Dempsey"), to consult with the board members, privately and collectively, to mediate their conflicts and develop a more efficient and positive working environment. With Dr. Dempsey's help, Wes, Jr. and Brett were able to resolve some of their disagreements and establish some ground rules that led Brett to return to the company as the Vice President of real estate. The brothers' working relationship, however, began to deteriorate again and, after a major dispute over a real estate issue in 2011, Brett decided to resign from the company. Wes, Jr. accused Brett of stealing business away from the Company Appellants and fired Brett before he could resign. Brett, who was out of town in August 2011 handling a real estate issue for work, learned that he had been fired when Lisa called him and told him that someone was cleaning out his office.

According to Lisa, Wes, Jr. locked Brett out of the building, and at first refused to return some of Brett's belongings. Lisa disagreed with Wes, Jr.'s treatment of Brett and when she tried to intervene to help her younger brother, "things got very volatile." Wes, Jr. not only threatened to fire any employee who talked to Brett but followed through with the threat and fired one of the sales

managers who had spoken with Brett. Although he eventually recovered his belongings, Brett was never allowed back in the business office.[8]

Although Brett resigned from the Board of Managers of SignAd GP, LLC[9] in September 2011, he remained on the Board of Managers for the real estate entities until he resigned from those boards in February 2014. According to Lisa, Wes, Sr. was "devastated" after Brett resigned from SignAd GP, LLC's Board of Managers. After Wes, Sr.'s health began to fail in 2012, he, too, resigned from the board. Lisa explained the negative impact these developments had with respect to her place in the company:

> And as a general rule my father and Brett and I usually agreed and voted on a lot of issues together, and then it was just me. And so I was aligned against Wes, Jr., Lee and Stacey. So I kind of lost my voice somewhat.

According to Lisa,

> [B]eginning in about 2010, the real estate meetings had become more abbreviated and they were not discussing specific land purchases and land sales and allowing me to vote on them or letting me know what was going on; and it just seemed kind of strange the lack of information that I was getting in the real estate board meetings. So I started asking more questions and I was met with hostility and anger and, you know, controlling by my brothers; and so I then started asking each meeting for an internal audit, which is a normal course of business, to have a company audited voluntarily internally to make sure that the books and

---

[8]     Brett met with Lisa and Lee in September 2011 and informed them that he was going to resign from SignAd GP, LLC's board and build his own sign company.

[9]     In his letter of resignation, Brett stated that he was resigning from SignAd, Ltd.'s Board of Managers. At the time, however, Brett was serving on SignAd GP, LLC's Board of Managers. SignAd, Ltd. does not have a Board of Managers.

8

records and everything is being run properly. And then I was met with more hostility and more controlling behavior.

The tension between Lisa and the remaining board members continued to escalate and became progressively worse after Brett and Wes, Sr. resigned from SignAd GP, LLC's Board of Managers in 2011 and 2012, respectively.

Wes, Sr. died on January 13, 2013. Within days, Lisa began asking questions about her father's will, the Grandchildren's Trust, and the business overall. For example, in a January 24, 2013 email to Wes, Jr., Lee, and Brett, Lisa expressed concerns that SignAd Outdoor had been paying for personal and nonbusiness expenses, and stated, "I would like to curtail effective immediately any nonbusiness related expenditures." Lisa was concerned particularly about what she considered to be excessive payments to her stepmother and stepsiblings. Lisa further stated, "I am requesting and am entitled to see a quarterly report of any expenses being paid for by SignAd Outdoor Advertising for nonbusiness purposes, including any expenses related to our stepmother and stepfamily." According to Lisa, her stepmother's children and grandchildren were "kind of getting a lot of benefits and expenses paid through the company that were not part of the [1989 stock purchase] contract."

Lisa also began asking questions about Wes, Sr.'s financial affairs and when she tried to get a copy of his will from Brett, the executor of Wes, Sr.'s estate, Brett told her to contact him when she was not "ill anymore." Lisa testified that although

9

she had received financial reports in the past, she had a problem getting the information in 2013. She also testified that when she asked for more specific information about some expenditures, "Wes, Jr. told me that we were going to meet in 30 days to start setting some controls on excessive spending."

Lisa also began reaching out to Mark in January and February, and trying to obtain information about her daughter Noelle's interests in the Grandchildren's Trust. At one point, Mark told her that there was approximately $20,000 in the Grandchildren's Trust. Lisa suspected that something was wrong because she had received "millions of dollars in earnings distributions. Her daughter's earnings were significantly less . . . [she] had only gotten about $10,000 a year." Lisa testified that when she asked the trustees about the apparent discrepancy, "[t]hey basically told me it was none of my business and that I was crazy."

On January 28, 2013, Lisa sent an email message to Wes, Jr., Lee, and Brett regarding the Grandchildren's Trust. Lisa repeated her request for information and stated, "In the kindest, most loving voice I am telling you that I am putting you all on notice that I will hold you to the highest fiduciary responsibility regarding the partnerships and trusts. Dad is gone now, so no excuses that he forced you. We need to strictly adhere to the law."

On January 30, 2013, at the Board of Managers meeting for Culcreuch West, LLC, Lisa accused her siblings of taking "millions of dollars." On February 1, 2013,

Lisa also emailed Lee, Wes, Jr., Brett, and Mark and informed them that she believed they had breached their fiduciary obligations as trustees and co-trustees of the Grandchildren's Trust, and she called for their immediate resignations. Lisa concluded her message by stating that "[f]ailure to do so [would] result in further investigation of the matter including your burden of proving specifically where the monies have been dispersed." Nine copies of the email were sent from Lisa's email account in rapid succession. According to Lisa, the duplicative messages had resulted from a computer glitch.

Lee responded later that morning and told Lisa that he had "no need to receive 9 copies of the same email." He also told Lisa that "no monies [had] been disbursed on [their] watch" and she had no basis for her allegations, he questioned her motives for making the allegations, and he demanded an apology. Lee also warned Lisa that "[f]urther actions along this line and others you showed at the board meetings may result in evaluating your fitness to serve in your various capacities—your lifetime appointment can be voided if it is determined that you are not 'able to serve.'" Lee, who had copied Wes, Jr., Stacey, Mark, and Brett on the email, asked them to advise him on their feelings on the matter and what actions, if any, they believed had to be taken.

That same day, Brett texted Lisa, "We are worried about you. Is everything okay?" When Lisa reiterated her request for Brett's resignation and expressed her

11

concerns about the way the Grandchildren's Trust had been handled, Brett responded, "Don't isolate yourself sis, back off please. I don't want any harm to come to you. Just once, listen to me." Lisa replied, "Is someone threatening to harm me?" Brett responded, "No, but I'm afraid you might be ousted from the board. I warned you/Lee in my last meeting before resigning. You are the minority from here on out!! Me & Dad are out as expected, too late for changes now, so get along, ok?" The next day, Brett texted Lisa:

> If you are called to a fitness test and fail, you will be removed off the BODs. At this point it may be best for everyone involved. I asked you to back off and again, you failed to listen to me, the one who has been patient and loving to you and watched you get more and more inflexible and hostile. Call me sis, I love you.

Lisa testified that she felt threatened by Lee and Brett's messages. "[T]hey were threatening that, in other words, if I kept on asking these questions about business matters and pressing that, that they were going to have me committed mentally and I'd be removed from the board; and so it was pretty scary." Lisa testified that "the less cooperative and transparent they were, the more concerned" she became, and she eventually hired a forensic accountant to audit the SignAd Outdoor business.

On March 1, 2013, Lisa's attorney, Howard Reiner ("Reiner"), spoke with Wes, Jr. on the phone. Reiner sent a letter to Wes, Jr. five days later memorializing their conversation. In his March 6, 2013 letter, Reiner asked Wes, Jr., as President

of SignAd GP, LLC, to "provide access to the partnership books and other records [of SignAd GP, LLC and SignAd Ltd.] for inspecting and copying, during business hours on or before March 19th." According to the letter, Wes, Jr. had told Reiner that he would never provide Lisa with access to the company's books and records. Wes, Jr. testified that he passed this information along to Richard Rothfelder ("Rothfelder"), SignAd Outdoor's corporate lawyer. Wes, Jr. testified that he was concerned Lisa would not keep the company's records confidential, "due to the fact primarily that Lisa had already begun contacting some vendors at that point, confidentiality was a huge concern for us. We didn't want to jeopardize this information getting out. I didn't know what she might do, if she might try contacting our land owners or customers or what might occur. So confidentiality was a requirement to going further."

Rothfelder sent a letter to Reiner and informed him that Lisa could come to his office to look at the books and records. According to Lisa, Rothfelder subsequently resigned from representing SignAd Outdoor in the matter and "so [she] never got anything."

On March 4, 2013, Lisa emailed Terry Denman[10] ("Terry") and asked him to provide her with certain partnership documents, including stock certificates. Terry was the secretary of SignAd GP, LLC's Board of Managers, and he was the President

_____

[10] Terry Denman is Patsy Gilbreath's nephew. Patsy Gilbreath is Wes, Sr.'s widow.

13

of Buyers Investment Group, Inc. Terry told Lisa that he did not have a problem giving her the documents, but that all requests had to go through Wes, Jr.

On March 4, 2013, Lee emailed a list of proposed agenda items for SignAd GP, LLC's March 20, 2013 board meeting to Wes, Jr., Stacey, Lisa, Mark, and Terry. On March 7, 2013, Reiner sent letters to Wes, Jr., Terry, Mark, and Billy Collins[11] requesting access to the partnership books and records of other companies, including Realty Acquisitions & Holdings, LLC, Big Eastex #1, Ltd., Culcreuch West, LLC, Ben Nevis West, Ltd., Buyers Investment Group, Inc., and Hang'em High, Ltd.[12]

On March 8, 2013, Lisa emailed Lee a list of six topics that she wanted discussed at the upcoming SignAd GP, LLC board meeting. Lee responded to her later that day and informed her that some of her items were operational and not appropriate topics for board meetings and that a lot of her concerns would be covered during the "Old Business" agenda item. On March 19, 2013, Lee sent an email message to Wes, Jr. and Stacey and copied Lisa, Terry, Dr. Dempsey, and Mark. Lee asked Wes, Jr. and Stacey if they agreed with his responses to Lisa's requests

---

[11]   Billy Collins was president of Culcreuch West, LLC, one of SignAd Outdoor's real estate companies.

[12]   Buyers Investment Group, Inc.—the former General Partner of Big Signs & Leasing #1 to #6, Ltd., Big Eastex #1, Ltd., and Hang'em High, Ltd.—was voluntarily dissolved in April 2013. Hang'em High, Ltd. was voluntarily dissolved in May 2013.

and stated that if they agreed with him, the final agenda would be the one he had originally submitted. Lee further stated:

> Also please note that I was not aware of the legal proceedings going on internally against our companies at the time of my response. And [Lisa's] response to me, and I quote, was "My atty and cpa have advised me that the days of secrecy and back room dealing a[r]e over," with no comments either on topic 1 or 7 (or any others). Mark did bring to my attention since then that the Executive Committee had been tasked by the Board in a previous meeting with monitoring free bills. Terry . . . can you put together a summary of any such similar motions that we tend to make and immediately forget about? Thanks.

Wes, Jr. testified that Lisa changed almost immediately after their father's death and he was extremely concerned about Lisa's behavior. According to Wes, Jr., "Lisa was just bombarding all of us, anybody, regarding money, where is the money kind of thing; and it was just—nothing was making sense. Accusatory toward all of us about stealing her inheritance. There was all—there was just so many claims going on."

Wes, Jr. testified that his mother, Ruth, who had been diagnosed with manic depression and paranoid schizophrenia when he was a toddler, would become "angry and volatile" and "somewhat combative" and even "physically aggressive" at times. According to Wes, Jr., there were "a couple of times where I had to physically restrain her and just wrap her up in a bear hug to help try to calm her." His mother would also "talk to herself occasionally and hallucinate and would get somewhat paranoid at times." According to Wes, Jr., his parents divorced in the mid-1970s

15

and he and his siblings were left with the responsibility of caring for their mentally ill mother. The bulk of the responsibility, however, was carried by Wes, Jr., who eventually had his mother involuntarily committed. Wes, Jr. testified that Lisa exhibited similar symptoms after their father died in January 2013:

> [T]here had been issues going back for quite a while, for years; but it really took off upon dad's passing. It really elevated to a totally out-of-control Lisa. Prior that, Lisa was—you could usually bring her back down. At that point there was no bringing her back. It was beyond help.

According to Wes, Jr., Lisa's symptoms became worse over time, and she was exhibiting her "worst behavior so far" at the SignAd GP, LLC March 21, 2013 board meeting.

Lisa's other siblings echoed similar sentiments. Stacey testified that Lisa became increasingly paranoid and erratic after their father's death. According to Stacey, Lisa's troubling behavior became "more and more and more prevalent" and her condition "deteriorated rapidly" during this time. Stacey testified that Lisa's behavior during the SignAd GP, LLC board meeting was "definitely" comparable to their mother's and sister's behavior.

## A.     March 21, 2013 Board of Managers Meeting

The Board of Managers for SignAd GP, LLC met on March 21, 2013. Lee, Wes, Jr., Lisa, Stacey, Mark, Terry, and Dr. Dempsey attended the meeting. Lisa was accompanied to the meeting by Officer Stevens, an off-duty Houston Police Department officer. Lisa testified that she brought Officer Stevens with her to the

16

meeting to ensure her safety because she felt threatened by her brothers. Lisa testified she felt threatened by Wes, Jr., in part because he had a history of bullying her. She also testified that during one of the board meetings, Wes, Jr. had talked about his extensive gun collection and she believed Wes, Jr. was trying to frighten her indirectly.

During the board meeting, there were several outbursts requiring several breaks, including at least one when Wes, Jr. accused Lisa of being mentally ill. According to Lisa, the situation quickly escalated. Lisa testified that, "Stacey, who was sitting next to me, stood up and started screaming at me over my head, like that she hates me and just totally irate screaming at me." When the meeting resumed, Wes, Jr., Lee, and Stacey all voted (over Lisa's dissent) to reduce the number of board meetings from six to one meeting per year. Lisa testified that Wes, Jr., Lee, and Stacey reduced the number of meetings because they did not want to keep her informed about SignAd Outdoor's financial affairs and they wanted to push her out of the family business.

According to Lisa, Wes, Jr., Lee, and Stacey also reestablished a defunct executive committee that had not met since Brett, one of the committee members, resigned in 2011. Wes, Jr. and Lee served on the committee and Brett had served on the committee until he resigned in 2011. During the March 2013 meeting, Wes, Jr., Lee, and Stacey, in their capacity as SignAd GP, LLC's managers, voted to

appoint Stacey to fill Brett's former position and serve on the committee along with Wes, Jr. and Lee. As a result of Stacey's appointment, Lisa was the only board member excluded from the committee.

Stacey testified that when Lisa arrived at the March 2013 board meeting, she was "very tense, agitated, [and] looking for a fight." According to Stacey, Lisa became increasingly angry and argumentative during the meeting. Lisa would get very angry, yell at all the board members, and call the members names each time one of her motions failed during the meeting. Stacey testified that Lisa was repetitive, argumentative and "wasn't really paying attention to what was even being discussed in the meeting." Stacey testified that this behavior was not normal for Lisa.

Stacey also testified that Lisa's behavior during the meeting was "definitely" comparable to their mother's and sister's behavior. When asked if she believed that Lisa posed a danger to herself in March 2013, Stacey testified that she believed that Lisa "could have been" and she felt it was a "possibility." When asked if she believed that Lisa posed a danger to others, Stacey answered, "Possibly."

Wes, Jr. testified that Lisa's behavior at the meeting "was by far the worst [he had] seen" and it made him "[e]xtremely concerned." He testified that:

> She was extremely volatile and manic. Her eyes were just not normal, kind of glazed over with anger. Threatening, you know, similar threats that she had made. And claims of theft; and some were claims that just elevated to a whole 'nother level, even for Lisa.

18

Mark also observed that Lisa was "very agitated," it was "more than just being upset," and it was "scary" because he had never seen her act that way.

Although Lisa left after the board meeting ended, Officer Stevens stayed behind at the request of the remaining board members. Wes, Jr. testified that right after the board meeting, Officer Stevens told him she was an expert in mental health issues, and she advised him that Lisa was mentally ill and that they needed to "take precautions." According to Wes, Jr., he was alarmed about Officer Steven's statements because although he knew this information, "hearing it from a professional who'd seen it and dealt with it was totally an eye opener for me." Wes, Jr. testified that he took Officer Steven's statements as a warning about Lisa's mental health and that she posed a potential security risk to him, his family, and SignAd Outdoor employees. Wes, Jr. testified that Officer Steven's statements prompted him "to go to the next step" and talk to his siblings about the need "to really take Lisa seriously" and "do what [they can do] to get her help." After the board meeting, Wes, Jr., Lee, and Stacey talked about their concerns for Lisa and her well-being.

Officer Stevens testified that she spoke to Wes, Jr. after the board meeting and told him she worked in the Houston Police Department's threat management unit. Officer Stevens denied telling Wes, Jr. that she had background or expertise in mental health and could recognize someone with mental health issues. She also denied telling Wes, Jr. that he had a "potential problem" and needed "to take

19

precautions." Officer Stevens testified that she did not think it was reasonable for Wes, Jr. to consider their conversation as "a warning not only about Lisa's mental health but about also potential security for [Wes, Jr.], his family, and his co-workers."

## B.    Lisa's Involuntary Commitment

Several days after the March board meeting, and with Lee's and Stacey's blessing, Wes, Jr. filed an "Application for Temporary Mental Health Services" ("Commitment Application") on March 25, 2013, in which he swore that Lisa was mentally ill, likely to cause serious physical harm to herself and others, suffered from abnormal mental, emotional, or physical distress, and presented a substantial risk of serious physical harm if not immediately restrained.  Wes, Jr. was already familiar with the involuntary commitment process because he had filed applications to have his mother and older sister, Sheree, committed years before.

In the required affidavit that accompanied the Commitment Application, Wes, Jr. averred that Lisa had "made threats and claims that myself, my accountant, my employees, brothers and sister had stolen millions of dollars from her."  He also averred that Lisa had hired an off-duty police officer to accompany her to a board meeting to "protect her from myself and others."  According to Wes, Jr., the officer told him that Lisa was mentally ill, and she gave him her card because he might "need her to help or testify to Lisa's illness."  Although Wes, Jr. further averred that

20

Lisa was "very volatile and threatening toward[s] [himself] and others," Wes, Jr., did not describe the nature or content of any alleged threats.

On March 26, 2013, based on Wes, Jr.'s Commitment Application and supporting affidavit, the probate court issued an Emergency Apprehension and Detention Warrant for Lisa. That afternoon, two Harris County Constables arrived at Lisa's home, took her into custody, and brought her to the Harris County Psychiatric Center ("HCPC") for an involuntary psychiatric examination.

At the HCPC, Lisa was housed in a small cell-like room with a woman who talked to imaginary people and repeatedly threatened to kill Lisa. Lisa testified that she constantly feared the woman would attack her. In the common area of the facility, a deranged man was running around and screaming in a frightening manner. Lisa testified the experience horrified her, not only because she feared she would be assaulted or killed by a mental patient, but also because she feared she would be locked away in a mental hospital for weeks, with no independence, as her mother had been. According to Lisa:

> These were my partners in business, my siblings that I trusted 1,000 percent and our father had just died. And I really felt like, you know, my life as it had been was going to change and they were going to throw me in the State hospital at Rusk or something like they had done to my mother; and it was very scary. And I have this wonderful daughter who is my whole world. And it's like they plotted this whole thing just because of money.

The evening of her arrival at the HCPC, Lisa was taken to an examination room where Dr. Crispa Aeschbach Jachmann ("Dr. Jachmann") physically examined Lisa, including collecting blood and urine samples, and asked her questions. Lisa testified that the interview lasted only ten or fifteen minutes, but other evidence suggests it might have been longer. According to Lisa, Dr. Jachmann told her that she had been talking to Wes, Jr. and he had informed her that Lisa had been mentally ill her entire life and was "threatening everybody."[13]

After examining Lisa, Dr. Jachmann signed a one-page Certificate of Medical Examination form stating that Lisa was mentally ill and a danger to herself and others. Dr. Jachmann initially diagnosed Lisa with a psychotic disorder not otherwise specified. The next day, however, Lisa was released from the facility with no restrictions, medications, or any recommended follow-ups. The HCPC multidisciplinary discharge document specifies that at discharge, Lisa was "Normal, not ill at all," there had been "[n]o change" in her condition since she was admitted the day before, and that she had been "[a]dmitted for family dispute possibly inn [sic] appropriately."

---

[13]   Wes, Jr. denied speaking to Dr. Jachmann and claimed he had never even heard of her until trial. Dr. Jachmann did not testify at trial.

## C.       Safety Meeting and Comments to Employees

Wes, Jr. testified that he locked Lisa out of the SignAd Outdoor building before the March board meeting and warned employees not to speak with her.  He explained that he did not want his employees to speak with Lisa or "cross her path" because he wanted to protect the employees' safety.

After Lisa was released from the HCPC, Wes, Jr. called an early morning safety meeting at SignAd Outdoor's offices.  At least five of SignAd Outdoor's staff attended the meeting.  During the meeting, Wes, Jr. reminded everyone to keep the doors locked and advised them to be aware of their surroundings.

SignAd Outdoor's sales and marketing director, Stacey Laycock ("Laycock"), attended the meeting. When she asked Wes, Jr. afterward what had prompted the meeting, he explained to her that "they were having issues with [Lisa], that he was concerned that she was ill and that he just was trying to [take] precautions." Laycock did not ask Wes, Jr. what he meant when he stated Lisa was ill.  Laycock's understanding of Wes, Jr.'s comments about Lisa being ill was only that Lisa was struggling because their dad had just died.  Laycock was left with the understanding that Wes, Jr. did not want Lisa in the building, but not because Lisa was a physical threat to anyone.

When asked if she could "recall whether or not [she was] aware in March of 2013 about any commitment proceedings involving" Lisa, Laycock replied, "I

recall—I think that's been discussed, yes." When asked if Wes, Jr. or anyone else at SignAd Outdoor made her aware that an attempt had been made to have Lisa involuntarily committed, Laycock testified:

> I know that there was a meeting about safety just to make sure that the doors were kept secured. I know that Wes was upset because he felt that his sister was ill, and that he was upset, I mean, tearful when he and I talked about just safety in general and that he had to have that meeting at all to secure the building for everyone's safety.

Laycock testified she did not recall whether her conversation with Wes, Jr. occurred before or after Wes, Jr. had Lisa committed, but she assumed that it occurred afterward because she "did not know anything prior to" the commitment.

On another occasion, Mark thought he saw Lisa's car in SignAd Outdoor's parking lot, and he told a small group of two or three people, including Terry, to "be careful" because Lisa was outside. According to Mark, one employee checked to see if the office door was locked while the others returned to their offices. Mark denied telling the group that they were in danger; "I just said be careful . . . That she's here." When asked what he meant by his remarks, Mark replied, "Just to be careful, make sure the doors are locked. We knew that [Lisa] wasn't to be in the building. And sometimes the doors aren't locked, the roll-up doors could be open." When asked if he meant to convey to employees that Lisa "is not welcome at SignAd" when he told them "to be careful," Mark replied, "I think they already knew that." Mark also testified, "I wanted to make sure that if it was her that we took

24

whatever measures to remain safe and secure in the building so that no one would be injured or who knows what might happen."

Mark testified that prior to Wes, Sr.'s death, he had never observed any employees of SignAd Outdoor be fearful of Lisa. He had also never seen Lisa be anything but respectful to employees before the March board meeting. According to Mark, Lisa seemed to get along well with everyone at SignAd Outdoor. Lisa's behavior at the March 2013 board meeting was the only basis for Mark's concern that Lisa posed a threat to employees. According to Mark, "[i]t would be too disruptive to the business" if Lisa were allowed in SignAd Outdoor's offices. "Well, had you seen how she carried on at the last meetings, I mean, there is just no way of making sure that everyone would be safe. It's just too—it's just not a good idea I don't believe in, in the current situation." Mark added that when he asked Lisa why she brought an off-duty police officer with her to the board meeting, Lisa told him that "she didn't feel safe." When asked if he perceived Lisa's statement that she did not feel safe "as a threat that she might harm somebody within SignAd," Mark replied, "You never know." Mark stated he was not sure if Lisa would harm anyone:

> But I felt like she—I didn't know what she was capable of. Well, she was very agitated. And I have known her for a long time and I've never seen her act the way that she did . . . . And it was scary. It was more than just being upset. That's why I said before I thought well, gee, I wonder if she's taking something. It just didn't quite seem like her.

25

When asked if he feared Lisa "was going to come on the premises and hurt an employee not Wes, Jr.," Mark replied, "It's possible, yes."

**D.      Accounting Firm and Audit of the Company Appellants**

On March 27, 2013, the day Lisa was released from the HCPC, Lisa hired new lawyers at Strasburger & Price, and she met with and retained a forensic accountant, Sheila Enriquez ("Enriquez").  Lisa hired Enriquez to conduct a forensic audit of SignAd, Ltd. and its related entities, Ben Nevis West, Ltd., Big Eastex #1 Ltd., Realty Acquisitions and Holdings, LLC, Hang 'Em High, Ltd., Buyers Investment Group, Inc., Big Signs & Leasing #1–#6 Ltd., and Big Leasing, LLC.  Lisa requested the audit because she had noticed "red flags" that were causing her concern, including personal expenses being run through the company, excessive charges to company credit cards, and significant giveaways of billboard space, all without explanation.

Enriquez identified the records she needed to conduct her audit and worked with Lisa and Strasburger & Price who made the requests for the accounting documents. The parties entered into a confidentiality agreement and SignAd Outdoor began producing some information to Lisa's attorneys in June 2013.  Wes, Jr. testified that Lisa violated the Confidentiality Agreement.

## E.    The Lawsuit

On December 13, 2013, Lisa sued Wes, Jr., Lee, Stacey, Mark, the Limited Partnerships, the General Partners, and others for violating her right to access and copy the books and records of the company and for an accounting, oppression, breach of fiduciary duty, unjust enrichment, defamation, false imprisonment, and conspiracy.  She sought to recover damages, injunctive relief, and a buyout of her interests in SignAd Outdoor.  Lisa later amended her pleadings to include claims for breach of contract, declaratory judgment, breach of fiduciary duty (both direct and derivative), statutory oppression, defamation, malicious prosecution, conspiracy, dissolution, and constructive trust.  The Individual and Company Appellants asserted counterclaims against Lisa, including claims for equitable or judicial expulsion of Lisa's interest from the Limited Partnerships.[14]

The case was tried to a jury.  After a four-week trial on several claims, the trial court submitted a seventy-six-page jury charge with a total of sixty interrogatories to the jury.[15]  The jury returned a unanimous verdict finding that (1) Wes, Jr. had maliciously prosecuted the involuntary commitment proceeding against Lisa, (2) Lee and Stacey had conspired in the malicious prosecution of Lisa, and (3) Wes, Jr. and Mark had defamed Lisa.  The jury further found that (4) Wes,

---

[14]    *See* TEX. BUS. ORGS. CODE § 152.501(b)(5)(C) (judicial decree of expulsion).

[15]    The last two interrogatories are misnumbered.

27

Jr. had breached his fiduciary duties to SignAd, Ltd., (5) SignAd GP, LLC, Wes, Jr., Lee, Stacey, and Mark had breached their fiduciary duties to SignAd, Ltd., (6) Wes, Jr., Lee, and Stacey had breached their fiduciary duties to SignAd GP, LLC, (7) the General Partners had improperly denied Lisa access to the books and records of the company, and (8) the governing persons of the Limited Partnerships and two of the General Partners had engaged in oppressive conduct. The jury also found that (9) Brett, Lee, and Mark were in a relationship of trust and confidence with Lisa; and (10) Lee had breached his fiduciary duties to Lisa. Finally, the jury found that (11) Lisa had engaged in conduct relating to the partnership business of the Limited Partnerships "that [made] it not reasonably practicable to carry on the business in partnership" with her; and (12) Wes, Jr., Stacey, Lee, SignAd GP, LLC, Culcreuch West, LLC, Realty Acquisitions & Holdings, LLC, and Big Leasing, LCC had not engaged in such conduct.

The jury awarded Lisa actual damages on her claims for malicious prosecution, defamation, and breach of fiduciary duty. The jury also awarded her punitive damages on her claims for malicious prosecution and defamation. By agreement, the parties tried all issues relating to attorney's fees to the bench through written submissions.

On November 17, 2016, the trial court signed a final judgment based on the jury verdict and its own findings on attorney's fees and in equity. The trial court

28

reduced the punitive damage award against Wes, Jr. for malicious prosecution to comply with the applicable statutory cap but otherwise awarded judgment in favor of Lisa for the actual and punitive damages found by the jury. The final judgment also awarded Lisa declaratory relief, injunctive relief, the appointment of a rehabilitative receiver, and attorney's fees. Two months later, based on a timely filed post-judgment motion, the trial court signed an amended final judgment to clarify its original judgment and to correct mistakes, omissions, and clerical errors in the original judgment ("Amended Final Judgment").

The Individual and Company Appellants assert a litany of issues on appeal. To the extent the parties' issues overlap, we address those issues collectively. Unless otherwise stated, we address the remaining issues separately.

## Discussion

The Individual and Company Appellants both challenge Lisa's standing to bring derivative claims on behalf of SignAd GP, LLC. Because standing is a necessary component of subject matter jurisdiction, we address that issue first.

## Standing

The Individual and Company Appellants argue that all relief granted in the Amended Final Judgment based on the derivative claim Lisa asserted on behalf of SignAd GP, LLC for breach of fiduciary duty against Wes, Jr., Lee, and Stacey should be reversed. They argue Lisa has no ownership interest in SignAd GP, LLC,

29

and thus she lacks standing to bring derivative claims on its behalf. With respect to this claim, the jury found that Wes, Jr., Lee, and Stacey breached their fiduciary duties to SignAd GP, LLC by (a) failing to maintain internal controls on employee fringe benefits and (b) selling company vehicles for less than fair market value. The jury awarded a total of $501,193 in damages for this claim. The Amended Final Judgment awarded Lisa one-sixth of the damage award under Section 153.405 of the Texas Business Organizations Code ("TBOC").

Standing is a constitutional prerequisite to maintaining suit. *Sneed v. Webre*, 465 S.W.3d 169, 179–80 (Tex. 2015); *Tex. Ass'n of Bus. v. Tex. Air Control Bd.*, 852 S.W.2d 440, 443–44 (Tex. 1993). Generally, unless standing is conferred by statute, "a plaintiff must demonstrate that he or she possesses an interest in a conflict distinct from that of the general public, such that the defendant's actions have caused the plaintiff some particular injury." *Sneed*, 465 S.W.3d at 180 (quoting *Williams v. Lara*, 52 S.W.3d 171, 178–79 (Tex. 2001)). "The issue of standing focuses on whether a party has a sufficient relationship with the lawsuit so as to have a justiciable interest in its outcome." *Austin Nursing Ctr., Inc. v. Lovato*, 171 S.W.3d 845, 848 (Tex. 2005) (citation omitted). "The general test for standing in Texas requires that there '(a) shall be a real controversy between the parties, which (b) will be actually determined by the judicial declaration sought.'" *Tex. Ass'n of Bus.*, 852 S.W.2d at 446 (quoting *Bd. of Water Eng'rs v. City of San Antonio*, 283 S.W.2d 722,

724 (Tex. 1955)). A party's lack of standing deprives a court of subject matter jurisdiction and renders any trial court action void. *Phillips v. Phillips*, 244 S.W.3d 433, 434–35 (Tex. App.—Houston [1st. Dist.] 2007, no pet.).

Lisa acknowledges that she does not have an ownership interest in SignAd GP, LLC. Indeed, SignAd GP, LLC is "a single member limited liability company owned by [Stacey Gilbreath] Powell." Despite her lack of an ownership interest in SignAd GP, LLC, Lisa argues she has standing to file suit on its behalf because she is a beneficial owner of one-sixth of the entire "SignAd Enterprise," of which SignAd GP, LLC is a part, and she is also a permanent member of SignAd GP, LLC's Board of Managers.[16] Lisa's argument hinges on her theory that the SignAd entities, all of which undisputedly are distinct and separate legal entities, constitute a single "integrated business." Lisa's argument is unavailing.

Lisa never pleaded an enterprise theory or obtained findings that would allow us to disregard the fact that SignAd GP, LLC, on whose behalf Lisa sued, and SignAd, Ltd., the entity in which Lisa has an ownership interest, are two separate entities. *See Docudata Records Mgmt. Servs., Inc. v. Wieser*, 966 S.W.2d 192, 197 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (stating that under Texas law, "the separate identity of corporations will be observed by the courts, even in instances where one may dominate or control the other, or may even treat it as a

---

[16] Lisa has a one-sixth ownership interest in the Limited Partnerships.

31

mere department, instrumentality or agency of the other") (quoting *Pulaski Bank & Trust Co. v. Tex. Am. Bank, N.A.*, 759 S.W.2d 723, 731 (Tex. App.—Dallas 1988, writ denied)).

Moreover, the TBOC, which sets forth the parameters for derivative proceedings for limited liability companies, states that a "member" of a closely held limited liability company may bring a derivative suit on behalf of the LLC, and further identifies when such derivative actions are permitted. *See* TEX. BUS. ORGS. CODE §§ 101.452, .463. Under the TBOC, Lisa's status as a board member of SignAd GP, LLC does not confer standing on her to bring a derivative suit on behalf of the entity. Stacey, as the single member of SignAd GP, LLC, is the person who has standing to assert a derivative claim on behalf of the LLC; Lisa does not.

Lisa argues that because Section 101.463 of the TBOC does not state that derivative standing is strictly limited to owner-members of an LLC, she can establish standing. Without argument or explanation, she then cites to *Neff v. Brady*, 527 S.W.3d 511 (Tex. App.—Houston [1st Dist.] 2017, no pet.) adding a parenthetical stating that double-derivative standing[17] is recognized where the "plaintiff is a

---

[17] A double-derivative suit is based upon the "injury suffered indirectly by the parent corporation, in which the shareholder does have an interest, as a result of injury to the subsidiary." *Neff v. Brady*, 527 S.W.3d 511, 522 (Tex. App.—Houston [1st Dist.] 2017, no pet.) (quoting *In re Bear Stearns Cos., Inc. Secs., Derivative, & ERISA Litig.*, 763 F.Supp.2d 423, 538 (S.D.N.Y. 2011)); *see Webre v. Sneed*, 358 S.W.3d 322, 334 (Tex. App.—Houston [1st Dist.] 2011), *aff'd*, 465 S.W.3d 169 (Tex. 2015). A double derivate suit is a "vehicle for bringing a derivate suit across

32

beneficial owner of the entity harmed by [the] breach of fiduciary duty to an affiliate." To the extent Lisa argues *Neff* supports her argument that she has standing to assert a claim on behalf of SignAd GP, LLC, we reject her argument.

*Neff* analyzes standing under the laws of Bermuda and Switzerland and does not address whether Lisa, as a non-member of an LLC, can assert a derivative claim on behalf of SignAd GP, LLC. Furthermore, *Neff* confirms that when, as here, standing has been conferred through statute, "the statute itself serves as the proper framework for the analysis." *Id.* at 522. The "proper analysis is to determine whether the claimant falls within the category of claimants upon whom the Legislature conferred standing." *Nephrology Leaders & Assocs. v. Am. Renal Assocs. LLC*, 573 S.W.3d 912, 916 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (holding that "courts must determine whether a particular plaintiff has established that he has been injured or wronged within the parameters of the statutory language"); *see also In re Sullivan*, 157 S.W.3d 911, 915 (Tex. App.—Houston [14th Dist.] 2005, orig. proceeding) ("[T]he judge-made criteria regarding standing do not apply when the Texas Legislature has conferred standing through a statute."); *Everett v. TK-Taito, L.L.C.*, 178 S.W.3d 844, 851 (Tex. App.—Fort Worth 2005, no pet.) ("When standing has been statutorily conferred, the statute itself serves as the

a second degree of separation." *Neff*, 527 S.W.3d at 534 (citation omitted). "Typically, this takes the form of a suit brough by shareholders of a parent company to assert the rights of a subsidiary." *Id.*

proper framework for a standing analysis."). Because Lisa is not a member of SignAd GP, LLC, she does not "fall within the category of claimants upon whom the Legislature [has] conferred standing" under the TBOC. *See Nephrology Leaders*, 573 S.W.3d at 916; TEX. BUS. ORGS. CODE § 101.463.[18]

We sustain the Individual and Company Appellants' challenge to Lisa's standing, reverse the trial court's judgment with respect to Lisa's derivative claim filed on behalf of SignAd GP, LLC, and render judgment dismissing the claim for lack of subject matter jurisdiction.[19]

---

[18] Lisa contends that even if she lacks standing to sue on behalf of SignAd GP, LLC, the Individual and Company Appellants' argument "only raises an immaterial defect in form of the jury question, which mistakenly (but harmlessly) presented the issue to the jury in terms of a fiduciary obligation to SignAd GP instead of to SignAd, Ltd." We reject Lisa's characterization of the argument. SignAd, Ltd. and SignAd GP, LLC are distinct legal entities and any duties Wes, Jr., Lee, and Stacey may owe to SignAd, Ltd. are not necessarily the same as any duties they may owe to SignAd GP, LLC. *See generally Docudata Records Mgmt. Servs., Inc. v. Wieser*, 966 S.W.2d 192, 197 (Tex. App.—Houston [1st Dist.] 1998, pet. denied) (stating that under Texas law, "the separate identity of corporations will be observed by the courts"). Jury Questions 30 through 33 asked the jury to determine whether Wes, Jr., Lee, and Stacey failed to comply with a duty they owed to *SignAd GP, LLC*, not SignAd, Ltd. We cannot simply ignore the question and substitute another entity for SignAd GP, LLC as Lisa suggests. The question presented is one of standing, and as explained, Lisa does not have standing to bring a derivative claim on behalf of SignAd GP, LLC.

[19] The Company Appellants also argue the trial court abused its discretion by allowing Sheila Enriquez, Lisa's expert, to testify regarding the amount of damages associated with this claim. Because we have concluded Lisa did not have standing to bring the derivative claim in the first place, we do not need to address the Company Appellants' challenges to the evidence supporting damages for the claim. Similarly, because we have determined that Lisa lacked standing to assert this derivative claim, we need not address the Individual Appellants' argument that the

34

## Sufficiency of the Evidence

The test for legal sufficiency is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). When conducting a legal sufficiency review, "view the evidence in the light favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *Id.* at 807; *see also Kroger Texas Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 793 (Tex. 2006). So long as the evidence falls within the zone of reasonable disagreement, we may not substitute our judgment for that of the factfinder. *City of Keller*, 168 S.W.3d at 822. Jurors are the sole judges of the credibility of the witnesses and the weight to give their testimony and may choose to believe one witness and to disbelieve another. *Id.* at 819.

A challenge to the legal sufficiency of the evidence by a party who did not have the burden of proof on that issue will be sustained if, among other things, the evidence offered to prove a vital fact is no more than a scintilla or the evidence conclusively establishes the opposite of a vital fact. *Id.* at 810; *see also Kroger Texas Ltd.*, 216 S.W.3d at 793. Evidence does not exceed a scintilla if it is so weak as to do no more than create a mere surmise or suspicion that the fact exists. *Kroger Texas*

---

award of "damages to SignAd, Ltd." based on the jury's answer to Jury Question 33 is erroneous because it does not conform to the verdict.

35

*Ltd.*, 216 S.W.3d at 793 (quoting *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 601 (Tex. 2004)).

A party attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof must demonstrate that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co. v. Francis*, 46 S.W.3d 237, 241 (Tex. 2001) (per curiam). A matter is conclusively established only if reasonable people could not differ as to the conclusions to be drawn from the evidence. *See City of Keller*, 168 S.W.3d at 816. If the evidence shows there was a conflict, then the elements were not conclusively established. *See Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986).

## Individual Appellants' Issues

### A.    Malicious Prosecution

The jury found that (1) Wes, Jr. maliciously prosecuted Lisa by commencing an involuntary commitment proceeding against her, (2) Lisa suffered $500,000 in mental anguish damages, (3) Lee and Stacey conspired to maliciously prosecute Lisa, (4) the harm to Lisa resulted from malice, and (5) Lisa should recover $875,000 in exemplary damages from Wes, Jr. (reduced to $500,000 in the Amended Final Judgment), $500,000 from Lee, and $500,000 from Stacey. In their first and second issues, the Individual Appellants argue that the judgment for Lisa on her malicious prosecution claim should be reversed because (1) Lisa did not meet her burden to

establish that Wes, Jr. lacked probable cause to file the Commitment Application in which he swore that Lisa was mentally ill and posed an imminent danger of harm to herself and others, (2) alternatively, the trial court abused its discretion by excluding evidence of Lisa's mental health history,[20] (3) the actual and punitive damages awarded to Lisa for malicious prosecution should be eliminated or remitted because the awards are excessive, and (4) the actual and punitive damages awarded against Lee and Stacey should be reversed because there is insufficient evidence of malice.[21]

### 1. Applicable Law

"To prevail in a suit alleging malicious prosecution of a civil claim, the plaintiff must establish: (1) the institution or continuation of civil proceedings against the plaintiff; (2) by or at the insistence of the defendant; (3) malice in the commencement of the proceeding; (4) lack of probable cause for the proceeding; (5) termination of the proceeding in plaintiff's favor; and (6) special damages." *Airgas-Sw., Inc. v. IWS Gas & Supply of Tex., Ltd.*, 390 S.W.3d 472, 478 (Tex. App.—Houston [1st Dist.] 2012, pet. denied) (quoting *Tex. Beef Cattle Co. v. Green*, 921 S.W.2d 203, 207 (Tex. 1996)).

---

[20] The Individual Appellants argue that the court's evidentiary errors not only explain the insupportable verdict, but also the excessive damage awards.

[21] The Individual Appellants do not appear to challenge the jury's findings that (1) Wes, Jr. acted with malice when he initiated the involuntary commitment proceeding against Lisa (Jury Questions 1 and 4) and (2) Lee and Stacey were part of a conspiracy to maliciously prosecute Lisa (Jury Question 3).

The law presumes that a defendant acted reasonably and had probable cause to initiate the proceeding at issue in a malicious prosecution case. *See Kroger Texas Ltd.*, 216 S.W.3d at 794; *Richey v. Brookshire Grocery Co.*, 952 S.W.2d 515, 517 (Tex. 1997). Therefore, the plaintiff bears the initial burden of disproving the existence of probable cause. *Kroger Texas Ltd.*, 216 S.W.3d at 794–95; *Richey*, 952 S.W.2d at 518. To rebut the presumption, the plaintiff must produce evidence that the motives, grounds, beliefs, or other information upon which the defendant acted did not constitute probable cause. *Richey*, 952 S.W.2d at 518. If the plaintiff rebuts that presumption, the defendant is then required to carry the burden of proving the existence of probable cause. *Akin v. Dahl*, 661 S.W.2d 917, 920 (Tex. 1983).

Probable cause in a malicious prosecution claim is evaluated from the perspective of the person who initiated the proceeding at the time the proceeding commenced. *See Akin*, 661 S.W.2d at 920; *see generally Pettit v. Maxwell*, 509 S.W.3d 542, 547 (Tex. App.—El Paso 2016, no pet.). Thus, "[i]t is the events prior to the institution of the proceedings which must be examined, and only those events, to determine if the defendants had probable cause to act." *Akin*, 661 S.W.2d at 920. "Events subsequent to the action of confinement and legal proceedings may tend to show whether the action of the [defendant] turned out to be correct or incorrect, but [they are] not material to the beliefs and motives at the time the proceedings were instituted." *Id.* Generally, whether probable cause existed is a question of law to be

decided by the trial court. *See Richey*, 952 S.W.2d at 518. If, however, the underlying facts are in dispute, as in this case, this presents a mixed question of law and fact for the jury. *Id.*; *Akin*, 661 S.W.2d at 920.

The civil proceeding on which Lisa premised her malicious prosecution claim is the involuntary commitment proceedings Wes, Jr. commenced against her when he filed the Commitment Application under Chapter 573 of the Texas Health and Safety Code. A Commitment Application, which is referred to by the Health and Safety Code as an "application for emergency detention," must state:

> (1) that the applicant has reason to believe and does believe that the person evidences mental illness;
>
> (2) that the applicant has reason to believe and does believe that the person evidences a substantial risk of serious harm to himself or others;
>
> (3) a specific description of the risk of harm;
>
> (4) that the applicant has reason to believe and does believe that the risk of harm is imminent unless the person is immediately restrained;
>
> (5) that the applicant's beliefs are derived from specific recent behavior, overt acts, attempts, or threats;
>
> (6) a detailed description of the specific behavior, acts, attempts, or threats; and
>
> (7) a detailed description of the applicant's relationship to the person whose detention is sought.

TEX. HEALTH & SAFETY CODE § 573.011(b).

39

## 2. Analysis

In their first issue, the Individual Appellants argue Lisa failed to establish a lack of probable cause and thus they are entitled to judgment as a matter of law. The jury was not asked to determine whether Stacey or Lee maliciously prosecuted Lisa by attempting to have her committed. Instead, the jury was asked whether Wes, Jr. maliciously prosecuted Lisa and whether Lee and Stacey conspired with Wes, Jr. to maliciously prosecute her. Accordingly, we understand the Individual Appellants' argument as a challenge to the sufficiency of the evidence supporting the jury's finding that Wes, Jr. initiated an involuntary commitment proceeding against Lisa "with a lack of probable cause for the proceeding."

Conspiracy is not an independent tort; it is a means to impose liability on Lee and Stacey. *See Agar Corp., Inc. v. Electro Circuits Int'l, LLC*, 580 S.W.3d 136, 142 (Tex. 2019). Therefore, if the evidence is legally insufficient to support the malicious prosecution claim against Wes, Jr., then we must also reverse the claim against Lee and Stacey for conspiracy to commit malicious prosecution.[22]

---

[22] The jury was not asked to determine whether Stacey or Lee acted without probable cause. Instead, the jury was asked whether each was "part of a civil conspiracy to maliciously prosecute Lisa." The jury was instructed that to "be part of a conspiracy," Stacey or Lee "must have had knowledge of, agreed to, and intended a common objective or course of action that resulted in the damages to Lisa Horan." They were further instructed that "[o]ne or more persons involved in the conspiracy must have performed some act or acts to further the conspiracy." The jury separately answered "yes" as to Lee and Stacey.

The jury was instructed that to find Wes, Jr. committed malicious prosecution, "you must find that" (1) "an involuntary commitment proceeding was instituted against Lisa," (2) "by or at the insistence" of Wes, Jr., and (3) "with a lack of probable cause for the proceeding."[23] Probable cause was defined in the jury charge as:

> [T]he existence of such facts and circumstances as would excite belief in a reasonable mind, acting on the facts or circumstances within his knowledge at the time the proceeding was commenced, that the commencement of the proceeding was proper.

Under the Health and Safety Code, the commencement of an involuntary commitment proceeding against Lisa would have been proper only if, among other things, Wes, Jr. had reason to believe and did believe that Lisa (1) "evidence[d] mental illness," (2) "evidence[d] a substantial risk of serious harm to [her]self or others," and (3) "the risk of harm [was] imminent unless [Lisa was] immediately restrained." TEX. HEALTH & SAFETY CODE § 573.011(b)(1)–(2), (4). The law presumes Wes, Jr. acted reasonably and had probable cause to initiate the involuntary commitment proceeding against Lisa. *See Richey*, 952 S.W.2d at 518. To overcome the presumption, Lisa had to produce evidence that Wes, Jr. filed the Commitment Application based on motives, grounds, beliefs, or evidence that did not support a reasonable belief that the commencement of the proceeding was

---

[23] The jury also had to find that the proceeding was instituted with malice, the proceeding terminated in Lisa's favor, and Lisa suffered special damages.

41

proper, i.e., a lack of probable cause. *See Kroger Texas Ltd.*, 216 S.W.3d at 794. In the absence of such evidence, the evidence is legally insufficient to support a finding of lack of probable cause and, thus, Wes, Jr. is entitled to judgment as a matter of law on Lisa's malicious prosecution claim. *See id.* at 795.

Although disputed, Lisa presented some evidence that Wes, Jr. was motivated to have her involuntarily committed because he wanted to remove her from the Board of Managers of the General Partnerships. The record reflects that Lisa, Wes, Jr., and the other siblings on the Company Appellants' Boards of Managers had been fighting for years over the management of the company after Wes, Jr. became president of what is now SignAd GP, LLC. By the mid-2000s, the animosity among the siblings, especially Wes, Jr. and Brett, had risen to the point where Lisa felt it necessary to hire a corporate psychologist, Dr. Dempsey, to help them mediate their disagreements and run their board meetings more effectively. Some of the siblings' disputes, however, proved too difficult to overcome.

In 2011, Wes, Jr. accused Brett of stealing business away from the company, fired Brett, locked him out of the company building, and at first refused to return some of his belongings. This prompted Brett to resign from SignAd GP, LLC's[24] Board of Managers. According to Lisa, Brett had been one of her closest allies on

---

[24] In his letter of resignation, Brett stated he was resigning from SignAd, Ltd.'s board. At the time, however, Brett was serving on SignAd GP, LLC's Board of Managers. SignAd, Ltd. does not have a board.

the board. The other was her father, who resigned in 2012 because of his failing health. Lisa testified that once her father and Brett were gone, it was just her against Wes, Jr., Lee, and Stacey.

After their father died in January 2013, Lisa became concerned that Wes, Jr. and the other trustees had breached their fiduciary duties to the Grandchildren's Trust, and she insisted on their resignations. Lisa explained that the repetitive emails she had sent to her siblings on this topic had resulted from a computer malfunction. She was also concerned about the way Wes, Jr. and others had been handling the Company Appellants' financial affairs and insisted on access to the companies' books and records. Rather than responding to Lisa's concerns or providing her with the information she requested, Wes, Jr. told Lisa's attorney that he would never provide Lisa with access to the company's books and records, and her brothers, Lee and Brett, told Lisa to stop asking questions or else she could be removed from the Board of Managers. Lisa, however, continued to ask questions about the Grandchildren's Trust and the business, and she demanded documents that Wes, Jr. refused to provide. Like their brother Brett, Wes, Jr. locked Lisa out of the company's office and told employees not to communicate with her.

By most accounts, the siblings' conflict came to a head during the March 2013 board meeting for SignAd GP, LLC. It is undisputed that Lisa became angry when Wes, Jr. and others expressed concern about her mental state at the board meeting.

43

Although Wes, Jr. testified that Lisa appeared "volatile," it is also undisputed that Lisa never became violent or threatened physical violence against herself or anyone else at the meeting. Terry Denman, who was present at the meeting, testified that Lisa was argumentative and figuratively "looking for a fight," but he "never thought of Lisa as being physically a threat." There was also testimony that other board members, including Stacey, were also angry and yelled at Lisa during the meeting. According to Terry, "[t]here [were] a lot of hard feelings expressed."

Lisa, who had been a board member for almost thirty years, testified she was justifiably angry during the board meeting because Wes, Jr. and the other board members refused to answer her questions about the Grandchildren's Trust and the company's financial affairs, voted against almost all her motions, voted over her objection to meet only once a year instead of four to five times a year, and they called her crazy. Lisa explained that she had to repeat herself at the meeting because the other board members refused to answer her questions. Lisa also testified that she brought Officer Stephens to the March 2013 board meeting because of the "hostility that [she] was feeling and experiencing from [her] brothers," as well as their "aggressive attitude and controlling behavior." According to Lisa, based on her brothers' threats and emails suggesting that her "fitness to serve" or lack thereof may result in her removal from the board, she was concerned they would have her "committed mentally and . . . removed from the board."

44

Four days after the Board of Managers' meeting, during which no further incidents or further interactions between Lisa and her siblings took place, Wes, Jr. filed an application to have Lisa involuntarily committed on the basis she was mentally ill and likely to cause serious harm to herself or others. In the affidavit Wes, Jr. filed in support of the Commitment Application, which was the sole basis on which Lisa was committed, Wes, Jr. averred that "Lisa [had] made threats and claims that myself, my accountant, my employees, brothers and sister had stolen millions of dollars from her." He also asserted that Lisa was not only "very repetitive and asks the same questions over and over," but she was also "very volatile and threatening toward[s] myself and others." He further averred that Lisa was "fixated on the fact that I somehow have taken all of her money" and she was making repeated calls to law enforcement.

Wes, Jr. also testified at trial that Lisa was causing problems for "SignAd"[25] during this time by harassing employees and contacting the company's accountants, bankers, insurance companies, and vendors without proper authority. According to Wes, Jr., Lisa contacted "SignAd's" insurance company, and she may have filed a claim on "SignAd's" behalf, even though she was not authorized to do so. He testified Lisa also contacted "SignAd's" bank which posed a problem for the

---

[25]  The company is referred to as "SignAd" in Wes, Jr.'s testimony and it is not clear if he is referring to SignAd GP, LLC, SignAd, Ltd., or all of the Limited Partnerships and General Partners, collectively.

company and harmed its relationship with the bank because, according to Wes, Jr., "I've spent . . . a long time establishing some stability with the bank to be able to borrow money and have a credit line with them." Wes, Jr. was concerned that Lisa's conduct would have a negative impact on "SignAd's" line of credit at the bank because her involvement suggested possible instability and insecurity within the company. Wes, Jr. also testified that Lisa had contacted the Texas Department of Transportation and "they warned us that she had contacted them; and we were able to, you know, explain to the best of our ability."

When asked which employees Lisa had been harassing and threatening, Wes, Jr. identified Terry Denman and Stacey Laycock. According to Wes, Jr., Lisa had sent Terry emails that were "somewhat insistent and threatening" before the March 2013 board meeting. She had also demanded that Terry show her copies of her stock certificates. Wes, Jr. admitted, however, that Lisa "can have the stock certificate any time she wants. It's how you go about requesting it." According to Wes, Jr., Lisa was "being a little bit abrasive" and unnecessarily "forceful" in her emails to Terry. Terry, however, testified that he "never thought of Lisa as being physically a threat." Lisa's emails to Terry were admitted into evidence.

Wes, Jr. also testified that Lisa had been calling Laycock with lists of leads Wes, Jr. considered useless. Wes, Jr. complained that Lisa was wasting the company's time because they "would have to dedicate time and effort and it cost the

46

company money to respond to" Lisa's requests. According to Wes, Jr., Laycock wanted to know how to respond to Lisa's suggestions. He acknowledged that Laycock never suggested she was scared or felt threatened by Lisa. Laycock testified she was unaware Wes, Jr. had identified Lisa's phone calls to her as one of the reasons he thought Lisa was threatening employees in March 2013. Laycock confirmed that Lisa never threatened her or made her fear for her physical safety.

Wes, Jr. testified that Lisa also "made it impossible to have an effective board meeting" and she was "definitely one of the reasons" why the board began meeting less often. He testified:

Q     Assuming [Lisa is] not going to change, do you ever see yourself getting along with Lisa as a member of the Board of Managers?

A     No.

. . .

Q     And so soon if you cannot vote Lisa off as a member of the Board of Managers and you cannot get along with her, how do you propose to get rid of her?

A     I don't know. I wish I had the answer to that.

Wes, Jr. denied, however, that his decision to initiate commitment proceedings against Lisa was "motivated at all by wanting to kick [Lisa] off the board or out of the company." According to Wes, Jr., he was "just concerned for my sister's welfare. I want my sister back. I'm tired of seeing her like this. You know, I'm tired of us having to deal with this."

47

Based on the evidence presented, the jury reasonably could have concluded that Wes, Jr. initiated the involuntary commitment proceedings against Lisa in March 2013 because he believed Lisa was a disruptive presence who posed a threat to the wellbeing of the company, and he needed to prove that Lisa was unfit to serve to remove her from the Board of Managers. Thus, the record contains some evidence supporting a finding that Wes, Jr. possessed a private motive to harm Lisa and therefore acted on something other than a reasonable and honest belief that Lisa was mentally ill and posed a substantial risk of imminent harm to herself or others unless she was immediately restrained. *See Tranum v. Broadway*, 283 S.W.3d 403, 415–16 (Tex. App.—Waco 2008, pet. denied) (holding there was some evidence defendant did not have probable cause to bring theft charges against former business partner, when defendant did not pursue criminal charges until after former business partner sued defendant for slander and there was evidence defendant had pursued theft charge against another prior business partner under similar circumstances); *cf. Kroger Texas Ltd.*, 216 S.W.3d at 795 (holding plaintiff did not rebut presumption of probable cause and noting that plaintiff did not introduce "evidence of, for example, prior bad relations . . . or any private motivation to harm her").

To the extent Wes, Jr. and others testified that Lisa was behaving abnormally, exhibiting signs of mental illness before her commitment, such as delusions, or behaving in a threatening manner, it was the jury's responsibility to resolve these

conflicts. *See City of Keller*, 168 S.W.3d at 819. As the sole judge of the witnesses' credibility and the weight to be given to their testimony, it was the jury's province to determine what the underlying facts were at the time Wes, Jr. initiated the commitment proceedings and whether the commitment was proper. *Id.* Based on the conflicting testimony, the jury reasonably could have credited Lisa's evidence over the evidence presented by Wes, Jr. *See id.* (stating jurors are sole judges of credibility of witnesses and weight to give their testimony).

Similarly, although Wes, Jr. averred in his Commitment Application affidavit that Lisa was "very volatile and threatening toward[s] myself and others," Wes, Jr. did not identify any specific threats of violence or anything else that would indicate Lisa posed a risk of substantial harm to herself or anyone else, much less that the risk of harm "is imminent unless [Lisa] is immediately restrained." TEX. HEALTH & SAFETY CODE § 573.011(b)(2)–(6). The fact that Wes, Jr. did not initiate commitment proceedings against Lisa until four days after the March 2013 board meeting further supports the jury's conclusion that Wes, Jr. did not have probable cause to believe Lisa posed a substantial risk of imminent harm to herself or others. *See City of Keller*, 168 S.W.3d at 819 (stating jury is sole judge of witnesses' credibility and weight to be given their testimony and is responsible for resolving any evidentiary conflicts).

Viewing the evidence and inferences in the light most favorable to the jury's finding, we conclude there is more than a scintilla of evidence supporting the jury's finding that Wes, Jr. lacked probable cause to initiate involuntary commitment proceedings against Lisa based on the facts and circumstances known to Wes, Jr. when he filed the Commitment Application on March 25, 2013. *See Kroger Texas Ltd.*, 216 S.W.3d at 793; *City of Keller*, 168 S.W.3d at 827.

To the extent Wes, Jr. attacks the jury's finding that he did not meet his burden to prove he acted with probable cause once Lisa rebutted the presumption of probable cause, this argument is also unavailing. A party attacking the legal sufficiency of an adverse finding on an issue on which the party had the burden of proof must demonstrate that the evidence conclusively establishes all vital facts in support of the issue. *Dow Chem. Co.*, 46 S.W.3d at 241. A matter is conclusively established only if reasonable people could not differ as to the conclusions to be drawn from the evidence. *See City of Keller*, 168 S.W.3d at 816.

Wes, Jr. argues that probable cause was established as a matter of law based on Dr. Jachmann's sworn certificate of medical examination where Dr. Jachmann stated Lisa was mentally ill and an imminent danger to herself and others when she was first committed. Wes, Jr.'s reliance on Dr. Jachmann's certificate is misplaced. The sworn certificate was executed after Wes, Jr. began the commitment proceedings against Lisa by filing the Commitment Application for emergency

50

detention. Because Dr. Jachmann's sworn certificate was not created until after Wes, Jr. initiated the commitment proceeding, it is "not material to [Wes, Jr.'s] beliefs and motives at the time the proceeding[] [was] instituted," and therefore, the sworn certificate does not establish the existence of probable cause as a matter of law. *See Akin*, 661 S.W.2d at 920 ("Just as his eventual adjudication as sane and his subsequent release was not evidence of a lack of probable cause, the initial determination of a lack of competency made shortly after his confinement was not evidence of probable cause."); *see also Pettit*, 509 S.W.3d at 549 (stating erroneous admission of subsequently discovered information was harmless because evidence is immaterial to defendant's state of mind for purposes of establishing probable cause in malicious prosecution case).

As previously discussed, there is also conflicting evidence regarding the facts and circumstances underlying Wes, Jr.'s decision to initiate involuntary commitment proceedings against Lisa. It was the jury's province to resolve these conflicts, assess the credibility of the witnesses, and determine how much weight, if any, to accord their testimony. *See City of Keller*, 168 S.W.3d at 819. Given the record before us, we cannot say that the evidence conclusively establishes the existence of probable cause. *See Hathaway*, 711 S.W.2d at 229 (stating element is not conclusively established when evidence is conflicting).

We overrule the Individual Appellants' first issue.

51

## B.      Exclusion of Evidence of Lisa's Mental Instability

The Individual and Company Appellants argue the trial court abused its discretion by excluding evidence of Lisa's past mental instability.

### 1.      Standard of Review and Applicable Law

A trial court's exclusion of evidence is reviewed for abuse of discretion. *JBS Carriers, Inc. v. Washington*, 564 S.W.3d 830, 836 (Tex. 2018). On appeal, the court must uphold the evidentiary ruling if there are any grounds to support it, even if those grounds were not asserted or cited in the trial court as the basis for the ruling. *K.J. v. USA Water Polo, Inc.*, 383 S.W.3d 593, 610 (Tex. App.—Houston [14th Dist.] 2012, pet. denied).

Relevant evidence is presumed to be admissible. TEX. R. EVID. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action." TEX. R. EVID. 401. Pursuant to Rule 403, relevant evidence may be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." TEX. R. EVID. 403.

Even if a trial court abuses its discretion by excluding evidence, the error is not reversible unless it "probably caused the rendition of an improper judgment." TEX. R. APP. P. 44.1(a)(1). In making this determination, we "evaluate the entire

case from voir dire to closing argument, considering the evidence, strengths and weaknesses of the case, and the verdict." *Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 236 (Tex. 2011); *see also State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009) (stating standard does not require complaining party "to prove that 'but for' the exclusion of evidence, a different judgment would necessarily have resulted"). "The role that the excluded evidence played in the context of the trial is important." *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. If the excluded evidence was crucial to a key issue, the error is likely harmful. *Id.* In other words, when assessing harm, we are required to assess whether the excluded evidence is controlling on a material issue in the case and would not have been cumulative of other evidence in the case. *See Manon v. Solis*, 142 S.W.3d 380, 393 (Tex. App.—Houston [14th Dist.] 2004, pet. denied) (citing *Tex. Dep't of Transp. v. Able*, 35 S.W.3d 608, 617 (Tex. 2000)).

### 2. Analysis—Individual Appellants

The Individual Appellants argue that the excluded evidence detailing Lisa's past mental instability was admissible to establish Wes, Jr.'s state of mind. They argue the evidence contextualized his observations and supported his reasonable belief that Lisa was mentally ill and posed a substantial risk of serious harm to herself or others when he initiated the involuntary commitment proceeding.

The Individual Appellants argue the trial court abused its discretion by excluding Wes, Jr.'s testimony that Lisa physically assaulted him with a desk drawer in 1992 after he discovered entries in her day planner indicating to him that she might be delusional, and he confronted her about his concerns. Wes, Jr. would have testified that, 21 years earlier, Lisa had noted in her calendar that she had lunch plans with President Reagan and dinner plans with the King of Spain.[26]

The trial court also excluded evidence that Lisa had been claiming for years that the mafia was harassing her. Wes, Jr. would have testified that Lisa told him and Stacey in the early to mid-1990s that the mafia was harassing her, and that Lisa had told Stacey in the 1980s that the mafia had bugged an apartment they shared in Tulsa, Oklahoma.[27] Wes, Jr. also would have testified that he had expressed his concerns to Lisa "[m]ultiple times over the last several years" over Lisa's "fixation with the Mafia." Stacey would have offered similar testimony about Lisa's concerns about the mafia.

---

[26]    Lisa disputes Wes, Jr.'s version of events and explains in her sur-reply that: "Wes Jr. probably read in Lisa's day planner that she had an appointment involving King of Prussia, which is a shopping mall in Philadelphia, Pennsylvania. Lisa owned a fashion design business called Diamondi, Inc. in the King of Prussia mall at that time. And Wes Jr. may have read in Lisa's day planner that Lisa, who was a member of the Republican National Committee Inner Circle at that time, planned to attend a political luncheon where a former U.S. President was scheduled to speak. Indeed, the Gilbreath family has been involved in Republican politics for many years. Wes Gilbreath, Sr. even ran for the U.S. Senate in 1988."

[27]    The trial court also excluded similar testimony from Stacey.

Brett would have testified at trial about text messages he and Lisa exchanged in May 2012 that made him concerned about Lisa's mental health. Lisa wrote to Brett

> I have had so many problems with the Mafia. I don't want them trying to take our company. Thus, I don't want an outsider coming in. Understand? They finally have quit bothering me for the most part, and I'm not referring to Lou. It has been a really tough battle.

Brett replied, "Don't share that with family." Brett also would have testified that based on this text exchange, he was worried Lisa was experiencing "a major setback of mental illness" and he "was just real concerned over her." According to Brett, he was aware Lisa had told other family members that she was being harassed by the mafia. "This had been a recurring thing over the years, and that's concerning to me." Brett also had other "personal experiences with Lisa that caused [him] a significant concern about her mental condition." Brett would have testified that, in 2012, he was worried Lisa "might not be able to pass the fitness test and she might be having a breakdown that could be more serious than some of the episodes she had before." "I was very worried about her being overstressed and that she could be having a breakdown."

The trial court also excluded testimony that a physician and family therapist believed Lisa was suffering from a mental illness in 2011. Specifically, the trial court excluded excerpts from John Horan's deposition, Lisa's ex-husband ("John"), in which he testified he had received telephone calls from two doctors who were

55

concerned because Lisa had taken Noelle, their daughter, to the emergency room several times over a two-week period, even though there was nothing apparently wrong with Noelle. John testified that one of the doctors told him she believed Lisa was suffering from Munchausen syndrome by proxy.

John mentioned the repeated emergency room visits when he and Lisa attended family counseling in 2011. The family therapist told John she did not think Lisa suffered from Munchausen by proxy. Rather, she believed Lisa suffered from Borderline Personality Disorder and/or Histrionic Personality Disorder and that Lisa's behavior "was part of histrionic, where Lisa was doing it to be the center of attention." Wes, Jr. would have testified that John told him about the family therapist's comments and he was concerned by them because he understood them "to be a medical diagnosis finding that Lisa suffered from a mental illness."

Brett and Stacey had also spoken to Lisa about these events, and they would have provided similar testimony regarding their concerns about Lisa's behavior. Brett would have testified that he became very concerned about Lisa and her daughter, Noelle, in 2011 after speaking with Lisa's then husband, John. At that time, Brett called Lisa about John's allegations

> My topic of concern was Lisa had taken Noelle to the hospital approximately ten times in a two-week period, and we were really concerned that nothing was wrong with Noelle and that Noelle might begin thinking something was wrong with her.

According to Brett, Lisa did not deny or try to explain John's allegations and her silence on the matter caused Brett further concern. Brett believed Lisa was behaving irrationally and he asked her to stop.

Wes, Jr. would also have testified that Lisa filed several criminal complaints against him after she was released from the HCPC, none of which were successful. She had also told a Houston Police Department officer in 2014 that she believed Wes, Jr. and her ex-husband, John, were trying to intimidate her by deliberately placing nails in her driveway. Lisa claimed that one of the tires on her car had been punctured by two nails and she found several similar nails in her driveway and there was no obvious explanation for them being in her driveway. She also suspected that Wes, Jr. and John had been trying to intimate Frank Shepard, a Gilbreath relative who had assisted Lisa with one of the criminal complaints she had initiated against Wes, Jr. for wrongful psychiatric commitment, because one of the tires on Frank's wife's car blew out while she was driving down the highway a week later.

There is no evidence that Stacey, John, or Brett—the three witnesses who would have testified about these events—told Wes, Jr. about the repeated medical visits or concerns that Lisa had Munchausen by Proxy Syndrome before he initiated the commitment proceedings against Lisa.[28] Brett testified that he never told anyone

---

[28] Notably, the record also reflects that Wes, Jr. did not believe Lisa posed a substantial risk of harm to Noelle when he filed the Commitment Application in March 2013.

57

about the 2012 text message or the two-week period in 2011. Because probable cause in a malicious prosecution claim is evaluated from the perspective of the person who initiated the proceeding at the time the proceeding commenced, information possessed by others, but unknown to Wes, Jr., is not relevant to determine whether Wes, Jr. acted with probable cause when he initiated the civil commitment proceeding against Lisa. *See generally Akin*, 661 S.W.2d at 921 ("It is proper for the trier of fact to consider all evidence which the prosecutor of the action knew or should have known relative to the condition of the plaintiff and upon which evidence the prosecutor based or should have based his action.").

Similarly, evidence of claims or statements Lisa made after the commitment proceeding is not relevant to determine whether Wes, Jr. had probable cause when he filed the Commitment Application in March 2013. *See* TEX. R. EVID. 401; *Akin*, 661 S.W.2d at 920 (stating that "it is the events prior to the institution of the proceedings which must be examined, and only those events, to determine if the defendants had probable cause to act," and that subsequent events "are not material to the beliefs and motives at the time the proceedings were instituted"); *see also Pettit*, 509 S.W.3d at 548–49 (stating subsequently discovered information is immaterial to defendant's state of mind for purposes of establishing probable cause).

Specifically, Wes, Jr. testified that it was not necessary for him to check on Noelle's welfare after Lisa was released from HCPC because he "never expected her to harm Noelle."

58

Evidence that Lisa physically assaulted Wes, Jr. on one occasion in 1992, after he told her he was worried she was mentally unstable is of little probative value with respect to whether, 21-years later in March 2013, Lisa posed a substantial and imminent risk of serious harm to Wes, Jr., or anyone else, unless she was immediately restrained. *See* TEX. HEALTH & SAFETY CODE § 573.011(b)(1)–(2), (4). The same is true with respect to the testimony about Lisa's behavior in the 1980's and 1990's.

While the excluded evidence could have provided additional detail regarding Wes, Jr.'s claims of Lisa's past mental instability, the exclusion of this evidence was not crucial with respect to whether Wes, Jr. had probable cause years or decades later in March 2013, to initiate commitment proceedings against Lisa. We further note that the record includes other evidence that, if the jury believed, could have supported Wes, Jr.'s argument that he had probable cause. For example, there is evidence Wes, Jr. and other family members had concerns about Lisa's mental health for decades, the symptoms of mental illness Lisa allegedly exhibited in the weeks leading up to the involuntary commitment proceeding, including her behavior during the March 21, 2013 board meeting, and Wes, Jr.'s past experiences with his mother and sister Sheree that informed his opinions about the state of Lisa's mental health and the threat she allegedly posed to herself or others as a result of her alleged mental illness. There is also evidence in the record that Lisa was diagnosed with a mental

59

illness in March 2013—the HCPC records reflect that Dr. Jachmann diagnosed Lisa with "Psychotic Disorder NOS" when she was admitted to the psychiatric facility.

Given the state of the entire record and the testimony about Lisa's siblings' past concerns about her mental health, and the comparisons they drew between their mother's conduct and Lisa's behavior during the weeks before she was involuntarily committed by Wes, Jr., we cannot say that the exclusion of additional evidence of Lisa's mental health, especially evidence from the 1980's and 1990's, "probably caused the rendition of an improper judgment" with respect to the malicious prosecution claim. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870; *see also* TEX. R. APP. P. 44.1(a)(1).

We overrule the Individual Appellants' second issue.

### 3.    Analysis—Company Appellants

In their sixth issue, the Company Appellants argue the trial court abused its discretion by excluding the same evidence because Lisa's mental capacity was directly relevant to whether her requests for books and records from the General Partners were made for a "proper purpose," and whether the Company Appellants' actions in requiring a confidentiality agreement, among other restrictions, before providing the requested records was "just and reasonable." As previously discussed, Lisa's siblings testified that she had a long history of mental instability, and that her mental health declined dramatically after their father died in January 2013. They

also drew comparisons between their mother's conduct when she was not taking her psychiatric medication and Lisa's behavior during the weeks before she was involuntarily committed.

Therefore, even if the trial court erred by excluding additional evidence about Lisa's mental health, as the Company Appellants argue, the exclusion of this evidence was harmless considering the wealth of similar testimony addressing the same issue. *See Manon*, 142 S.W.3d at 393 (citing *Able*, 35 S.W.3d at 617); *see also* TEX. R. APP. P. 44.1(a)(1).

We overrule the Company Appellants' sixth issue.

## C.    Actual and Exemplary Damages for Malicious Prosecution

The Individual Appellants argue that the actual and exemplary damage awards for malicious prosecution should be eliminated or remitted[29] because the awards against Wes, Jr., Lee, and Stacey are excessive and there is insufficient evidence of malice with respect to Lee and Stacey. (Jury Questions 4 to 7).

### 1.    Amount of Actual Damages

The Individual Appellants challenge the award of actual damages for Lisa's malicious prosecution claim in a mere two paragraphs. They argue

---

[29]    The remedy for an excessive verdict is to order a remittitur, and remittitur is only available should we conclude a damage award rests on factually insufficient evidence. *Torrington Co. v. Stutzman*, 46 S.W.3d 829, 851 (Tex. 2000). Neither Lisa nor the Individual Appellants suggest an amount of remittitur, should this Court determine that remittitur is appropriate.

61

When "it is evident that the jury's award is the result of passion, prejudice or other improper motive, or is so excessive as to shock an appellate court's sense of justice, . . . the verdict should be overturned." *Dayton Hudson Corp. v. Altus*, 715 S.W.2d 670, 674 (Tex. App.— Houston [1st Dist.] 1986, writ ref'd n.r.e.).

Here, the legislature has established a maximum recovery of mental-anguish damages in a health-care case at $500,000. TEX. CIV. PRAC. & REM. CODE § 74.301(c). Lisa proved no economic loss at all. So, the jury's award is identical to the maximum someone could recover in a medical-malpractice case for the death of a child, lacking economic losses. To say her one-day commitment deserves to be compensated at that level insults all the Texas plaintiffs suffering truly egregious and irreplaceable losses. The $500,000 mental-anguish award should be vacated, or, alternatively, should be remitted to a small fraction of the current amount.

Lisa argues that the Individual Appellants have waived this argument based on inadequate briefing. The Individual Appellants respond that:

> . . . it is difficult to cite to evidence about damages when the evidence does not exist in the record. While no one would be happy with a one-day commitment, no one should expect $500,000 in actual damages for it, especially when—according to the records of the admitting and discharging physicians—it helped. The discharging doctor noted that, following commitment, Lisa was "very much improved. RR6:92, RR25C:934. The award is patently excessive and represents a jury motivated by passion, most likely due to the erroneous exclusion of the relevant evidence about probable cause.

This is the sum of the Individual Appellants' argument on this issue. They do not identify the standard of review, cite to the record, or offer any meaningful analysis of the issue. While the Individual Appellants arguably have waived their issue, we nonetheless address the merits of the argument as presented by the Individual Appellants.

### (a) Standard of Review and Applicable Law

A claim that an award of actual damages is excessive is a factual-sufficiency complaint. *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 406 (Tex. 1998). When conducting a factual sufficiency review, we consider and weigh all the evidence in a neutral light and will set aside the finding only if it is "so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust." *Id.* at 407. The jury is the sole judge of the witnesses' credibility, and a reviewing court may not impose its own opinion to the contrary. *See id.* When presented with conflicting testimony, the fact finder may believe one witness and disbelieve others, and it may resolve inconsistencies in the testimony of any witness. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *see also Mar. Overseas Corp.*, 971 S.W.2d at 407 (stating "the court of appeals may not pass upon the witnesses' credibility or substitute its judgment for that of the jury, even if the evidence would clearly support a different result"). "Only in those cases where it is evident that the [jury's] award for damages is the result of passion, prejudice, or other improper motive or [is] so excessive as to shock" an appellate court's sense of justice will the jury's verdict be overturned. *Moore's, Inc. v. Garcia*, 604 S.W.2d 261, 266 (Tex. App.—Corpus Christi 1980, writ ref'd n.r.e.).

"There is no certain measure of damages for the varying degrees of harm incurred by a person who has been maliciously prosecuted or falsely imprisoned."

63

*Dayton Hudson Corp. v. Altus*, 715 S.W.2d 670, 674 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.). "The measure of damages usually rests in the composite judgment and conscience of the jury." *Id.* Mental anguish is a "relatively high degree of mental pain and distress" that is "more than mere disappointment, anger, resentment or embarrassment, although it may include all of these." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995) (quoting *Trevino v. Sw. Bell Tel. Co.*, 582 S.W.2d 582, 584 (Tex. Civ. App.—Corpus Christi 1979, no writ)). "Even when an occurrence is of the type for which mental anguish damages are recoverable, evidence of the nature, duration, and severity of the mental anguish is required." *Serv. Corp. Int'l*, 348 S.W.3d at 231.

"The process of awarding damages for amorphous, discretionary injuries such as mental anguish or pain and suffering is inherently difficult because the alleged injury is a subjective, unliquidated, nonpecuniary loss." *Figueroa v. Davis*, 318 S.W.3d 53, 62 (Tex. App.—Houston [1st Dist.] 2010, no pet.) (quoting *HCRA of Tex., Inc. v. Johnston*, 178 S.W.3d 861, 871 (Tex. App.—Fort Worth 2005, no pet.)). "Once the existence of some pain, mental anguish and disfigurement has been established, there is no objective way to measure the adequacy of the amount awarded as compensation, which is generally left to the discretion of the fact finder." *Figueroa*, 318 S.W.3d at 62 (quoting *Pentes Design, Inc. v. Perez*, 840 S.W.2d 75, 80 (Tex. App.—Corpus Christi 1992, writ denied)). The fact finder's discretion in

this regard is necessary, in part, because "[i]ndividuals experience mental anguish in myriad ways, so each case is unique." *Anderson v. Durant*, 550 S.W.3d 605, 619 (Tex. 2018).

### (b)  Analysis

The jury found that Lisa sustained $500,000 in past mental anguish damages based on her malicious prosecution claim, and the judgment awards that amount against Wes, Jr., Lee, and Stacey, jointly and severally. The Individual Appellants do not challenge the sufficiency of the evidence supporting the jury's award of damages against Wes, Jr. based on Lisa's past mental anguish. They only challenge the excessiveness of the award.

The Individual Appellants argue that the award of $500,000 for past mental anguish based on "a one-day commitment" is "patently excessive" and "represents a jury motivated by passion, most likely due to the erroneous exclusion of the relevant evidence about probable cause."[30] *See Dayton Hudson Corp.*, 715 S.W.2d at 674 (stating that when "it is evident that the jury's award is the result of passion, prejudice or other improper motive, or is so excessive as to shock an appellate court's sense of justice, . . . the verdict should be overturned"). They also argue that the verdict's size alone establishes prejudice and passion, especially when compared to

---

[30]  As previously discussed, we hold the trial court did not abuse its discretion by excluding the additional evidence of Lisa's alleged mental instability.

medical malpractice cases involving the death of a child because Chapter 74 of the Civil Practice and Remedies Code caps the recovery of non-economic damages in such cases at $500,000.

We have already held that the trial court did not abuse its discretion by excluding the evidence to which the Individual Appellants refer. And as it concerns the damages cap under Chapter 74, the cap reflects a legislative public policy decision, not a jury's evaluation of an amount that "would fairly and reasonably compensate" someone for their injury. *See Saenz v. Fid. Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996) (requiring evidence that amount of mental anguish damages awarded to be fair and reasonable compensation). This is particularly significant given that "[i]ndividuals experience mental anguish in myriad ways, so each case is unique." *Anderson*, 550 S.W.3d at 619.

The Individual Appellants also argue that "[w]hile no one would be happy with a one-day commitment, no one should expect $500,000 in actual damages for it, especially when—according to the records of the admitting and discharging physicians—it helped." They argue the HCPC's multidisciplinary discharge document noted that following commitment, Lisa was "very much improved." The same document, however, also indicates that Lisa was "Normal, not ill at all" when she was discharged, there had been "[n]o change" in her condition since she was

66

admitted the day before, and that she had been admitted for a "family dispute possibly [in]appropriately."

Lisa also presented evidence that without any prior notice or knowledge of the filed Commitment Application, she was removed from her home by law enforcement officers and taken in the back of a patrol car to a psychiatric facility where she was involuntarily confined for twenty-four hours. Lisa did not have an opportunity to contest Wes, Jr.'s affidavit and Commitment Application. At the HCPC, Lisa was subjected to invasive physical and mental examinations, and surrounded by what she perceived were dangerous people, including a delusional roommate who repeatedly threatened to kill her, and a deranged man who ran around the common area, screaming in a frightening manner. In addition to being in constant fear that she would be assaulted or killed by another patient while she was at the HCPC, Lisa testified she had no privacy, she was constantly monitored, and she was questioned repeatedly by medical staff. Lisa also knew that her mother had been confined for weeks at a time and sent to the state psychiatric hospital when Wes, Jr. had her involuntarily committed and Lisa feared the same would happen to her. She testified she was terrified of losing her independence and being separated from her daughter, Noelle.

Lisa also testified about her emotional state while she was in the HCPC: "I really felt like, you know, my life . . . was going to change and they were going to

throw me in the State hospital at Rusk or something like they had done to my mother; and it was very scary. And I have this wonderful daughter who is my whole world. And it's like they plotted this whole thing just because of money." Lisa further testified she "was heartbroken [and] physically ill from the betrayal of [her] own siblings" after "dealing with things like" her father's death and the attempted commitment. She explained she did not seek counseling because she was afraid her siblings would use that information against her in their effort to prove she had a mental illness. Lisa testified she was still scared because Wes, Jr. was still trying to obtain a guardianship over her because his attempt to have her committed was unsuccessful.

The jury had the benefit of observing Lisa as she testified about her experience and could assess her emotional demeanor; this afforded some insight into the severity of the mental anguish Lisa suffered in the past as a result of the jury's finding that she had been maliciously prosecuted by her brother and business partner. *See Plasencia v. Burton*, 440 S.W.3d 139, 149 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (holding there was factually sufficient evidence supporting award of mental anguish damages based on witness testimony and noting fact finder had opportunity to observe witness testifying and "assess his emotional demeanor" and this gave fact finder "some insight into the mental anguish" witness had suffered). As we held, there is sufficient evidence supporting the jury's finding that Lisa's

brother, Wes, Jr., lacked probable cause to initiate commitment proceedings against her.

Although Lisa's daughter, Noelle, testified that Lisa was "normal" after her release from the HCPC, it was the jury's responsibility to resolve any conflicts in the evidence and to pass on the weight or credibility of the witnesses' testimony. *See Dayton Hudson Corp.*, 715 S.W.2d at 674 (stating "it is not the prerogative of the appellate court to substitute its own judgment for that of the jury, even if that court might have awarded a lesser sum as a fact finder"). We note that the Individual Appellants have not identified any specific evidence of jury prejudice or bias, only speculation.

Considering Lisa's testimony regarding the conditions of her confinement and the impact that her brother Wes, Jr.'s decision to have her involuntarily committed to a psychiatric facility had on her, we cannot conclude it is evident the jury's award was the result of passion, prejudice or other improper motive or is so excessive as to shock the conscience of the court. *See id.* (overruling defendant's claim that damage award for malicious prosecution was excessive and finding that although damages awarded were larger than usual awards in false imprisonment and malicious prosecution suits, there was sufficient evidence to support jury's findings and court's judgment).

After considering and weighing all the evidence in a neutral light, we cannot say that the evidence supporting the jury's award of past mental anguish damages is so weak or so contrary to the overwhelming weight of all the evidence as to make the award excessive. *See Mar. Overseas Corp.*, 971 S.W.2d at 406.

We overrule the Individual Appellants' factual sufficiency challenge to the award of past mental anguish damages based on Lisa's malicious prosecution claim.

### 2. Actual Damages Against Lee and Stacey

In one sentence at the end of the section of their brief challenging the sufficiency of the evidence supporting the jury's finding that Lee and Stacey acted with malice for purposes of awarding exemplary damages, the Individual Appellants add the following conclusory sentence concerning actual damages: "And, because malice is required for actual damages, too, that award also should be eliminated. *See Kroger Texas Ltd. P'ship v. Suberu*, 216 S.W.3d 788, 792 (Tex. 2006)."

Texas Rule of Appellate Procedure 38.1(i) requires an appellant's brief to contain a clear and concise argument with appropriate citations to authorities and the record. *See* TEX. R. APP. P. 38.1(i). The failure to provide a substantive and meaningful analysis applying the law to the facts waives a complaint on appeal. *See Encinas v. Jackson*, 553 S.W.3d 723, 728 (Tex. App.—El Paso 2018, no pet.) (holding appellant waived argument by "provid[ing] no citation to authority, nor appl[ying] applicable law to the facts of the case in support of her second issue");

*Marin Real Estate Partners, L.P. v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.) ("A failure to provide substantive analysis of an issue waives the complaint."); *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("[P]arties asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law supports their contentions."). "An appellate court has no duty—or even right— to perform an independent review of the record and applicable law to determine whether there was error." *Valadez v. Avitia*, 238 S.W.3d 843, 845 (Tex. App.—El Paso 2007, no pet.). "Were we to do so, . . . we would be abandoning our role as neutral adjudicators and become an advocate for that party." *Id.*

Although the Individual Appellants provide record citations in the preceding paragraphs discussing malice with respect to exemplary damages and a lone legal citation citing the elements of a malicious prosecution claim, there is no meaningful analysis with respect to the sufficiency of the evidence supporting the award of actual damages against Lee and Stacey based on Lisa's malicious prosecution claim. Their arguments and analysis with respect to exemplary damages are inapplicable because, as the Individual Appellants fail to acknowledge, the "malice" element for a malicious prosecution claim is not the same as a predicate finding of "malice" to establish liability for exemplary damages.

Malice, for purposes of a malicious prosecution claim, is defined as "ill will, evil motive, gross indifference, or reckless disregard of the rights of others." *Hernandez v. Mendoza*, 406 S.W.3d 351, 357 (Tex. App.—El Paso 2013, no pet.); *French v. French*, 385 S.W.3d 61, 69 (Tex. App.—Waco 2012, pet. denied). For purposes of exemplary damages, however, "malice" is defined as "a specific intent by the defendant to cause substantial injury or harm to the claimant." *See* TEX. CIV. PRAC. & REM. CODE § 41.001(7). Although a plaintiff must present clear and convincing proof of malice to recover exemplary damages, the standard of proof for a malicious prosecution claim is the preponderance of the evidence. *See Ellis Cnty. State Bank v. Keever*, 888 S.W.2d 790, 793 (Tex. 1994) (holding malicious prosecution claim must be proven by preponderance of evidence); *Soon Phat, L.P. v. Alvarado*, 396 S.W.3d 78, 109 (Tex. App—Houston [14th Dist.] 2013, pet. denied) (holding exemplary damages must be proven by clear and convincing evidence). Thus, to the extent the Individual Appellants attempt to challenge the awards of actual damages for malicious prosecution against Lee and Stacey on the basis that there is no evidence Lee and Stacey acted with malice, that argument is waived. *See* TEX. R. APP. P. 38.1(i).

We note that even if waiver were not an issue, the Individual Appellants would not prevail on this issue. The jury found Wes, Jr. maliciously prosecuted Lisa and that Wes, Jr., Lee, and Stacey conspired to maliciously prosecute Lisa. Once a civil

conspiracy is established, each conspirator is responsible for all acts done by any of the conspirators in furtherance of the conspiracy. *Greenberg Traurig of N.Y., P.C. v. Moody*, 161 S.W.3d 56, 90 (Tex. App.—Houston [14th Dist.] 2004, no pet.) (citing *Akin*, 661 S.W.2d at 921). A finding of civil conspiracy further imposes joint and several liability on all conspirators for actual damages resulting from acts in furtherance of the conspiracy. *Carroll v. Timmers Chevrolet, Inc.*, 592 S.W.2d 922, 925 (Tex. 1979). "[C]ivil conspiracy 'came to be used to extend liability in tort . . . beyond the active wrongdoer to those who have merely planned, assisted, or encouraged his acts.'" *Helping Hands Home Care, Inc. v. Home Health of Tarrant Cnty., Inc.*, 393 S.W.3d 492, 506 (Tex. App.—Dallas 2013, pet. denied) (quoting *Carroll*, 592 S.W.2d at 925–26)).

As previously discussed, there is legally sufficient evidence supporting the jury's finding that Wes, Jr. maliciously prosecuted Lisa and the Individual Appellants are not challenging the jury's conspiracy findings. Because the jury found Lee and Stacey conspired with Wes, Jr. to maliciously prosecute Lisa, Lee and Stacey are jointly and severally liable for actual damages resulting from acts in furtherance of the conspiracy. *See Helping Hands*, 393 S.W.3d at 511 (stating "the effect of the unchallenged conspiracy finding is to make Delzell and Grice responsible for any unlawful act committed by Delzell, Duckworth, or Grice").

We overrule the Individual Appellants' challenge to the awards of actual damages against Lee and Stacey based on insufficiency of the evidence.

### 3.     Exemplary Damages Awards Against Lee and Stacey

The jury found that Lisa should recover $875,000 in exemplary damages from Wes, Jr. (reduced to $500,000 in the Amended Final Judgment), $500,000 from Lee, and $500,000 from Stacey for her malicious prosecution claim. The Individual Appellants argue (1) there is legally insufficient evidence that Lee and Stacey acted with malice, and thus the award of exemplary damages against Lee and Stacey must be reversed, and (2) the awards of exemplary damages against Wes, Jr., Lee, and Stacey are excessive.[31]

### (a)     Evidence of Malice

For an exemplary damage award, "we conduct a legal sufficiency review under the 'clear and convincing' evidence standard." *Soon Phat, L.P.*, 396 S.W.3d at 109. We examine all evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. *Id.* We assume the fact finder resolved any disputed facts in favor of its finding if a reasonable fact finder could have done so and we disregard all evidence that a reasonable fact finder could have disbelieved.

---

[31]     The Individual Appellants do not challenge the jury's finding that Wes, Jr. acted with malice when he initiated the involuntary commitment proceeding against Lisa (Jury Questions 1 and 4).

74

*Diamond Shamrock Ref. Co., L.P. v. Hall*, 168 S.W.3d 164, 170 (Tex. 2005) (citing

*In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)); *see also Jang Won Cho v. Kun Sik*

*Kim*, 572 S.W.3d 783, 809 (Tex. App.—Houston [14th Dist.] 2019, no pet.).

Exemplary damages may be awarded "only if the claimant proves by clear

and convincing evidence that the harm with respect to which the claimant seeks

recovery of exemplary damages results from: (1) fraud; (2) malice; or (3) gross

negligence." TEX. CIV. PRAC. & REM. CODE § 41.003(a). "'Malice' means a specific

intent by the defendant to cause substantial injury or harm to the claimant." *Id.*

§ 41.001(7). "'Clear and convincing' means the measure or degree of proof that will

produce in the mind of the trier of fact a firm belief or conviction as to the truth of

the allegations sought to be established." *Id.* § 41.001(2). "Specific intent means

that the actor desires to cause the consequences of his act or that he believes the

consequences are substantially certain to result from it." *Tri-County Elec. Coop.,*

*Inc. v. GTE Sw. Inc.*, 490 S.W.3d 530, 556 (Tex. App.—Fort Worth 2016, no pet.)

(citing *Reed Tool Co. v. Copelin*, 689 S.W.2d 404, 406 (Tex. 1985)).

Lisa argues there is sufficient evidence supporting the jury's findings that Lee

and Stacey acted with malice because they accused her of being mentally ill at the

March 2013 board meeting even though she was not ill, and they "fanned her anger

and alarm about the Grandchildren's Trust by refusing to answer questions, refusing

to provide books and records (even in response to written demands from her attorney), and making threats to remove her from the board."

During the March 2013 meeting, there were several angry outbursts requiring several breaks, including at least one when Wes, Jr. accused Lisa of being mentally ill. Lisa testified, "Stacey, who was sitting next to me, stood up and started screaming at me over my head, like that she hates me and just totally irate screaming at me." When the meeting resumed, Wes, Jr., Lee, and Stacey all voted (over Lisa's dissent) to reduce the number of board meetings from six to one meeting per year. Lisa testified that her siblings dramatically reduced the number of meetings because they did not want to keep her informed about SignAd Outdoor's financial affairs and they wanted to push her out of the family business. Wes, Jr., Lee, and Stacey, in their capacity as SignAd GP, LLC's managers, also voted to appoint Stacey to fill Brett's former position on SignAd GP, LLC's Executive Committee and serve on the committee along with Wes, Jr. and Lee. Lisa contends that by doing so, Wes, Jr., Lee, and Stacey effectively reestablished the defunct committee which had not met since Brett resigned in 2011, and as a result of Stacey's appointment, Lisa was the only board member excluded from the committee.

After the highly contentious board meeting, Lee and Stacey conferred with Wes, Jr. about Lisa and, four days later, Wes, Jr. filed the Commitment Application with Lee's and Stacey's approval. Prior to initiating the commitment proceeding,

76

both Lee and Wes, Jr. had threatened to have Lisa declared "unfit" to serve and removed from the Board of Managers. Lisa argues her siblings' actions in having her committed were in retaliation "for questioning their actions and making request for books and records, and an intentional effort to silence and intimidate Lisa and remove her from the board of managers."

While there was evidence Wes, Jr., Lee, and Stacey were concerned about Lisa's disruptive behavior, they could not identify any potential imminent danger justifying the need for emergency involuntary commitment. Indeed, Wes, Jr. waited four days after the March 2013 board meeting before filing the Commitment Application. Similarly, although Lee and Stacey testified that they had concerns about Lisa's mental health after their father died, the record also reflects that neither Lee nor Stacey reached out to Lisa or otherwise acted on their concerns before they agreed to have Lisa involuntarily committed and confined to a mental health facility.[32] Lisa testified that after she was released, none of her siblings called her to see how she was doing or how the process had gone.

Lisa testified that although she and Lee had a good relationship, their relationship soured after she accused him of stealing from the Grandchildren's Trust and demanded that he resign as trustee in February 2013. Lee was noticeably upset

---

[32] Wes, Jr. testified that Lee agreed with him that Lisa needed to be involuntarily committed. Lee testified that he agreed with Wes, Jr. and Stacey that "something needed to be done" with regard to Lisa.

by Lisa's allegations that he and the other trustees had breached their fiduciary obligations to the Grandchildren's Trust. Lee told Lisa that she had no basis for her allegations, he questioned her motives for making the allegations, and he demanded an apology. Lee also told Lisa that "[f]urther actions along this line and others you showed at the board meetings may result in evaluating your fitness to serve in your various capacities—your lifetime appointment can be voided if it is determined that you are not 'able to serve.'" Lisa testified that she understood Lee was threatening to have her removed from the board.

Based on the record before us, we conclude that a reasonable jury could have disregarded Lee's and Stacey's testimony that they were only trying to help Lisa when they agreed to have her involuntarily committed and resolved any disputed facts in favor of its findings that Lee and Stacey acted with malice. *See Jang Won Cho*, 572 S.W.3d at 810–11. Reviewing all the evidence in the light most favorable to the jury's findings, disregarding evidence the jury could have disregarded, and deferring to the jury's resolution of disputed facts, we conclude that a reasonable trier of fact could have formed a firm belief or conviction that Lee and Stacey acted with malice. *See Soon Phat, L.P.*, 396 S.W.3d at 109; *Jang Won Cho*, 572 S.W.3d at 810–11. We thus hold that the jury's findings of malice with respect to Lee and Stacey are supported by legally sufficient evidence and we overrule the Individual Appellants' challenge to the exemplary damage awards against Lee and Stacey.

78

**(b)     Excessiveness of the Exemplary Damage Awards**

The Individual Appellants challenge the award of exemplary damages against Wes, Jr., Lee, and Stacey for Lisa's malicious prosecution claim in a mere two paragraphs. They assert that:

> [w]hen reviewing a finding of exemplary damages, courts should consider three guideposts:
>
>> (1) the degree of reprehensibility of the misconduct; (2) the disparity between the exemplary-damages award and the actual harm suffered by the plaintiff or the harm likely to result; and (3) the difference between the exemplary damages awarded and the civil or criminal penalties that could be imposed for comparable conduct.
>
> *Bennett v. Grant*, 525 S.W.3d 642, 650 (Tex. 2017). Here, given the substantial evidence—admitted and improperly excluded—that Lisa's commitment was justified, the family member's actions to have her committed were not highly reprehensible. There was a considerable disparity between the exemplary damages of $1.5 million and the actual harm proved from the one-night commitment. And there was no evidence or argument advanced regarding comparable civil or criminal penalties.
>
> Given the paucity of proof of malice, the identical awards of $500,000 each against Wes, Lee, and Stacey are excessive. Further, if the award of actual damages is vacated or substantially reduced, the punitive damages should disappear or be reduced, too.

The Individual Appellants do not identify the appropriate standard of review, state whether they are challenging the legal or factual sufficiency of the evidence or provide any record citations.

Although the Individual Appellants cite to *Bennett v. Grant*, 525 S.W.3d 642 (Tex. 2017) ("*Bennett II*") and identify the three guideposts courts consider when evaluating the excessiveness of an exemplary damage award, this is only part of the analysis. Although courts consider several non-exclusive factors when evaluating the first guidepost—the degree of reprehensibility of a defendant's misconduct—the Individual Appellants do not reference these factors or make any attempt to apply them in this case. *See Bennett II*, 525 S.W.3d at 650. Nor do they brief the issue separately with respect to Wes, Jr., Lee, and Stacey. *See* TEX. CIV. PRAC. & REM. CODE § 41.006 (requiring awards of exemplary damages to be specific as to each defendant in cases with multiple defendants); *Horizon Health Corp. v. Acadia Healthcare Co., Inc.*, 520 S.W.3d 848, 879 (Tex. 2017) (holding "determining the basis for a constitutionally permissible amount of exemplary damages, courts must consider the harm each defendant actually caused and assess the punishment based on that harm because this approach most closely matches the punishment to each defendant's misconduct"). The closest the Individual Appellants come to doing so is when they state that "[g]iven the paucity of proof of malice, the identical awards of $500,000 each against Wes, Lee, and Stacey are excessive."

Although the Individual Appellants arguably waived their complaint due to inadequate briefing, we reach the merits of the argument as presented. *See* TEX. R.

80

APP. P. 38.1(i) (requiring appellant's brief to contain clear and concise argument with appropriate citations to authorities and record).

### (i) Standard of Review and Applicable Law

The exemplary damage awards against Wes, Jr., Lee, and Stacey were premised on findings of malice. The jury charge defined malice as "a specific intent . . . to cause substantial injury or harm" to Lisa. The jury was asked, "Do you find by clear and convincing evidence that the harm to Lisa Horan resulted from malice with respect to the individuals below?" The jury answered "Yes" separately for Wes, Jr., Lee, and Stacey. Based on these findings, the jury was asked to determine the amount of exemplary damages to be assessed separately against Wes, Jr., Stacey, and Lee. The jury awarded Lisa $500,000 in exemplary damages separately against Lee and Stacey, and $875,000 in exemplary damages against Wes, Jr. *See* TEX. CIV. PRAC. & REM. CODE § 41.006 (requiring awards of exemplary damages to be specific as to each defendant in cases with multiple defendants). The trial court reduced the amount of the award against Wes, Jr. to $500,000 to comply with the applicable statutory cap under Section 41.008(b) of the Texas Civil Practice and Remedies Code.[33] *See id.* § 41.008(b).

Because *Bennet II* is the only authority the Individual Appellants rely on in this section of their opening brief, we will liberally construe their argument as a

---

[33] Lisa is not challenging the reduced award.

challenge to the constitutionality of the exemplary damage awards. *See Bennett II*, 525 S.W.3d at 650 (analyzing whether exemplary damage award is unconstitutionally excessive).

Appellate courts consider three guideposts when reviewing the constitutionality of an exemplary damage award: (1) the degree of reprehensibility of the misconduct, (2) the disparity between the exemplary damage awarded and the actual harm suffered by the plaintiff or the harm likely to result, and (3) the difference between the exemplary damages awarded and the civil or criminal penalties that could be imposed for comparable conduct. *Id.* (citing *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003)). Whether an exemplary damage award is unconstitutionally excessive is a question of law that we review de novo. *See Bennett II*, 525 S.W.3d at 650 (citing *Bunton v. Bentley*, 153 S.W.3d 50, 54 (Tex. 2004)).

The first guidepost—the degree of reprehensibility of a defendant's misconduct—is the most important of these factors. *Horizon Health Corp.*, 520 S.W.3d at 875 (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)); *see generally Bennett v. Reynolds*, 315 S.W.3d 867, 874 (Tex. 2010) (*Bennett I*) (quoting *State Farm*, 538 U.S. at 419) (stating exemplary damages are permitted if wrongdoing "is so reprehensible as to warrant the imposition of further sanctions to achieve punishment or deterrence"). Courts consider several non-exclusive factors

when evaluating the degree of reprehensibility of a defendant's misconduct including whether (1) the harm inflicted was physical rather than economic, (2) the tortious conduct showed an indifference to or reckless disregard for the health or safety of others, (3) the target of the conduct had financial vulnerability, (4) the conduct involved repeated actions, and (5) the harm resulted from intentional malice, trickery, or deceit. *See Bennett II*, 525 S.W.3d at 650.

The Individual Appellants do not reference these factors or make any attempt to apply them in this case, and we will not abandon our role as a neutral adjudicator and make the argument for them. *See Valadez*, 238 S.W.3d at 845. Instead, we will analyze the issue as briefed. We will, however, separately evaluate the excessiveness of the awards against Wes, Jr., Lee, and Stacey, as required. *See* TEX. CIV. PRAC. & REM. CODE § 41.006 (requiring awards of exemplary damages to be specific as to each defendant); *Horizon Health Corp.*, 520 S.W.3d at 874 ("Constitutional rights are personal in nature, and, therefore, inquiries into the constitutional excessiveness of an exemplary damages award must be defendant-specific.") (citing *Gore*, 517 U.S. at 574).

### (ii) Wes, Jr.

For the first guidepost—the degree of reprehensibility of the misconduct—the Individual Appellants argue: "[G]iven the substantial evidence—admitted and improperly excluded—that Lisa's commitment was justified, the family member's

83

actions to have her committed were not highly reprehensible." As previously discussed, there is sufficient evidence supporting the jury's finding that Wes, Jr. did not have probable cause to initiate civil commitment proceedings against Lisa, and, therefore, Lisa's detention was unjustified. Thus, the first guidepost, as briefed, weighs against a finding that the award of $500,000 in exemplary damages against Wes, Jr. is unconstitutionally excessive. *See Bennett II*, 525 S.W.3d at 650.

With respect to the second guidepost—the disparity between the exemplary damage award and the actual harm suffered by the plaintiff or the harm likely to result—the Individual Appellants argue: "There was a considerable disparity between the exemplary damages of $1.5 million and the actual harm proved from the one-night commitment." The $1.5 million in exemplary damages cited by the Individual Appellants, however, is the total amount of exemplary damages awarded to Lisa in the Amended Final Judgment for all three defendants: Wes, Jr., Lee, and Stacey. The amount of actual damages awarded against Wes, Jr., Stacey, and Lee, jointly and severally ($500,000) is equal to the amount of exemplary damages the trial court awarded against Wes, Jr. individually ($500,000).[34] As we already held, the jury's award of $500,000 in actual damages for the mental anguish Lisa

---

[34] Although Lisa asked for $500,000 in exemplary damages against Wes, Jr., the jury awarded her $875,000. The trial court reduced the amount to $500,000 in compliance with the statutory cap under Section 41.008(b) of the Texas Civil Practice and Remedies Code. TEX. CIV. PRAC. & REM. CODE § 41.008(b).

84

experienced based on her wrongful involuntary commitment is supported by sufficient evidence. Thus, this factor also weighs against a finding that the award of $500,000 in exemplary damages against Wes, Jr. is unconstitutionally excessive. *See Bennett II*, 525 S.W.3d at 650.

The third guidepost identified by *Bennett II* is "the difference between the exemplary damages awarded and the civil or criminal penalties that could be imposed for comparable conduct." *See id.* In their limited analysis of this issue, the Individual Appellants note that "there was no evidence or argument advanced regarding comparable civil or criminal penalties." The absence of evidence on this issue does not weigh in favor of or against a finding that the award of $500,000 in exemplary damages is unconstitutionally excessive. *See id.*

As briefed, two of the three *Bennett II* guideposts weigh against a finding that the award of $500,000 in exemplary damages against Wes, Jr. is unconstitutionally excessive, and the third factor is neutral. *See id.* We overrule the Individual Appellants' challenges to the excessiveness of the exemplary damages award against Wes, Jr. *See id.*

### (iii) Lee

For the first guidepost—the degree of reprehensibility of the misconduct—the Individual Appellants argue: "[G]iven the substantial evidence—admitted and improperly excluded—that Lisa's commitment was justified, the family member's

actions to have her committed were not highly reprehensible." As previously discussed, there is sufficient evidence supporting the jury's findings that Wes, Jr. did not have probable cause to initiate civil commitment proceedings against Lisa and that Lee acted with malice when he conspired with Wes, Jr. and Stacey to have Lisa involuntarily committed to a mental health facility. This finding, which is supported by the evidence, demonstrates that Lee's decision to have Lisa involuntarily committed in collaboration with Wes, Jr. and Stacey was not "justified." The Individual Appellants further contend, "Given the paucity of proof of malice, the identical awards of $500,000 each against Wes, Lee, and Stacey are excessive." The Individual Appellants appear to suggest the award of $500,000 in exemplary damages against Lee is excessive because it is the same amount awarded against Wes, Jr.[35] The jury, however, apparently agreed that Wes, Jr.'s conduct was more egregious because it awarded Lisa $875,000 in exemplary damages against Wes, Jr. and only $500,000 in exemplary damages against Lee. The jury's $875,000 award against Wes, Jr. exceeded the statutory cap, and thus the trial court reduced it to $500,000. We thus conclude that the first guidepost, as briefed, weighs against a

---

[35] In the section of the Individual Appellants' brief challenging the sufficiency of the evidence supporting the jury's finding that Lee and Stacey acted with malice, the Individual Appellants argued: "Neither Lee nor Stacey even instituted the commitment, so to award exemplary damages against them—and in the same amount awarded against Wes (the signer)—demonstrates a jury swayed by passions."

86

finding that the award of $500,000 in exemplary damages against Lee is unconstitutionally excessive. *See id*.

With respect to the second guidepost—the disparity between the exemplary damage award and the actual harm suffered by the plaintiff or the harm likely to result—the Individual Appellants argue: "There was a considerable disparity between the exemplary damages of $1.5 million and the actual harm proved from the one-night commitment." As previously discussed, the $1.5 million in exemplary damages cited by the Individual Appellants is the total amount of exemplary damages awarded to Lisa in the Amended Final Judgment. The jury awarded only $500,000 in exemplary damages against Lee individually. The $500,000 in exemplary damages against Lee is equal to the amount of actual damages awarded against Wes, Jr., Stacey, and Lee, jointly and severally ($500,000). As previously discussed, the jury's award of $500,000 in actual damages for the mental anguish Lisa experienced based on her wrongful involuntary commitment is supported by sufficient evidence. Thus, the second guidepost also weighs against a finding that the award of $500,000 in exemplary damages against Lee is unconstitutionally excessive. *See id*.

The third guidepost identified by *Bennett II* is "the difference between the exemplary damages awarded and the civil or criminal penalties that could be imposed for comparable conduct." *See id*. The Individual Appellants' analysis of

this issue is simply: "And there was no evidence or argument advanced regarding comparable civil or criminal penalties." The absence of evidence on this issue does not weigh in favor of or against a finding that the award of $500,000 in exemplary damages is unconstitutionally excessive. *See id.*

As briefed, two of the three *Bennett II* guideposts weigh against a finding that the award of $500,000 in exemplary damages against Wes, Jr. is unconstitutionally excessive, and the third factor is neutral. We overrule the Individual Appellants' challenges to the excessiveness of the exemplary damages award against Lee. *See id.*

### (iv) Stacey

With respect to the first guidepost, the Individual Appellants argument that "the family member's actions to have [Lisa] committed were not highly reprehensible" because there is substantial evidence that Lisa's commitment was "justified" is not persuasive. As previously discussed, there is sufficient evidence supporting the jury's findings that Wes, Jr. did not have probable cause to initiate civil commitment proceedings against Lisa and that Stacey acted with malice when she conspired with Wes, Jr. and Lee to have Lisa involuntarily committed to a mental health facility. This finding, supported by the evidence, demonstrates that Stacey's decision to have Lisa involuntarily committed in collaboration with her brothers was not "justified." As is the case with Lee, the Individual Appellants appear to suggest

the award of $500,000 in exemplary damages against Stacey is excessive because it is the same amount of exemplary damages awarded against Wes, Jr. The jury, however, apparently agreed that Wes, Jr.'s conduct was more egregious because it awarded Lisa $875,000 in exemplary damages against Wes, Jr. and only $500,000 in exemplary damages against Stacey. The jury's $875,000 award against Wes, Jr. exceeded the statutory cap, and therefore, the trial court reduced it to $500,000. *See* TEX. CIV. PRAC. & REM. CODE § 41.008(b). Therefore, the first guidepost, as briefed, weighs against a finding that the award of $500,000 in exemplary damages against Stacey is unconstitutionally excessive. *See Bennett II*, 525 S.W.3d at 650.

For the second guidepost, the Individual Appellants argue: "There was a considerable disparity between the exemplary damages of $1.5 million and the actual harm proved from the one-night commitment." As previously discussed, the $1.5 million in exemplary damages cited by the Individual Appellants is the total amount of exemplary damages awarded to Lisa in the Amended Final Judgment. The jury awarded a third of this amount in exemplary damages against Stacey individually ($500,000). The $500,000 in exemplary damages award against Stacey is equal to the amount of actual damages awarded against Wes, Jr., Stacey, and Lee, jointly and severally ($500,000). As previously discussed, the jury's award to Lisa of $500,000 in actual damages for the mental anguish she experienced based on her wrongful involuntary commitment is supported by sufficient evidence. Thus, we conclude

89

that this factor also weighs against a finding that the award of $500,000 in exemplary damages against Stacey is unconstitutionally excessive. *See id*.

The Individual Appellants' analysis of the third guidepost is simply, "And there was no evidence or argument advanced regarding comparable civil or criminal penalties." The absence of evidence on this issue does not weigh in favor of or against a finding that the award of $500,000 in exemplary damages is unconstitutionally excessive. *See id*.

As briefed, two of the three *Bennett II* guideposts weigh against a finding that the award of $500,000 in exemplary damages against Stacey is unconstitutionally excessive, and the third factor is neutral. *See id*.

We overrule the Individual Appellants' challenges to the excessiveness of the exemplary damages award against Stacey. *See id*.

## D. Defamation

The jury found that (1) Wes, Jr. and Mark defamed Lisa, (2) Lisa should recover $50,000 in past mental anguish damages and $500,000 in exemplary damages against Wes, Jr., and (3) Lisa should recover $25,000 in past mental anguish damages and $50,000 in exemplary damages against Mark. The Individual Appellants argue that the awards of actual and exemplary damages against Wes, Jr. and Mark should be reversed because, among other things, there is no evidence their

alleged defamatory statements proximately caused Lisa to suffer any mental anguish.

### 1. Standard of Review and Applicable Law

To prevail on a claim for defamation, a plaintiff must establish that (1) the defendant published a false statement of fact to a third party, (2) that was defamatory concerning the plaintiff, (3) with the requisite degree of fault, and (4) that proximately caused damages. *Anderson*, 550 S.W.3d at 617–18 (citing *Bos v. Smith*, 556 S.W.3d 293, 307 (Tex. 2018)).[36] Proximate cause encompasses both foreseeability and cause in fact. *Anderson*, 550 S.W.3d at 618 (citing *Del Lago Partners, Inc. v. Smith*, 307 S.W.3d 762, 774 (Tex. 2010)). A defendant's action is the cause in fact of damages if it was "a substantial factor in causing the injury and without which the injury would not have occurred." *Anderson*, 550 S.W.3d at 618 (quoting *Bos*, 556 S.W.3d at 307). "[A] jury may not reasonably infer an ultimate

---

[36] There are two types of defamation: defamation per se and defamation per quod. If a statement is defamatory per se, no independent proof of damage to the plaintiff's reputation or mental anguish is required because such statements are "so obviously hurtful to a plaintiff's reputation that the jury may presume general damages, including for loss of reputation and mental anguish." *Hancock v. Variyam*, 400 S.W.3d 59, 63–64 (Tex. 2013); *see also Bentley v. Bunton*, 94 S.W.3d 561, 604 (Tex. 2003). All other allegedly defamatory statements, i.e., statements that are defamatory per quod, require proof that the defamatory statements proximately caused all the damages sought, including damages for mental anguish, and the amount of these damages. *See Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 501, 504–05 (Tex. App.—Houston [14th Dist.] 2008, pet. denied). Lisa does not dispute that Wes, Jr.'s and Mark's allegedly defamatory statements constitute defamation per quod or challenge the jury's finding that Wes, Jr.'s statements were not defamatory per se.

fact from 'meager circumstantial evidence which could give rise to any number of inferences, none more probable than another.'" *Hancock v. Variyam*, 400 S.W.3d 59, 70–71 (Tex. 2013) (quoting *Hammerly Oaks, Inc. v. Edwards*, 958 S.W.2d 387, 392 (Tex. 1997)); *see also Burbage v. Burbage*, 447 S.W.3d 249, 262 (Tex. 2014).

### 2. Actual Damages for Defamation

The jury found that Wes, Jr. published statements to SignAd Outdoor employees that Lisa was "mentally ill" and "physically dangerous," and that $50,000 would compensate Lisa for the past mental anguish she suffered as a proximate cause of these statements ($25,000 for each statement). The jury also found that Mark published "[s]tatements to [SignAd Outdoor] employees that Lisa was at the building and to be careful," and that $25,000 would compensate Lisa for the past mental anguish she suffered as a proximate cause of Mark's statements.[37]

The record reflects that the testimony Lisa gave about her mental and emotional state supporting the award of past mental anguish damages was limited to her father's death and her involuntary commitment. Lisa points to her testimony that she was "heartbroken" and "physically ill from the betrayal of [her] own siblings" as evidence that the defamatory statements caused her to suffer mental

---

[37] The jury was asked what sum of money would compensate Lisa for her injuries "that were proximately caused by" Wes, Jr.'s and Mark's alleged defamatory statements. The jury awarded Lisa $0 damages for past and future injury to her reputation and future mental anguish with respect to her defamation claims against Wes, Jr. and Mark. Lisa does not appeal these findings.

92

anguish. But the record reflects that this statement was in direct response to a question about her emotional state after "dealing with things like" her father's death and the attempted commitment proceeding:

> Q. In January of 2013 after your father's death, and then after the failed commitment, what was your emotional state in dealing with things like that? What was your emotional state?

> A. I mean, I was heartbroken. And you know, I was physically ill from the betrayal of my own siblings. But you know, just like all of us, we all have to deal with tragedies and you just have to put one foot in front of the other and take care of what you have to take care of.

Similarly, Lisa's testimony that she was afraid Wes, Jr. would try to impose a guardianship over her or lock her away in a mental hospital for weeks, as her mother had been, is also related to the involuntary commitment proceeding. Nothing in the record reveals a causal connection between Lisa's emotional state and the alleged defamatory statements Wes, Jr. and Mark made after the March 2013 involuntary commitment. *See Exxon Mobil Corp. v. Hines*, 252 S.W.3d 496, 505–06 (Tex. App.—Houston [14th Dist.] 2008, pet. denied) (holding there was legally insufficient evidence supporting award of noneconomic damages because plaintiffs' testimony regarding mental anguish and reputational damages related to issues other than alleged defamatory statements).

Lisa suggests that her testimony regarding the mental anguish she suffered because of the involuntary commitment proceeding also provides circumstantial

evidence that she suffered mental anguish due to the defamatory statements, because the commitment proceedings and the defamatory statements "both stem from the false claim that she is mentally ill and physically dangerous." Lisa's argument is unavailing.

Although related, the act of having someone involuntarily committed to a psychiatric hospital is different than telling mutual co-workers that the person is mentally ill and dangerous. Moreover, to recover damages on her defamation claim, Lisa had to establish that the defamatory statements were a "substantial factor in causing [her] injury and without which [her] injury would not have occurred." Lisa has not directed this Court to any testimony or evidence specifically linking her allegations of mental anguish to Wes, Jr.'s and Mark's defamatory statements. To the contrary, the record identifies other causes for Lisa's mental anguish, including the involuntary commitment proceeding and her father's death. As such, the jury could not have reasonably inferred that Mark's and Wes, Jr.'s defamatory statements caused Lisa's mental anguish. *See Burbage*, 447 S.W.3d at 262 (holding jury could not reasonably infer that defamation caused cancellations at funeral home "when the cancellations could have occurred for any number of reasons"); *Exxon Mobil Corp*, 252 S.W.3d at 506 ("The fact that the evidence identifies other, distinct causes of the harm, prevents this evidence from supporting the conclusion that appellees were noneconomically harmed by publication of the two presentations."); *see generally*

94

*Bos*, 556 S.W.3d at 307–08 (holding defamatory statements were not substantial factor in causing plaintiff's injuries because plaintiff's testimony did not link damages to statements and there was "overwhelming amount of other circumstances impacting [plaintiff's] reputation and mental state").

Because there is no evidence that Wes, Jr.'s and Mark's alleged defamatory statements were the proximate cause of Lisa's past mental anguish, we sustain the Individual Appellants' challenge to the jury's award of damages against Wes, Jr. and Mark on Lisa's defamation claims. We reverse the judgment in favor of Lisa and render judgment that Lisa taken nothing on her defamation claims against Wes, Jr. and Mark.[38]

### 3. Exemplary Damages for Defamation

The jury awarded Lisa $500,000 in exemplary damages against Wes, Jr. and $50,000 against Mark based on their respective defamatory statements. A party may not recover exemplary damages unless the plaintiff also establishes actual damages.

---

[38] Lisa also argues there is sufficient evidence supporting the award of mental anguish damages because she presented evidence that her reputation was injured by Mark's and Wes, Jr.'s defamatory statements. But those questions were presented separately to the jury who found Lisa did not suffer reputational damage. Specifically, the question on damages for Lisa's defamation claim expressly allowed the jury to award Lisa damages for (1) "Injury to reputation sustained in the past," (2) "Injury to reputation that, in reasonable probability, Lisa Horan will sustain in the future," (3) "Mental anguish sustained in the past," and (4) "Mental anguish that, in reasonable probability, Lisa Horan will sustain in the future." (Jury Questions 52 and 58). The jury found that Lisa suffered $0 in past and future reputational damages, $0 in future mental anguish damages, and it awarded Lisa $25,000 for past mental anguish for each defamatory statement.

*Hancock*, 400 S.W.3d at 71 ("Exemplary damages are not available unless a plaintiff establishes actual damages."). Because we hold that no evidence supports the jury's awards of actual damages against Wes, Jr. and Mark for defamation, we sustain the Individual Appellants' challenge to the award of exemplary damages against Wes, Jr. and Mark for Lisa's defamation claim.[39]

**E.     Derivative Claim for Breach of Fiduciary Duty:  Wes, Jr. and ProIce**

Lisa asserted a breach of fiduciary duty claim against Wes, Jr. on behalf of SignAd, Ltd. asserting Wes, Jr. had engaged in certain "self-dealing transactions with his side business" ProIce Solutions, LLC" ("ProIce").  The jury was instructed that "[b]ecause Wesley Gilbreath, Jr. was President of SignAd, Ltd., he owed SignAd, Ltd. a fiduciary duty."  The jury found that Wes, Jr. failed to "comply with his fiduciary duty to SignAd, Ltd. with regard to the transactions with [ProIce]."[40]

Wes, Jr. argues that the trial court's Amended Final Judgment based on the jury's finding must be reversed because there is neither evidence he owed a fiduciary duty to SignAd, Ltd., nor a jury finding that such a fiduciary relationship existed.

---

[39]     Because of our disposition, it is not necessary for us to address Wes, Jr.'s and Mark's remaining challenges to Lisa's defamation claims.

[40]     The jury awarded damages in the amount of (1) $750.00 for the "fair market value of services provided to [ProIce] in the past, and (2) $300/per month for the "fair market value of services provided to [ProIce] that, in reasonable probability, will be sustained in the future."  As later discussed, this finding and these awards were part of the basis for the trial court's Amended Final Judgment awarding injunctive relief, appointing a rehabilitative receiver, and awarding attorney's fees.

96

Wes, Jr. also contends that (1) because "there was no proof and no finding that [he] owed a fiduciary duty to SignAd, Ltd., the jury's finding of breach becomes immaterial, and cannot support a judgment against [him] for breach of fiduciary duty," (2) the judgment against him should be reversed because there was no evidence SignAd, Ltd. sustained a loss of revenue as a result of ProIce's use of its billboards, and (3) alternatively, the question presented to the jury for breach of fiduciary duty (Jury Question 15) is so defective it cannot support a judgment.

### 1.    Background

SignAd GP, LLC's Board of Managers approved a policy that allowed other companies in which the managers had an interest, to use its vacant billboards in exchange for paying only administrative costs.  Pursuant to the policy, Wes, Jr. allowed ProIce, a company in which he is a passive investor, to advertise on the company's vacant billboards.  ProIce was not billed for and did not pay for administrative costs.

According to Wes, Jr., the omission was inadvertent.  He also contends that ProIce's use of the billboards was reflected on monthly billing reports, approved by a sales manager, and discussed at board meetings.  Wes, Jr. argues there was no loss of revenue to SignAd, Ltd. from ProIce's use of its billboards because there was no evidence ProIce ever advertised on billboards for which SignAd, Ltd. had a paying customer wanting to pay for the billboard.

## 2.    Applicable Law

To prevail on a claim for breach of fiduciary duty, a plaintiff must establish that (1) a fiduciary relationship existed between the plaintiff and the defendant, (2) the defendant breached its fiduciary duty, and (3) the breach resulted in injury to the plaintiff or benefit to the defendant. *Heritage Gulf Coast Props., Ltd. v. Sandalwood Apartments, Inc.*, 416 S.W.3d 642, 650 (Tex. App.—Houston [14th Dist.] 2013, no pet.) (citing *Lundy v. Masson*, 260 S.W.3d 482, 501 (Tex. App.—Houston [14th Dist.] 2008, pet. denied)); *see also Meyer v. Cathey*, 167 S.W.3d 327, 330–31 (Tex. 2005) (discussing existence of fiduciary relationship as element of fiduciary duty claim). "As a general rule, the plaintiff must establish the existence of a duty; the burden is not on the defendant to show that it had no duty." *Humble Sand & Gravel, Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004).

Whether a fiduciary duty exists is a question of law. *Meyer*, 167 S.W.3d at 330. The existence of facts giving rise to a formal fiduciary duty, however, is a question for the fact finder's determination if the facts are disputed. *See Envtl. Procedures, Inc. v. Guidry*, 282 S.W.3d 602, 627 (Tex. App.—Houston [14th Dist.] 2009, pet. denied) (citing *Brewer & Pritchard, P.C. v. Johnson*, 7 S.W.3d 862, 867 (Tex. App.—Houston [1st Dist.] 1999), *aff'd*, 73 S.W.3d 193 (2002)). Although the parties disagree as to whether Wes, Jr. owes a fiduciary duty to SignAd, Ltd., they do not appear to disagree about the underlying facts.

### 3. Existence of Fiduciary Duty

SignAd GP, LLC, as SignAd, Ltd.'s General Partner with "the sole and exclusive right" to manage SignAd, Ltd.'s business, owes fiduciary duties to SignAd, Ltd. and its limited partners. *See Allen v. Devon Energy Holdings, LLC*, 367 S.W.3d 355, 392 (Tex. App.—Houston [1st Dist.] 2012, vacated w.r.m.) ("[A] general partner in a limited partnership owes a fiduciary duty to the limited partners because of its control over the entity.") (citing *Crenshaw v. Swenson*, 611 S.W.2d 886, 890 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.). And Wes, Jr., as an officer of SignAd GP, LLC, owes a fiduciary duty to SignAd GP, LLC. *See Int'l Bankers Life Ins. v. Holloway*, 368 S.W.2d 567, 576 (Tex. 1963) (stating corporate officers generally owe fiduciary duty as matter of law to corporate entities they serve); *see also Saden v. Smith*, 415 S.W.3d 450, 464 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) (same).

The relevant question here is whether Wes, Jr., as an officer of SignAd GP, LLC, owes a fiduciary duty to SignAd, Ltd. The jury was not asked to determine whether Wes, Jr. owed a fiduciary duty to SignAd, Ltd. Instead, the trial court instructed the jury that Wes, Jr. was the President of SignAd, Ltd. and that as the President of that entity, he owed a fiduciary duty to SignAd, Ltd. Wes Jr., however,

was not the President of SignAd, Ltd. Rather, he was President of SignAd GP, LLC, SignAd, Ltd.'s General Partner. The relevant jury question and instruction stated:

> Did Wesley Gilbreath, Jr. comply with his fiduciary duty to SignAd, Ltd with respect to the transactions with ProIce Solutions, LLC?

> Because Wesley Gilbreath, Jr. was President of SignAd, Ltd., he owed SignAd, Ltd a fiduciary duty.

Lisa argues that despite the erroneous instruction, she was not required to obtain a jury finding that Wes, Jr. owed a fiduciary duty to SignAd, Ltd. Relying on several decisions from the Fifth Circuit Court of Appeals, she claims that Wes, Jr. owed a fiduciary duty to SignAd, Ltd. as a matter of law based on the "control" he exercised over SignAd GP, LLC and SignAd, Ltd.'s daily operations.[41] *See FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615, 621–22 (5th Cir. 2011) (holding officer of general partner of limited partnership who "exercised near-complete control over both tiers of the entity" owed fiduciary duties to limited partnership under Texas law); *McBeth v. Carpenter*, 565 F.3d 171, 178 (5th Cir. 2009) (holding president of general partner who had "exclusive right to manage all contracts and agreements . . . relating to the [l]and" under development and controlled operations

---

[41] Wes, Jr. argues that Lisa waived this argument because she did not raise it in the trial court. Although a party cannot raise new issues on appeal, parties may construct new arguments on appeal in support of issues properly before court. *See Greene v. Farmers Ins. Exch.*, 446 S.W.3d 761, 763 n.4 (Tex. 2014) (stating that parties may construct new arguments on appeal in support of issues properly before court).

of limited partnership owed fiduciary duties to limited partnership); *LSP Inv. P'ship v. Bennett (In re Bennett)*, 989 F.2d 779, 790 (5th Cir. 1993) (holding individual who was sole general partner of sole general partner of limited partnership owed fiduciary duty to limited partners because individual was only person with power or authority to direct affairs of second-tier general partner who had "full, exclusive and complete authority and discretion to manage, control and make all decisions affecting the purposes of the partnership and to take any action required to effectuate the purpose of the partnership").

Assuming, without deciding, that such a "control" test exists and could form the basis of a fiduciary duty, Lisa's argument does not carry the day.[42] The holdings in each of the cases Lisa cites focus on the control the person alleged to owe the fiduciary duty exercised over the relevant limited partnership. The oldest of the opinions on which Lisa relies, *LSP Investment Partnership v. Bennett (In re Bennett)*, 989 F.2d 779 (5th Cir. 1993), relied upon the reasoning of *Crenshaw v.*

---

[42]   We have not found, and Lisa has not cited, any Texas case holding that an officer of a general partner of a limited partnership owes a fiduciary duty to the limited partnership as a matter of law. In *Rainier Income Fund I, Ltd. v. Gans*, 501 S.W.3d 617 (Tex. App.—Dallas 2016, pet. denied), the Dallas Court of Appeals held that an officer of the general partner of a limited partnership did not owe a formal fiduciary duty to the limited partnership. *See id.* at 624 (holding appellants failed to establish formal fiduciary relationship between general partner's officer, Gans, and limited partnership because "Gans is not a partner in the partnership; he is an officer of the general partner" and noting "appellants do not cite any case for the proposition that an officer of the general partner of a partnership owes a fiduciary duty to the partnership").

*Swenson*, 611 S.W.2d 886 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.) and the extent and degree of control exercised by the individual in that case who purportedly owed the fiduciary duty. *See In re Bennett*, 989 F.2d at 790 ("[B]ased on the holding in *Crenshaw* and the cases cited therein, we find that Bennett, as the managing partner of the managing partner, owed to the MG limited partners 'the highest fiduciary duty recognized in the law.'").

In *Crenshaw*, the Austin Court of Appeals, relying on the law of trusts, held that Elizabeth Swenson, the general partner of the general partner of a limited partnership, owed a fiduciary duty to the limited partners. 611 S.W.2d at 891. The court, however, did not hold that the general partners of a general partner owe fiduciary duties to limited partners as a matter of law. Limiting its holding to the "facts of the present case," the court held that Swenson, who was the sole general partner of the general partner (and who no one contested exercised complete control over the limited partnership), owed a fiduciary duty to the limited partners. *See id.* at 890–91 ("In a limited partnership, the general partner acting in complete control stands in the same fiduciary capacity to the limited partners as a trustee stands to the beneficiaries of the trust.").[43]

---

[43]     The Texas Legislature has expressly rejected this analogy. TEX. BUS. ORGS. CODE § 152.204(d) ("A partner, in the partner's capacity as partner, is not a trustee and is not held to the standards of a trustee.").

102

Relying on *Crenshaw* and other cases, the Fifth Circuit Court of Appeals in *In re Bennett* held that Bennett, who was the sole general partner of Mariner Interest No. 20, Ltd. ("No. 20"), the general partner of Mariner/Greenspoint, Ltd. ("MG"), owed a fiduciary duty to MG's limited partners because of the degree of control Bennett exercised over No. 20 and MG.[44] *See In re Bennett*, 989 F.2d at 781, 790. The court explained that "[u]nder the terms of the MG partnership agreement, the general partner, No. 20, was charged with management of the partnership and had full, exclusive and complete authority and discretion to manage, control and make all decisions affecting the purposes of the partnership," and that "Bennett, as the sole general partner of No. 20, was the only individual with the power or authority to direct the affairs of No. 20 and MG." *Id.* at 781. As such, the court held, Bennett owed a fiduciary duty to MG's limited partners.[45] *Id.* at 790 In so holding, the court

---

[44] *LSP Investment Partnership v. Bennett (In re Bennett)*, 989 F.2d 779 (5th Cir. 1993) involved an appeal from an adversary proceeding in a bankruptcy case, in "which the bankruptcy court entered an order granting a discharge to the Appellee, Archie Bennett, Jr., over the objection of the Appellants that certain of Mr. Bennett's debts were not dischargeable." The Fifth Circuit Court of Appeals had to decide whether "Bennett, as the managing partner of the managing partner of the limited partnership, owed a sufficient fiduciary duty to the limited partners to satisfy the strict requirements of 11 U.S.C. §523(a)(4)," which the court explained "provides that debts resulting from a defalcation by the debtor while acting in a fiduciary capacity are not dischargeable in bankruptcy." *In re Bennett*, 989 F.2d at 780.

[45] Relying on *Crenshaw v. Swenson*, 611 S.W.2d 886 (Tex. Civ. App.—Austin 1980, writ ref'd n.r.e.), the court in *In re Bennett* noted that it was "Swenson's high level of control, over the project and the limited partners' investments, [which] appears to have been critical in persuading the *Crenshaw* court that Ms. Swenson owed a fiduciary duty to the limited partners." *In re Bennett*, 989 F.2d at 789 ("What this

103

noted that under Texas law, "the issue of control has always been the critical fact looked to by the courts in imposing this high level of responsibility." *Id.* at 789–90 (concluding that by virtue of his control, Bennett owed a fiduciary duty to MG's limited partners).

Like the court in *In re Bennett*, the courts in *In re Harwood* and *McBeth* focused much of their duty analysis on the degree of control exercised by Harwood and Carpenter over the general partnership and limited partnership in those cases, holding that by virtue of their control over both tiers of the relevant entities, Harwood and Carpenter, as officers of the general partner, owed fiduciary duties to the limited partnerships. *See In re Harwood*, 637 F.3d at 623[46] (stating "Harwood exercised near-complete control over both tiers of the entity until a few months prior to his termination" and board "paid little attention to the day-to-day operations of FNFS," and "the other managing shareholder and chief executive officer of B&W, was not able to exercise meaningful oversight because he had no particular banking

---

Court finds significant is the *Crenshaw* court's analysis of why the managing partner of the managing partner in that case owed a fiduciary obligation to the underlying limited partners.").

[46] In *FNFS, Ltd. v. Harwood (In re Harwood)*, 637 F.3d 615 (5th Cir. 2011), B&W Finance, Co. Inc. ("B&W") served as the sole general partner of FNFS, Ltd., a Texas limited partnership. *Id.* at 617. Harwood served as the President, Chief Operating Officer, and Director of B&W. *Id.*

expertise"); *McBeth*, 565 F.3d at 178[47] (stating that under limited partnership agreement "the general partner retained exclusive control and management over the partnership" and noting "extensive testimony" established that Carpenter, who often referred to himself as "the general partner," "was 'the man in control' and 'heading the efforts' of the partnership" with "exclusive right to manage all contracts and agreements. . . relating to the [l]and"); *see also Allen*, 367 S.W.3d at 391 (holding "a general partner in a limited partnership owes a fiduciary duty to the limited partners because of its control over the entity").

There is no evidence of such requisite control here. SignAd GP, LLC is a single-member limited liability company. Stacey is the sole member of SignAd GP, LLC. Lee is the Chairman of SignAd GP, LLC's Board of Managers and its Chief Executive Officer. Wes, Jr. is the President of SignAd GP, LLC (not SignAd, Ltd.) and SignAd GP, LLC's Chief Operating Officer. Wes, Jr., Lee, Stacey, and Lisa are the current members of SignAd GP, LLC's Board of Managers.

SignAd GP, LLC has "the sole and exclusive right to manage the business of" SignAd, Ltd. under the limited partnership agreement. And SignAd GP, LLC's Board of Managers manages the business and affairs of SignAd, Ltd. and "develop[s] policies and procedures to be implemented and followed by the officers

---

[47] In *McBeth v. Carpenter*, 565 F.3d 171 (5th Cir. 2009), Carpenter served as the President of StoneLake Management, L.L.C., the general partner of StoneLake Ranch, L.P. *Id.* at 175.

and employees in their day-to-day operations." Pursuant to SignAd GP, LLC's regulations, Wes, Jr., as President of SignAd GP, LLC, controls SignAd GP, LLC's "business and affairs," but he does so subject to the Chairman of the Board and the Board of Managers. Specifically, Section 4.6 of SignAd GP, LLC's regulations states: "Subject to the Chairman of the Board, if any, and the Board of Managers, itself, the President shall in general supervise and control all of the business and affairs of" SignAd GP, LLC and "in general shall perform all duties incident to the office of President."

Unlike the passive minority owner in *Allen* and the other managing shareholder and chief executive officer of the general partner in *In re Harwood* who "was not able to exercise meaningful oversight because he had no particular banking expertise," Lisa testified she had been actively involved in the family business for decades as an owner and board member, and that Brett, her ally on the board for many years, had been the company's vice president of real estate. Also, unlike *In re Harwood* where the board "paid little attention to the day-to-day operations" of the company, Lisa, and the other members of SignAd GP, LLC's Board of Managers, reviewed regular financial information and developed and implemented policies governing the running of SignAd GP, LLC and SignAd, Ltd., including the free billboard policy. Although Wes, Jr. decided which properties, if any, to purchase, the Board of Managers set the limit on his spending authority and any sales of real

property had to be presented to and approved by the Board of Managers. Based on this evidence, we conclude that the degree of control Wes, Jr. exercised as an officer of SignAd GP, LLC did not, under the circumstances presented here, create a fiduciary duty as a matter of law as to SignAd, Ltd.

We sustain Wes, Jr.'s challenge to the jury's finding that he failed to "comply with his fiduciary duty to SignAd, Ltd. with regard to the transactions with ProIce Solutions, LLC." We reverse the trial court's judgment in favor of Lisa on her derivative claim for breach of fiduciary duty against Wes, Jr. based on his transactions with ProIce and we render judgment that Lisa take nothing on this claim.[48]

## F. Breach of Fiduciary Duty: Lee

The jury found that an informal fiduciary relationship existed between Lee and Lisa (Jury Question 34) and that Lee failed to comply with his fiduciary duty to Lisa (Jury Question 37).[49] Based in part on these findings, the trial court granted injunctive relief in favor of Lisa and appointed a rehabilitative receiver to oversee

---

[48] Wes, Jr. argues that if we reverse the breach of fiduciary duty claim against him as it concerns ProIce, we must also reverse the award of attorney's fees and expenses based on this claim. We address these issues later in our opinion.

[49] The jury also found that Brett and Mark were in an informal fiduciary duty relationship with Lisa, but it also found that neither had breached their fiduciary duty to Lisa.

107

an equitable buyout by the Company Appellants of Lisa's interests in the Limited Partnerships and General Partners in which she holds an interest.

On appeal, Lee argues that the jury's finding that he failed to comply with an informal fiduciary duty to Lisa (Jury Question 37) is immaterial and that the portions of the Amended Final Judgment awarding equitable relief based on the alleged breach of his fiduciary duty to Lisa should be reversed because there is no evidence, and no finding, either that Lisa was damaged by the breach or Lee improperly benefited from the breach. Lisa responds that Lee does not have standing to complain about the equitable relief awarded against the Company Appellants because no equitable relief was awarded against him.

### 1. Standing

"Just as plaintiffs must have standing to bring suit, appellants must have standing to appeal trial court judgments." *Nephrology Leaders*, 573 S.W.3d at 914 (citing *Tex. Quarter Horse Ass'n v. Am. Legion Dep't of Tex.*, 496 S.W.3d 175, 181 (Tex. App.—Austin 2016, no pet.)); *see also Torrington Co. v. Stutzman*, 46 S.W.3d 829, 843 (Tex. 2000) ("[A]n appealing party may not complain of errors that do not injuriously affect it or that merely affect the rights of others."). The "ultimate inquiry is whether the appellant possesses a justiciable interest in obtaining relief from the lower court's judgment." *Nephrology Leaders*, 573 S.W.3d at 91 (quoting *Tex. Quarter Horse Ass'n*, 496 S.W.3d at 184); *see also Torrington*, 46 S.W.3d at 843

(holding appellate standing requires party's own interests prejudiced by alleged error).

The trial court issued injunctive relief based in part on Lee's breach of his fiduciary duty to Lisa and, more importantly, it was issued against the "General Partners, the Limited Partnerships, [and] the Individual Defendants," including Lee. We thus conclude that Lee has standing to challenge the materiality of the jury's finding on appeal.

### 2.    Jury's Finding of Breach

Lee argues that the jury's finding he breached his fiduciary duty to Lisa is immaterial because there is no finding or evidence Lisa suffered damages or that Lee received a benefit because of the breach.

To establish her claim against Lee for breach of fiduciary duty, Lisa had to prove (1) the existence of a fiduciary duty between herself and Lee, (2) that Lee breached his duty to her, and (3) that Lee's breach injured Lisa or benefited Lee. *See First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 220 (Tex. 2017) ("Generally, the elements of a claim for breach of fiduciary duty are (1) the existence of a fiduciary duty, (2) breach of the duty, (3) causation, and (4) damages."); *Severs v. Mira Vista Homeowners Ass'n, Inc.*, 559 S.W.3d 684, 703 (Tex. App.—Fort Worth 2018, pet. denied) (stating elements of claim for breach of fiduciary duty are "(1) a fiduciary relationship between the plaintiff and defendant,

109

(2) a breach by the defendant of his fiduciary duty to the plaintiff, and (3) an injury to the plaintiff or benefit to the defendant as a result of the defendant's breach").

Jury Question 37 instructed the jury that to establish Lee failed to comply with his fiduciary duty to Lisa, Lisa had to establish one of five scenarios.[50] Under the fourth scenario, Lisa had to prove that "[Lee] placed his own interests before Lisa Horan's, used the advantage of his position to *gain a benefit for himself* at the expense of Lisa Horan or placed himself in a position where his self-interest might conflict with his obligations as a fiduciary." (emphasis added). The elements of causation and damages were thus included in the charge and, by virtue of its affirmative finding that Lee failed to comply with his fiduciary duty to Lisa, the jury implicitly found that Lee personally benefited from his breach of his fiduciary duty to Lisa. *See First United Pentecostal Church of Beaumont*, 514 S.W.3d at 214 (noting that under third element of breach of fiduciary claim, plaintiff must establish the breach injured the plaintiff or benefited defendant).

---

[50] The instruction stated, "[t]o prove that Elliott L. Gilbreath failed to comply with his fiduciary duty, Lisa Horan must show: "(1) the transaction(s) in question were not fair and equitable to Lisa Horan; or (2) Elliott L. Gilbreath did not make reasonable use of the confidence that Lisa Horan placed in him; or (3) Elliott L. Gilbreath failed to act in the utmost good faith or exercise the most scrupulous honestly toward Lisa Horan; or (4) Elliott L. Gilbreath placed his own interest before Lisa Horan's, used the advantage of his position to gain a benefit for himself at the expense of Lisa Horan or placed himself in a position where his self-interest might conflict with his obligations as a fiduciary; or (5) Elliott L. Gilbreath failed fully and fairly to disclose all important information to Lisa Horan concerning the transaction[s]."

110

Even if the jury had not made such implicit findings, we would deem the elements of causation and damages found in support of the Amended Final Judgment because no party requested their inclusion or objected to their exclusion, and the trial court did not make findings on either element. *See Chon Tri v. J.T.T.*, 162 S.W.3d 552, 558 (Tex. 2005) ("If one or more elements of that cause of action was omitted from the charge, and there was no request to include the omitted element or objection to its exclusion, and no written findings were made by the trial court on the omitted element, then the omitted element must be deemed found by the trial court in a manner that supports its judgment.").

The question that remains is whether there is evidence that Lee's failure to comply with his fiduciary duty to Lisa either injured Lisa or benefited Lee. The jury found that SignAd GP, LLC breached its fiduciary duties to SignAd, Ltd. by causing SignAd, Ltd. to pay certain non-business-related legal fees for Wes, Jr., Lee, Stacey, and Mark. The jury awarded $375,000 in damages for that claim. In the Amended Final Judgment, the trial court awarded Lisa a share of the awarded damages in proportion to her one-sixth ownership interest in SignAd, Ltd.[51] The jury found that Lee knowingly participated in the breach and it apportioned 25% of the responsibility for the breach to Lee.

---

[51] As discussed later in this opinion, we sustain the Company Appellants' challenge to the Amended Final Judgment awarding Lisa a share of the damages in proportion to her one-sixth ownership interest in SignAd, Ltd.

111

As discussed later in the opinion, the record also reflects that Wes, Jr., Lee, and Stacey voted to amend SignAd GP, LLC's regulations to allow themselves, as the majority of the Board of Managers, to create SignAd GP, LLC's Special Litigation Committee over Lisa's objections, and they appointed themselves to the committee. There is also some evidence that SignAd, Ltd. paid the personal legal fees of Wes, Jr., Lee, Stacey, and Mark at Wes, Jr.'s direction and that the Special Litigation Committee gave Wes, Jr. the authority to make such decisions. Based on this evidence, the jury reasonably could have concluded that Lee breached his fiduciary duty to Lisa through his knowing participation in the Special Litigation Committee which authorized Wes, Jr. to cause SignAd, Ltd. to pay for Lee's personal legal fees, constituting not only a benefit to Lee, but also injuring Lisa's interest in SignAd, Ltd.

We overrule Lee's challenge to the portions of the Amended Final Judgment based on the jury's finding that he failed to comply with his informal fiduciary duty to Lisa.

Company Appellants' Issues

## A.    Books and Records

Lisa pleaded for declaration of her rights to access the books and records of the General Partners and Limited Partnerships under various provisions of the TBOC

and the Partnership Agreements. She also sought declarations that the General Partners had failed to provide her with access to the relevant records in the past.

In her eighth amended petition, Lisa pleaded for a "declaration that she is entitled to access the books and records of the Limited Partnership Defendants as per the Partnership Agreements" and for "costs and other damages caused by the Defendants' breaches of the provisions providing her access to the books and records, which was denied under Tex. Civ. Prac. & Rem. Code § 37.009."[52] She also pleaded for "declaratory judgment under Tex. Civ. Prac. & Rem. Code 37.004 that the General Partners of the Limited Partnerships have unlawfully denied her access to the books and records of the Limited Partnerships under [TBOC] § 153.552(a)" and "injunctive relief to enforce compliance in accordance with her statutory rights and her reasonable fees and costs under Section 37.009." Lisa further pleaded that the General Partners had "denied her access to the books and records as required by [TBOC] Section 101.502." And last, she pleaded that the General Partners had violated TBOC Sections 3.151, 3.152, and 3.153 which required them to provide Lisa with "access to examine the books and records . . . for any purpose reasonably related to her service as a member of the board of managers."

---

[52] "In any proceeding under this chapter, the court may award costs and reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009.

113

In the Amended Final Judgment, the trial court entered a declaratory judgment which states in part:

(a) The Court declares in accordance with the jury's findings that the following General Partner entities breached the Limited Partnership Agreements as set forth below by failing to provide Lisa Horan, Trustee (1) just and true books of account and all other partnership records at any time during normal business hours; and (2) year-end balance sheets: Big Leasing LLC (General Partner of Big Signs & Leasing ## 1–6, Ltd.) Culcreuch West, LLC (General Partner of Ben Nevis West, Ltd.), and Realty Acquisitions & Holdings, LLC (General Partner of Big Eastex #1, Ltd.).

(b) The Court declares in accordance with the jury's findings that the following General Partner entities as set forth below in violation of Tex. Bus. Org. Code § 153.552 failed to provide Lisa Horan, Trustee with the books and records of the Limited Partnerships: Big Leasing LLC (General Partner of Big Signs Leasing ##1–6, Ltd.); Culcreuch West, LLC (General Partner of Ben Nevis West, Ltd.), and Realty Acquisitions & Holdings, LLC (General Partner of Big Eastex #1, Ltd.).

(c) The Court declares in accordance with the jury's findings that the following General Partner entities as set forth below in violation of Tex. Bus. Org. Code § 101.502 failed to provide Lisa Horan, Trustee with the books and records of the limited liability companies: Big Leasing LLC (General Partner of Big Signs & Leasing ## 1–6, Ltd.); and Realty Acquisitions & Holdings, LLC (General Partner of Big Eastex #1, Ltd.).

(d) The Court declares in accordance with the jury's findings that the following General Partner entities, of which Lisa Horan was a governing person, as set forth below in violation of Tex. Bus. Org. Code §§ 3.151 and 3.152 failed to provide Lisa Horan, Trustee with the books and records of the General Partners: SignAd GP, LLC, Culcreueh West, LLC, Big Leasing [LLC], and Realty Acquisitions & Holdings, LLC. Accordingly, the Court declares that Lisa Gilbreath Horan is entitled to attorneys' fees and other proper relief under Tex. Bus. Org. Code § 3.152(c).

114

The trial court also granted Lisa injunctive relief based on Lisa's contractual and statutory claims for access to the books and records. Specifically, the trial court enjoined:

> the General Partners, the Limited Partnerships, the Individual Defendants, and their agents, servants, employees, representatives, and those acting in concert or participation with them, directly or indirectly, from. . . denying Plaintiff access to the books and records of the General Partners and Limited Partnerships as per the operative agreements and under Texas law until such time as an equitable buyout of Lisa Horan, Trustee's interests are bought out and fully paid for or she no longer serves on the boards of managers of any entity, whichever comes later.

The Company Appellants argue that the issued declarations must be reversed because (1) the trial court lacked subject matter jurisdiction to enter them, (2) no evidence supported the findings on which they are predicated, (3) one finding omits essential elements (Jury Questions 8–9), (4) other findings are immaterial (Jury Questions 11–14), and (5) the limitation of liability provisions in the Limited Partnership Agreements preclude any finding of wrongdoing against the General Partners.

### 1. Lack of Subject Matter Jurisdiction

The Company Appellants argue the trial court lacked subject matter jurisdiction to enter the declaratory judgment because there was no justiciable controversy among the parties. They argue that because Lisa received the requested

115

books and records before trial, there was no longer a dispute among the parties over that issue.

The Uniform Declaratory Judgment Act ("UDJA") is remedial in nature. Its "purpose is to settle and to afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations." TEX. CIV. PRAC. & REM. CODE § 37.002(b); *see Gulshan Enters., Inc. v. Zafar, Inc.*, 530 S.W.3d 298, 305 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "A declaratory judgment, by its nature, is forward looking; it is designed to resolve a controversy and prevent future damages. It affects a party's behavior or alters the parties' legal relationship on a going-forward basis." *Intercont'l Grp. P'ship v. KB Home Lone Star L.P.*, 295 S.W.3d 650, 660 (Tex. 2009). A trial court may render a declaratory judgment if it serves a useful purpose or will terminate the controversy between the parties. *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 468 (Tex. 1995); *Gulshan Enters., Inc.*, 530 S.W.3d at 305.

Although Lisa received access to the books and records prior to trial, as noted below, the evidence reflects she was denied access repeatedly and had to file suit to obtain the information in the first place. Lisa requested a declaration that she has the right to access the books and records of the Limited Partnerships and General Partners both under the Partnership Agreements and Texas law, including her right to do so in the future. Her request for a declaration regarding her right to access the

116

books and records was thus not moot. That the trial court did not expressly declare she has a right of access does not alter the fact that a live controversy on her right of access still existed at trial.[53] We thus conclude that Lisa's request for declaratory judgment was not moot and the trial court had jurisdiction to hear her claim.

## 2. No Evidence

The Company Appellants argue there is no evidence the General Partners failed to provide Lisa with the books and records to which she was entitled. The record reflects that Lisa's attorney contacted the General Partners, SignAd GP, LLC, Culcreuch West, LLC, Realty Acquisitions & Holdings, LLC, and Big Leasing LLC's predecessor, Buyers Investment Group, Inc., in March 2013 to obtain the books and records, both in writing and by phone. When Wes, Jr. spoke to Lisa's lawyer on March 1, 2013, he told Lisa's lawyer that he would never allow Lisa to access the books and records. SignAd Outdoor's attorney later agreed to allow Lisa to come to his office and inspect the books and records, but SignAd Outdoor hired new counsel before Lisa was able to inspect the books. After several months of negotiations, the parties executed a confidentiality agreement. Although the General Partners provided some records, Lisa ultimately had to file suit to obtain the

---

[53]    A claim for attorney's fees can keep a declaratory judgment case alive despite substantive mootness because a party does not have to prevail to recover its attorney's fees under the Uniform Declaratory Judgments Act. *See Martin v. Cadle Co.*, 133 S.W.3d 897, 906 (Tex. App.—Dallas 2004, pet. denied) (stating party to declaratory judgment action need not prevail to recover award of attorney's fees).

remaining documents and information. She did not receive everything she requested until three years after making her initial request.

Although the Limited Partnership Agreements state that the "General Partner shall keep at the principal place of business and make available to all Partners at any time during normal business hours, just and true books of account and all other Partnership records," Lisa testified she was allowed to go to SignAd Outdoor's office only twice and only outside of regular business hours. She also testified that she was only allowed to view a limited amount of information in a conference room and that there were two police officers there to observe her, her accountant, and attorney. This testimony alone is some evidence the General Partners failed to provide Lisa with the books and records she requested in violation of the Limited Partnership Agreements and the TBOC.

The Company Appellants argue there is no evidence Lisa had a "proper purpose" for examining the companies' books and records, or that her requests were "just and reasonable," as required under Section 153 of the TBOC.[54] The record reflects that Lisa began contacting the General Partners and making written requests

---

[54] Section 153.552(a) states: "On written request stating a proper purpose, a partner or an assignee of a partnership interest may examine and copy, in person or through a representative, records required to be kept under Section 153.551 and other information regarding the business, affairs, and financial condition of the limited partnership as is just and reasonable for the person to examine and copy." TEX. BUS. ORGS. CODE § 153.552(a).

for access to the books and records of the Limited Partnerships in March 2013. There is also evidence she requested the documents for the purpose of conducting a forensic audit to verify whether the Limited Partnerships' business and finances were being managed properly. Lisa's expert, Enriquez, conducted a forensic audit using the information requested. This is some evidence that Lisa requested the materials for a "proper purpose," namely, to conduct a forensic audit, and that her requests for documents to conduct an audit were "just and reasonable." The Limited Partnership Agreements do not have a similar "proper purpose" requirement.

### 3. Immaterial Jury Findings

Jury Questions 8 and 9 asked whether SignAd GP, LLC, Big Leasing LLC, Culcreuch West, LLC, and Realty Acquisitions & Holdings, LLC breached the Limited Partnership Agreements by refusing to produce books and records voluntarily, and the jury answered "yes."[55] Jury Questions 11 through 14 asked whether SignAd GP, LLC, Big Leasing LLC, Culcreuch West, LLC, and Realty Acquisitions & Holdings, LLC violated statutory provisions requiring access to the books and records, and the jury answered "yes" to those questions as well.[56]

---

[55] Although the jury found that all four General Partners breached the Limited Partnership Agreements by refusing to produce books and records voluntarily, the Amended Final Judgment only refers to Big Leasing LLC, Culcreuch West, LLC, and Realty Acquisitions & Holdings, LLC.

[56] Jury Questions 11 through 13 asked the jury to determine whether the named parties violated TBOC Section 153.552 and Jury Question 14 asked the jury to determine whether the named parties violated TOBC Section 3.152.

The Company Appellants argue that these questions were submitted with respect to a breach of contract claim, and that the jury's answers to the questions were "immaterial" because they were not tied to any damage question. The premise of the Company Appellants' argument is that the jury questions related to a breach of contract claim. They did not.

Lisa did not seek damages for a past breach of the Limited Partnership Agreements; she sought equitable relief based in part on the Company Appellants' past violations of her contractual and statutory rights. *See Gulshan Enters., Inc.*, 530 S.W.3d at 307 ("Although such an action may resemble a breach-of-contract action claim, the two actions are distinct: in a declaratory judgment action, a plaintiff seeks a determination of liability without an award of damages, while a plaintiff in a breach-of-contract action seeks both a determination of liability and an award of damages."). In the Amended Final Judgment, the trial court stated:

> The jury rendered a verdict that the General Partners and Limited Partnerships denied Plaintiff her contractual and statutory right to access to the books and records of the entities. Resulting from the fact that the evidence presented showed the continuing nature of the denial of access well into the third year of litigation, the Court cannot be assured that the entities will not continue to deny Plaintiff access to the books and records pending the completion of a buyout of the interests of Lisa Horan, Trustee, without injunctive relief to protect her rights.

A question is immaterial when it should not have been submitted to the jury, or when it was properly submitted but has been rendered immaterial by other findings. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994).

The jury questions regarding the parties' past violations of the Limited Partnership Agreements and the TBOC provisions were material because the jury's answers to those questions formed the basis of the injunctive relief the trial court granted, specifically the questions of imminent harm. We thus reject the Company Appellants' arguments regarding the materiality of these questions.

We address the Company Appellants' challenges to the issuance of injunctive relief later in this opinion.

### 4. Declaratory Judgment

In their reply brief, the Company Appellants argue that Lisa was not entitled to declaratory relief because Lisa "couched her books and records claims, in part, in terms of a breach of the limited partnership agreements" and her claims for declaratory relief were based on the same theories. *See BHP Petroleum Co., Inc. v. Millard*, 800 S.W.2d 838, 841 (Tex. 1990) (holding declaratory judgment is not available to settle issues already pending before court). Lisa's claims that SignAd GP, LLC, Big Leasing LLC, Culcreuch West, LLC, and Realty Acquisitions & Holdings, LLC violated her statutory rights under the TBOC, however, are not the proper subject of a breach of contract claim and did not encompass issues already before the court. Moreover, Lisa did not seek damages for a breach of contract claim. She sought a declaration that she has a right of access to the books and records under the Limited Partnership Agreements and TBOC and provided evidence Big

121

Leasing LLC, Culcreuch West, LLC, and Realty Acquisitions & Holdings, LLC violated the agreements in the past by refusing her access. *See Gulshan Enters., Inc.*, 530 S.W.3d at 307 (explaining difference between declaratory judgment and breach of contract claim).

## 5. Limitation on Liability

The Company Appellants also argue that the limitation-of-liability clauses in the Limited Partnership Agreements preclude any finding of wrongdoing against the General Partners, and further that Lisa never "properly pleaded any of those legal theories."

Texas Rules of Civil Procedure require matters submitted to the jury to have been "raised by the written pleadings and the evidence." TEX. R. CIV. P. 278. Lisa pleaded claims for declaratory relief and breach of fiduciary duty in connection with her claims for access to the books and records, asserting violations of the Limited Partnership Agreements and the TBOC. In response, the Company Appellants filed affirmative defenses to her claims based on the exculpatory clauses included in the Limited Partnership Agreements.

Section 12.3 of the SignAd, Ltd. Partnership Agreement states:

The General Partner shall not be liable to the Partnership or any Partner for any claim, demand, liability, cost, damage, or cause of action arising out of the General Partner's management of the Partnership's affairs, except where the claim at issue is based upon gross negligence, bad faith, willful breach of any material provision of this Agreement, or willful misconduct of the General Partner.

122

Section 8.02 of the Limited Partnership Agreements for Big Signs & Leasing (#1–6), Big Eastex #1, Ltd., and Ben Nevis West, Ltd. states:

> … Always, unless fraud, deceit, or a wrongful taking shall be involved, the General Partner shall not be liable or obligated to the Limited Partners for any mistake of fact or judgment made by the General Partner in operating the business of the Partnership, which results in any loss of the Partnership or its Partners. . . . Neither shall the General Partner be responsible to any Limited Partner because of a loss of his investment or a loss in operations, unless it shall have been occasioned by fraud, deceit, or a wrongful taking by the General Partner.

Because the theories of "fraud, deceit, or a wrongful taking" and "gross negligence, bad faith, [and] willful breach" were pleaded by the General Partners as part of their affirmative defenses and presented to the jury at their request, it was not necessary for Lisa to plead these affirmative defenses or any exceptions to the same.

To the extent the Company Appellants contend the limitation-of-liability clauses precluded Lisa's declaratory judgment action, nothing in the clauses precludes such relief. The clauses preclude a finding of "liability" but not a declaration of rights. And to the extent the clauses applied, the jury was instructed on those limitations. The issues were thus specifically presented to the jury who found that SignAd GP, LLC, Big Leasing LLC, Culcreuch West, LLC, and Realty Acquisitions & Holdings, LLC breached their obligations under the Limited Partnership Agreements.

While the Company Appellants argue there is no evidence of "fraud, deceit, or a wrongful taking" or "gross negligence, bad faith, or willful breach," they offer

no elaboration. And as already discussed above, there was sufficient evidence that SignAd GP, LLC, Big Leasing LLC, Culcreuch West, LLC, and Realty Acquisitions & Holdings, LLC breached their obligations under the Limited Partnership Agreements to grant Lisa access to the books and records. Lisa's attorney contacted SignAd GP, LLC, Culcreuch West, LLC, Realty Acquisitions & Holdings, LLC, and Big Leasing LLC's predecessor, Buyers Investment Group, Inc., in March 2013 to obtain access to the General Partners' and the Limited Partnerships' books and records. Although Wes, Jr. initially told Lisa's lawyer that he would never allow Lisa to access the books and records, SignAd GP, LLC, Culcreuch West, LLC, Realty Acquisitions & Holdings, LLC, and Big Leasing LLC produced some records in June 2013 and September 2013. Lisa, however, did not receive everything she requested until three years after making her initial request.

We overrule the Company Appellants' challenge to the books and records claims.

## B. Derivative Claim for Breach of Fiduciary Duty: SignAd GP, LLC to SignAd, Ltd.

Lisa asserted a derivative claim against SignAd GP, LLC for breach of its fiduciary duty to SignAd, Ltd. The jury found that SignAd GP, LLC breached its fiduciary duties to SignAd, Ltd. by causing SignAd, Ltd. to pay $375,000 in non-business-related legal fees for Wes, Jr., Stacey, Lee, and Mark. The jury further found that Wes, Jr., Lee, Stacey, and Mark knowingly participated in SignAd GP,

124

LLC's breach of fiduciary duty and assigned a percentage of responsibility to each. The Amended Final Judgment awarded Lisa a share of the awarded damages in proportion to her one-sixth ownership interest in SignAd, Ltd.[57]

The Company Appellants argue that this award should be reversed because (1) insufficient evidence supports the finding that SignAd GP, LLC breached a fiduciary duty, (2) insufficient evidence supports the damages finding, and (3) Lisa cannot recover directly for damages to SignAd, Ltd.

### 1. Evidence of Breach

The Company Appellants argue the jury's breach of fiduciary duty finding was based solely on Enriquez's testimony that payments of legal fees for Wes, Jr., Lee, Stacey, and Mark were personal expenses that SignAd, Ltd. improperly paid. Enriquez concluded that, in her opinion, the payments did not comport with SignAd, Ltd.'s governing documents and could potentially put SignAd, Ltd.'s S-Corporation status "at risk" which might present a tax problem for SignAd, Ltd. sometime in the future. The Company Appellants argue that Enriquez's opinions cannot support the jury's findings because they are unsupported personal opinions, improper legal conclusions, and rank speculation. They argue that Enriquez's testimony is not evidence because (1) she relied solely on a line in SignAd, Ltd.'s accounts payable

---

[57] The Grandchildren's Trust and Lisa, Wes, Jr., Stacey, Lee, and Brett, as trustees of their respective irrevocable trusts, are each limited partners in the Limited Partnerships, with each owning an equal one-sixth interest in the partnerships.

125

record describing the payments as "guardianship and trust issues," (2) the Individual Appellants were entitled to indemnity, and (3) Enriquez speculated about a risk to SignAd, Ltd.'s S-Corporation status.

Enriquez testified that in addition to relying on an accounts payable record, she also relied on the deposition testimony of Mike Phillips ("Phillips") (SignAd, Ltd.'s controller), Wes, Jr., and Stacey in concluding that $384,366 in company funds were used improperly to pay for the personal legal fees of Wes, Jr., Lee, Stacey, and Mark to investigate a guardianship over Lisa, for serving as trustees, or defending against Lisa's malicious prosecution claim (against Wes, Jr., Lee, and Stacey) and defamation claims (against Wes, Jr. and Mark), none of which are related to SignAd, Ltd.'s business. According to Enriquez, Phillips testified that for fees concerning those individuals in their capacity as individuals, "[SignAd, Ltd.] pays for those expenses because the litigation committee had provided Mr. Wes Gilbreath, Jr. the right to essentially make that call." Lee, Stacey, and Wes, Jr. had voted to create the Special Litigation Committee over Lisa's objection.

Enriquez also testified that SignAd, Ltd.'s accounts payable records corroborated Wes, Jr.'s deposition testimony indicating that SignAd, Ltd. had been paying his, Stacey, Lee, and Mark's legal fees with respect to claims asserted against them in their individual capacities. According to Enriquez, the records revealed that between April 2013 and December 2015, SignAd, Ltd. had paid $384,366 in

126

personal legal fees for Wes, Jr., Stacey, Lee, and Mark, with the description of "Guardianship and Trust issues."[58] Wes, Jr. also testified that after Lisa's involuntarily commitment, he consulted with his attorney several times to seek a guardianship over Lisa.[59] There is thus some evidence supporting the jury's finding that SignAd, Ltd. paid $375,000 for personal legal fees unrelated to SignAd, Ltd.

## 2. Evidence of Damages

The Company Appellants argue that Enriquez "testified that the payment of attorneys' fees is not allowed by SignAd's governing documents" and that such testimony is an improper legal opinion based on assumed facts that vary materially from the actual facts. *See United Way of San Antonio, Inc. v. Healing Hands Lifeline Found., Inc.*, 949 S.W.2d 707, 713 (Tex. App.—San Antonio 1997, no pet.) ("Under Texas law, a witness may not give legal conclusions or interpret the law to the jury."); *see also Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499–500 (Tex. 1995) (stating expert's opinion based on assumed facts that vary materially from actual facts has no probative value). Contrary to the Company Appellants' characterization of Enriquez's testimony, Enriquez agreed that the governing documents allowed for the payment of attorney's fees incurred with respect to claims

---

[58] Although Enriquez testified that SignAd, Ltd. had improperly paid $384,366 for personal legal fees, the jury only awarded SignAd, Ltd. $375,000 in damages. Nothing in the record explains this discrepancy.

[59] These portions of Wes, Jr.'s deposition testimony were played for the jury.

against SignAd GP, LLC, SignAd, Ltd., and managers, officers, employees, and agents of these companies when acting in their official capacity.

According to the Company Appellants, Wes, Jr., Lee, Stacey, and Mark are entitled to recover their legal fees under both an express provision in SignAd GP, LLC's regulations allowing such expenditures and indemnity provisions in SignAd, Ltd.'s and SignAd GP, LLC's governing documents allowing recovery against certain liability. They argue there was no "waste" of partnership resources because Wes, Jr., Lee, Stacey, and Mark were entitled to have their personal legal fees paid pursuant to SignAd GP, LLC's governing documents. Specifically, they argue that SignAd, GP, LLC amended its regulations in early 2014 to establish a Litigation Committee and passed a resolution allowing Wes, Jr. and other officers to make legal expenditures considered necessary. The meeting minutes, however, state that SignAd GP, LLC's Board of Managers authorized the creation of a Litigation Committee "to address the lawsuit filed by Lisa Horan *against the company* [SignAd GP, LLC]." The resolution also reflects that the Litigation Committee was created for the "purpose of addressing all matters on behalf of [SignAd GP, LLC] and [SignAd, Ltd.] with regard to" Lisa's lawsuit. Nothing in the resolution suggests payment of personal legal fees is approved for legal fees incurred by Wes, Jr., Lee, Stacey, and Mark in their individual capacities.

128

The Company Appellants' arguments regarding indemnity fare no better. The indemnity provision in the SignAd, Ltd. Partnership Agreement states that the "General Partner shall be indemnified and held harmless by the Partnership . . . from and against any and all claims . . . arising out of the General Partner's management of the Partnership affairs . . . ." including attorney's fees "incurred in settling or defending any claims, threatened action, or finally adjudicated legal proceedings." The term "General Partner" is defined as SignAd GP, LLC. Wes, Jr. testified that SignAd, Ltd. was paying his, Lee's, Stacey's and Mark's legal fees with respect to Lisa's claims against them in their individual capacities. Thus, the legal fees at issue were incurred by Wes, Jr., Lee, Stacey, and Mark personally, and not by SignAd GP, LLC, to settle or defend "any claims, threatened action, or finally adjudicated legal proceedings."

Similarly, SignAd GP, LLC's regulations permit indemnity for "[m]anagers, officers, employees, and agents" acting in their official capacities. Lee, Stacey, and Wes, Jr. were not acting in their official capacity as an officer or manager of SignAd GP, LLC when they had Lisa involuntarily committed or pursued the possibility of establishing a guardianship over Lisa. Similarly, neither Mark nor Wes, Jr. were

acting in their official capacity as a manager, officer, employee, or agent of SignAd GP, LLC when they allegedly defamed Lisa.[60]

In their reply brief, the Company Appellants also argue that pleading deficiencies precluded the submission of the questions associated with this claim because Lisa pled only that SignAd GP, LLC breached the duty of loyalty by "engaging in transactions solely for the benefit of certain limited partners to the detriment of others," and never addressed fee payments. They further argue Lisa never alleged that the Individual Appellants "knowingly participated" in any alleged breach.

In her eighth amended petition Lisa alleged that

In addition to paying their individual attorneys' fees not related to their agency for SignAd in this case, [Stacey], Lee and Wes. Jr. have approved and consented to SignAd's payment of Individual legal fees related to [Mark] Ritter's separate probate action to discharge himself as trustee of the Horan Trust and for the fees of the trustees of the Grandchildren's Trust to sue to have each and every one of their acts

---

[60] The Company Appellants also argue that the "breach of fiduciary duty issue should never have been submitted to the jury" because the limitation-of-liability provision in the Limited Partnership Agreement precludes the claim. As we concluded, the issues set forth in Section 12.3 of the SignAd, Ltd. Partnership Agreement for gross negligence, bad faith, willful breach, and willful misconduct were properly pleaded and submitted to the jury who found in favor of Lisa in connection with her claim that Wes, Jr., Lee, and Stacey breached their duties to SignAd, Ltd. And while the Company Appellants also argue there is no evidence supporting these findings, they do so without further elaboration or analysis. It is not the role of this Court to search a twenty-four-volume reporter's record from a four to five weeklong jury trial to support a party's appellate argument and we decline to do so now.

130

related to The Grandchildren's trust approved. These probate causes of action have no relationship whatsoever with this suit. . . .

Texas follows a "fair notice" standard for pleading, focusing on whether the opposing party can ascertain from the pleading the nature and basic issues of the controversy, and what type of evidence might be relevant. *Low v. Henry*, 221 S.W.3d 609, 612 (Tex. 2007); *see also* TEX. R. CIV. P. 45, 47. Pleadings must give fair notice of the claim asserted and the relief sought to provide the opposing party with enough information to enable him to prepare a defense. *In re Lipsky*, 460 S.W.3d 579, 590 (Tex. 2015). Although Lisa's pleading does not use the phrase "knowing participation in breach of fiduciary duty," the wrongful conduct she alleges with respect to Wes, Jr., Lee, and Stacey is apparent. *See generally Boyles v. Kerr*, 855 S.W.2d 593, 601 (Tex. 1993) (stating pleadings must be liberally construed to include all causes of action that may reasonably be inferred).

### 3. Lisa's Recovery of Damages

The Company Appellants argue there is insufficient evidence of damages because Enriquez's testimony that SignAd, Ltd. could be subject to potential tax penalties due to SignAd GP, LLC's alleged breach of its fiduciary duty was speculative and therefore irrelevant. Enriquez explained she was concerned about the payment of personal legal fees from SignAd, Ltd.'s company funds because "it puts [SignAd, Ltd.'s] S Corp[oration] status at risk if this was found to be dividends, which then violates what the equal []distribution of dividends called for." The

131

Company Appellants argue that any risk to SignAd, Ltd.'s S-Corporation status was only a "theoretical possibility" because the Internal Revenue Service had not made any inquiries and no penalties have been assessed or paid.

Lisa counters that Enriquez's testimony regarding the risk to SignAd, Ltd.'s S-Corporation status is immaterial to the damage award based on the breach-of-fiduciary-duty finding because the evidence shows that SignAd GP, LLC misapplied SignAd, Ltd.'s funds by paying for personal legal fees. She argues that it is a breach of fiduciary duty for a general partner to waste the partnership's resources on unauthorized expenditures that do not advance the business. *See Ritchie v. Rupe*, 443 S.W.3d 856, 887 (Tex. 2014) (stating that "the duty of loyalty that officers and directors owe to the corporation specifically prohibits them from misapplying corporate assets for their personal gain"). Lisa contends that SignAd GP, LLC misapplied SignAd, Ltd.'s company funds to enrich the individuals whose personal legal fees were paid by the limited partnership company.

Whether or not SignAd GP, LLC's breach of its fiduciary duty risked SignAd, Ltd.'s status as an S-Corporation, the evidence established SignAd GP, LLC damaged SignAd, Ltd. because SignAd GP, LLC authorized the payment of legal

fees incurred by Wes, Jr., Lee, Stacey, and Mark for matters unrelated to SignAd, Ltd. The jury's finding on damages is thus supported by the evidence.[61]

The Company Appellants also argue that the Amended Final Judgment improperly awarded money damages directly to Lisa under Section 153.405 of the TBOC on her derivative claim filed on behalf of SignAd, Ltd.[62] They argue that while a limited partner may bring an action on behalf of a limited partnership to

---

[61] The jury found in favor of Lisa on her derivative claim filed on behalf of SignAd GP, LLC, awarding damages for lack of internal controls regarding fringe benefits and the sale of certain company cars. The Company Appellants challenge Enriquez's testimony regarding the fringe benefits and automobile's fair market value. Because we are reversing the Final Amended Judgment awarding damages to Lisa on her derivative claim filed on behalf of SignAd GP, LLC for lack of standing, we need not address those points.

The Company Appellants also challenge the admissibility of Enriquez's opinion regarding the expenditure of legal fees based on improper methodology, improper legal conclusions, and unfair prejudice. With respect to her methodology, the Company Appellants argue that "Enriquez's complete dependence on a single phrase in SignAd's accounts payable records ["Guardianship and Trust issues"] is an inconsistent application of her stated methodology of requiring 'documentation' and an improper attempt to cherry-pick facts." As discussed, Enriquez testified that her opinion was also based on deposition testimony from Phillips, Wes, Jr., and Stacey and her review of the claims alleged in the pleadings. The Company Appellants also argue without further elaboration or analysis of the relevant factors that "even if relevant, [Enriquez's testimony] was unfairly prejudicial to SignAd and misleading to the jury." This issue is waived. *See* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to contain clear and concise argument with appropriate citations to authorities and record); *see also Marin Real Estate Partners v. Vogt*, 373 S.W.3d 57, 75 (Tex. App.—San Antonio 2011, no pet.) ("A failure to provide substantive analysis of an issue waives the complaint."); *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.) ("[P]arties asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law supports their contentions.").

[62] The judgment recites that the award to Lisa is "[i]n accordance with the court's discretion under Tex. Bus. Org[s]. Code §153.405."

recover a judgment in the limited partnership's favor, an individual stakeholder in a legal entity does not have the right to recover personally for harms done to the legal entity. They argue that Section 153.405 does not authorize the direct distribution of damages recovered in a derivative claim brought on behalf of a limited partnership to a single limited partner. *See* TEX. BUS. ORGS. CODE § 153.405.

The TBOC authorizes a limited partner to bring an action on behalf of a limited partnership to recover a judgment "in the limited partnership's favor." TEX. BUS. ORGS. CODE § 153.401.[63] When the trial court entered judgment, Section 153.405 of the Business Organizations Code, entitled "Expenses of Plaintiff," stated:[64]

> If a derivative action is successful, wholly or partly, or if anything is received by the plaintiff because of a judgment, compromise, or settlement of the action or claim constituting a part of the action, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct the plaintiff to remit to a

---

[63] The Texas Legislature amended Section 153.401 of the TBOC in 2019. *See* Act of June 10, 2019, 86th Leg., R.S., ch. 899, § 25, sec. 153.401, 2019 Tex. Sess. Law Serv. 899 (current version at TEX. BUS. ORGS. CODE § 153.402). Because the amendment was not effective until September 1, 2019, the former version of Section 153.401 applies to this appeal. Thus, all references to Section 153.401 are to the former version of this section unless otherwise noted.

[64] In 2019, the Texas Legislature amended Section 153.405 of the TBOC. *See* Act of June 10, 2019, 86th Leg., R.S., ch. 899, § 29, sec. 153.405, 2019 Tex. Sess. Law Serv. 899 (current version at TEX. BUS. ORGS. CODE § 153.411). Because the amendment was not effective until September 1, 2019, the former version of Section 153.405 applies to this appeal. Thus, all references to Section 153.405 are to the former version of this section unless otherwise noted.

party identified by the court the remainder of the proceeds received by the plaintiff.

TEX. BUS. ORGS. CODE § 153.405.[65]  Under the plain language of Section 153.405, Lisa can recover only her "reasonable expenses, including reasonable attorney's fees" and the court shall direct Lisa "to remit to a party identified by the court the remainder of the proceeds received by [her]."[66]  *Id.*  Lisa is thus not entitled to a direct distribution of the damages awarded for her derivative claim.

Lisa argues that nonetheless a court has discretion under Section 153.405 to award a share of the recovered damages directly to a limited partner in proportion to her ownership interest in a derivative action brought on behalf of a closely held limited partnership.  Lisa cites to this Court's opinion in *Beach Capital Partnership, L.P. v. DeepRock Venture Partners L.P.*, 442 S.W.3d 609 (Tex. App.—Houston [1st Dist.] 2014, no pet.), but her reliance on that case is misplaced.

---

[65]  Under the current version of Section 153.405, now codified at Section 153.411, the court may order "the limited partnership to pay expenses the plaintiff incurred in the proceeding if the court finds the proceeding has resulted in a substantial benefit to the limited partnership."  TEX. BUS. ORGS. CODE § 153.411(b)(1).  Expenses include attorney's fees, costs, or expenses for which the limited partnership may be required to indemnify another person.  *Id.* § 153.411(a).

[66]  In contrast, Section 101.463 of the TBOC expressly states that under certain circumstances, courts may treat a derivative proceeding brought by a member of a closely held limited liability company as a direct action brought by the member for the member's own benefit and award any recovery on the claim directly to the member.  TEX. BUS. ORGS. CODE § 101.463(c).  In 2019, the Texas Legislature amended the TBOC and added a similar provision for closely held limited liability partnerships.  *See id*. § 153.413(c).  Section 153.413, however, only applies to a derivative suit filed on or after September 1, 2019.

In *Beach Capital Partnership*, the majority partner brought a derivative suit on behalf of the partnership, Playa. *Id.* at 613. The jury assessed the damages caused to Playa at $500,000, and because the trial court simultaneously awarded damages and ordered the dissolution of Playa, it awarded 80% of the jury's award, or $375,000, directly to *DeepRock* as the majority partner. *Id.* at 616. This Court held the trial court had not erred in awarding a portion of a derivative damage award directly to a limited partner under Section 153.405, but it did so because "the judgment dissolved Playa and ordered Playa's receiver to distribute all remaining assets to DeepRock." *Id.* This part of the judgment was not challenged by the parties. This Court thus held that the direct award to DeepRock was "entirely consistent with a payment of $500,000 to Playa and its simultaneous distribution to Playa's partners," especially "in light of the unchallenged judgment that all of [the dissolved partnership's] remaining assets be distributed immediately to [the limited partner]." *Id.* ("That the award was direct, rather than passing through the hands of the receiver, has no practical impact, nor was it improper.").

The holding in *Beach Capital Partnership* has no application here. SignAd, Ltd. has not been dissolved, nor did the trial court direct a receiver to distribute the remaining assets of the partnership to the limited partners. Lisa is thus not entitled to a direct distribution of damages for the derivative claim she filed on behalf of SignAd, Ltd.

136

We sustain the Company Appellants' challenge to the award of direct damages to Lisa for this derivative claim and we reverse the portion of the Amended Final Judgment awarding Lisa direct damages for the derivative claim she asserted on behalf of SignAd, Ltd.[67]

## C.    Other Errors

The Company Appellants argue that there are "flagrant" errors throughout the jury charge that require reversal.  They first argue that the erroneous intermingling of unpled legal theories included in the books and records and derivative claims tainted many of the individual claims, if not the entire verdict.  We have already concluded, however, that the legal theories at issue were sufficiently pleaded and were properly submitted to the jury.

The Company Appellants also assert that the category of damages submitted in Jury Question 29 did not include the proper legal measures of damages.  They argue that Jury Question 29 improperly instructed the jury to consider a specific category of purported damages in the form of "legal fees paid on behalf of individuals," as selected by Enriquez.  According to the Company Appellants, this

---

[67]    The Company Appellants also argue the trial court abused its discretion in awarding attorney's fees to Lisa on this claim because the plain language of Section 153.405 authorizes an award of fees and expenses to the derivative plaintiff out of any proceeds recovered by the plaintiff, and not a separate award of fees and expenses in addition to the damages awarded.  We address these arguments later in our opinion under our discussion on attorney's fees.

is an improper comment on the weight to be given Enriquez's testimony. The Company Appellants argue the proper measure of damages in this case is "the loss suffered by the company."[68] This argument lacks merit.

An improper comment on the weight of the evidence occurs when the judge (1) assumes the truth of a material controverted fact, (2) exaggerates, minimizes, or withdraws some pertinent evidence from the jury's consideration, or (3) suggests to the jury the trial judge's opinion concerning the matter about which the jury is asked. *See Halmos v. Bombardier Aerospace Corp.*, 314 S.W.3d 606, 617 (Tex. App.— Dallas 2010, no pet.). None of these occurred here. Moreover, Enriquez testified that SignAd, Ltd. improperly paid $384,366 in personal legal fees for Wes, Jr., Lee, Stacey, and Mark unrelated to the company. This was the loss suffered by SignAd, Ltd. and thus a proper measure of damages for SignAd GP, LLC's breach of fiduciary duty.

The Company Appellants also argue the trial court improperly charged the jury with six books and records liability questions that essentially asked the jury the same question multiple times. They claim the repetitive questioning was "prejudicial to SignAd, [Ltd.,] a comment on the evidence, and calculated to do

---

[68] The Company Appellants also argue the proper measure of damages was not included in Jury Question 33, involving the derivative claim Lisa filed on behalf of SignAd GP, LLC. Because we are reversing the Amended Final Judgment awarding damages for that derivative claim, we need not address this argument.

nothing more than nudge the jury to answer the questions favorably for Lisa." The questions, however, were not repetitive. They involved different parties alleged to have violated either an agreement or statute.

The Company Appellants further complain the trial court did not instruct the jury to consider only pre-litigation requests for books and records, thus allowing the jury improperly to consider requests for production and resulting discovery disputes. We have found no authority supporting the assertion that a jury can consider only pre-litigation requests for books and records. And the Company Appellants' reliance on *Uvalde Rock Asphalt Company v. Loughridge*, 425 S.W.2d 818 (Tex. 1968) (orig. proceeding) in support of their argument is misplaced. In that case, Uvalde Rock Asphalt Company's shareholders, the Whites, made a written demand to inspect the company's books and records. *Id.* at 819. When the company refused the demand, the Whites filed a petition for a writ of mandamus to compel the company to allow them immediate access to the books and records. *Id.* Thereafter, the Whites filed a "motion for discovery requesting the right to inspect fourteen named items, comprising virtually all of the books and records of the Company." *Id.* at 820. The Texas Supreme Court held the company was entitled to a jury trial on the issue of whether the Whites were requesting access to the books and records for a proper purpose and the trial court abused its discretion in granting the Whites' motion for discovery because otherwise the Whites would receive discovery of all the relief

139

they sought in their lawsuit, effectively denying the company its right to a jury trial on the matter. *Id.* The Court's opinion in *Uvalde Rock Asphalt Company* does not address the question presented here—charge error—and is therefore distinguishable.

Last, the Company Appellants argue the trial court improperly allowed Enriquez to testify "about the 'difficulty' in obtaining documents based, in part, on the parties' discovery disputes." They further contend that the "evidence was extremely prejudicial to SignAd and admitted over objection." To preserve error with respect to the admission of evidence, the complaining party must timely and specifically object to the evidence and obtain a ruling. TEX. R. APP. P. 33.1(a); *see also* TEX. R. EVID. 103(a). When Enriquez was asked if this case was any different from the other cases she had worked on as a forensic accountant, she replied that "the difficulty in getting the records" in this case was the most significant differentiating factor. No objection was raised.[69] Because the Company Appellants

---

[69] It was not until the next day that during Enriquez's testimony, the Company Appellants argued, "Your Honor, as you know, you have an earlier ruling that excludes all discussion of discovery and discovery orders in this case. I want to object to counsel and this witness' continual references to documents that were requested, documents that were produced and when they were produced. . ." The Company Appellants' counsel argued that the testimony was "opening this door to the discovery and the discovery disputes that you specifically excluded." The trial court disagreed that the testimony violated its previous instructions, "I didn't hear the Plaintiff mention that they had to file motions to compel and that the Court granted the motions to compel and that was only produced after an order compelling production."

did not object to Enriquez's testimony, they have not preserved anything for our review.

We overrule the Company Appellants' challenges to the judgment based on these alleged errors.

## D. Oppression

The Company Appellants argue there is no evidence supporting the jury's finding of oppression. They argue "there is no evidence or factually insufficient evidence to support the finding, or that Wes, Jr., Lee, or Stacey 'abuse[d] their authority' with the 'intent to harm anyone in a manner that does not comport with the honest exercise of their business judgment, and by doing so created a serious risk of harm to [the Company Appellants].'" They further contend there is no evidence that any alleged actions by Wes, Jr., Lee, or Stacey were severe and created exigent circumstances, were inconsistent with their duty to exercise their honest business judgment for the benefit of the Company Appellants, and involved an unjust exercise or abuse of power.[70]

The Company Appellants further contend that even more problematic is the fact that Jury Question 47 (on oppression) broadly inquired as to the conduct of the

---

[70] The Company Appellants do not cite to any testimony or evidence in the twenty-four-volume reporter's record from a four to five weeklong jury trial in their opening brief to support their arguments. In their reply brief, they address the evidence identified in Lisa's response. We limit our analysis to that evidence.

"governing persons" (those "who are entitled to manage and direct the affairs of an entity") rather than any named individuals. Lisa was a member of the Board of Managers of each of the General Partners and therefore among those implicated in the alleged oppressive conduct. Consequently, they argue, it was error for the court to give any effect to the jury's finding of oppression when the jury's answer could have been based on Lisa's behavior.

### 1. Standard of Review and Applicable Law

Section 11.404 of the Texas Business Organizations Code authorizes Texas courts to appoint a receiver to rehabilitate a domestic entity under certain circumstances. TEX. BUS. ORGS. CODE § 11.404. Relevant to this appeal, Section 11.404(a)(1)(C) allows a trial court to appoint a receiver for the entity's property and business if "in an action by an owner or member of the domestic entity, it is established that . . . the actions of the governing persons of the entity are illegal, *oppressive*, or fraudulent." *Id.* § 11.404(a)(1)(C) (emphasis added).

The term "oppressive" is not defined in the statute. In *Ritchie v. Rupe*, 443 S.W.3d 856 (Tex. 2014), the Texas Supreme Court held that an entity's directors or managers engage in oppressive action "when they abuse their authority over the [entity] with the intent to harm the interests of one or more of the [partners or members], in a manner that does not comport with the honest exercise of their business judgment, and by doing so create a serious risk of harm to the [entity]." *Id.*

142

at 871; *id.* at 867 (holding "complained-of actions must create exigent circumstances for the corporation"). The Court held that by grouping the term "oppressive" with "illegal" and "fraudulent" under the relevant statute, the Legislature signaled that the term "oppressive" should be construed to include acts that are as serious as illegal or fraudulent acts. *Id.* at 869–70 ("We must construe the third of these terms— 'oppressive'—in a manner consistent with the severity of these concepts"). "Courts must exercise caution in determining what actions constitute oppressive conduct." *See Argo Data Res. Corp. v. Shagrithaya*, 380 S.W.3d 249, 265 (Tex. App.—Dallas 2012, pet. denied) (citing *Willis v. Bydalek*, 997 S.W.2d 798, 801 (Tex. App.— Houston [1st Dist.] 1999, pet. denied) *disapproved of on other grounds by Ritchie*, 443 S.W.3d at 870–71 n.17).

"A corporation's officers and directors are afforded broad latitude in conducting corporate affairs and the minority shareholder's expectations must be balanced against the corporation's need to exercise its business judgment and run its business efficiently." *Argo Data Res. Corp.*, 380 S.W.3d at 265. "Courts take a broader view, however, of what constitutes oppressive conduct in a closely held corporation where oppression may be found more easily." *Id.*

Although it is within the jury's province as factfinders to determine whether certain acts occurred, whether such acts constitute oppression is a question of law for the court. *Id.* at 264; *Willis*, 997 S.W.2d at 801; *Davis v. Sheerin*, 754 S.W.2d

143

375, 383 (Tex. App.—Houston [1st Dist.] 1988, writ denied), *disapproved of on other grounds by Ritchie*, 443 S.W.3d at 876. We review questions of law de novo. *See Argo Data Res. Corp.*, 380 S.W.3d at 264. We have the duty to evaluate legal conclusions independently and we are not obligated to give deference to the trial court's legal conclusions. *See id.*

### 2. Analysis

The question of oppression was presented to the jury in Jury Question 47. The question states: "Do you find that the actions of the governing persons of the entities listed below were oppressive?" The jury had to respond separately as to nine Limited Partnerships (SignAd, Ltd., Ben Nevis, West., Ltd., Big Eastex #1, Ltd., Big Signs & Leasing #1, Ltd., Big Signs & Leasing #2, Ltd., Big Signs & Leasing #3, Ltd., Big Signs & Leasing #4, Ltd., Big Signs & Leasing #5, Ltd., and Big Signs & Leasing #6, Ltd.) and two General Partners (Realty Acquisitions & Holdings, LLC and Big Leasing, LLC).[71] The jury was instructed that:

> An entity's directors or managers engage in oppressive actions when they abuse their authority over the entity with the intent to harm the interests of one or more of the partners or member[s], in a manner that does not comport with the honest exercise of their business judgment, and by doing so they create a serious risk of harm to the entity.
>
> Oppressive actions include acts that have the following characteristics:

---

[71] All of the listed General Partners and Limited Partnerships are closely held.

144

- They are severe and create exigent circumstances;

- They involve an unjust exercise or abuse of power that harms the rights or interests of persons subject to the governing persons' authority and disserves the purpose for which the power is authorized; and

- They are inconsistent with the governing person's duty to exercise their honest business judgment for the benefit of the entities.

The jury answered "yes" to Jury Question 47 for all nine of the Limited Partnerships and "yes" for Realty Acquisitions & Holdings, LLC and Big Leasing, LLC.[72] In the Amended Final Judgment, the trial court granted injunctive relief and appointed a rehabilitative receiver based in part on the jury's findings of oppression.

Jury Question 47 defined the term "governing person." It stated that "[a] person is a governing person of an entity if he is the person or is among the group of persons who are entitled to manage and direct the affairs of an entity. An officer is not a governing person." The question, however, did not identify any individual by name. It referred only generally to "governing persons." Thus, the jury was not asked to respond as to any named individual. Given the definition of "governing persons," we agree that, as a member of the Board of Managers, Lisa qualifies as a "governing person" and the jury's finding of oppression arguably could have been based on Lisa's own conduct. This would be consistent with the jury's finding under

---

[72] Jury Question 47 did not ask the jury to make a determination as to SignAd GP, LLC or Culcreuch West, LLC.

145

Jury Question 46 that Lisa engaged in conduct relating to the partnership business of each of the nine Limited Partnerships that made "it not reasonably practicable to carry on the business in partnership with [her]," especially given that in response to Jury Question 44, the jury found that Wes, Jr., Lee, Stacey, SignAd GP, LLC, and the other General Partners had not engaged in such conduct. The fact that the oppression finding could have been based on Lisa's own conduct, however, does not mean that Jury Question 47 and the jury's findings of oppression should be disregarded.

Lisa argues that Wes, Jr., Lee, and Stacey are a controlling majority of SignAd GP, LLC's Board of Managers and the boards for the other Company Appellants. She argues they abused their power to marginalize her by withholding information, refusing her requests for more transparency, and effectively excluding her from the family business. After years of refusing Lisa's requests for additional financial information, Lisa had to hire a lawyer and eventually file suit to obtain the Company Appellants' books and records to conduct a forensic audit. Despite Lisa's rights to access the books and records of the company, Wes, Jr. told Lisa's attorney that he would never provide her with confidential company information. And when the requested information was finally provided, Lisa claims it revealed irregularities such as self-dealing transactions involving Wes, Jr., failure to maintain internal

146

controls, improper use of company funds, and accounting deficiencies that threatened the S-Corporation status of SignAd, Ltd.

Lisa then points out that during the highly contentious March 2013 board meeting, Wes, Jr., Lee, and Stacey voted down Lisa's requests for greater disclosures. They also voted to stop having regular board meetings (except for the annual meeting), they re-established an Executive Committee that included all of them but excluded Lisa, and appointed Stacey to serve on SignAd GP, LLC's Executive Committee along with Lee and Wes, Jr. By doing do, Lisa argues, Wes, Jr., Lee, and Stacey effectively excluded Lisa from management or, at a minimum, Lisa's role in the management of the Company Appellants was greatly diminished. Lisa also argues that days after the meeting, Wes, Jr., with Lee and Stacey in agreement, tried to have Lisa involuntarily committed to a mental hospital "in a depraved attempt to silence and intimidate" her and "remove her from the board." Lisa argues that the sum of these actions is sufficient evidence to establish "abuse of power by Wes, Jr., Lee and Stacey as control persons of the SignAd entities that harmed both Lisa and the company, created exigent circumstances, and were completely inconsistent with the honest exercise of business judgment."

Lisa does not cite any authority to support her argument that the alleged conduct constitutes oppression as a matter of law. The Company Appellants reply that the alleged actions do not constitute oppression because as a limited partner,

147

Lisa was "prohibited from 'tak[ing] part in the management' of the partnership" and although "she serves on the Board, the Board acts by majority vote." They argue that being outvoted on her "audit requests, appointment to the Executive Committee, or regarding the reduction of annual Board meetings" is not oppression. Finally, the Company Appellants argue that once Lisa received the financial information she requested, she did not find evidence of fraud, but only "hypothetical potential tax penalties unlikely to ever be assessed." More to the point, they argue that none of the findings described any "act taken directly against Lisa, as is required for 'oppressive conduct.'" *See Ritchie*, 443 S.W.3d at 871 (holding that, among other things, oppression requires conduct taken "with the intent to harm the interests of one or more of the shareholders").

We conclude that the conduct Lisa describes does not amount to oppression as a matter of law. *See Argo Data Res. Corp.*, 380 S.W.3d at 264 (stating factfinders determine whether certain acts occurred, but whether such acts constitute oppression is question of law for court). While the sum of Lisa's complained-of conduct certainly impacted Lisa negatively, and some of the conduct was found by the jury to be improper, such as the failure to provide Lisa with the financial records to which she was entitled, we cannot say that Wes, Jr., Lee, or Stacey abused their authority over any of the Company Appellants by engaging in such conduct in a manner that did not comport with the honest exercise of their business judgment thereby creating

148

a serious risk of harm to the business. *See Ritchie*, 443 S.W.3d at 871 (holding directors or managers engage in oppressive actions "when they abuse their authority over the [entity] with the intent to harm the interests of one or more of the [partners or members], in a manner that does not comport with the honest exercise of their business judgment, and by doing so create a serious risk of harm to the [entity]").

Lisa points to the fact that once she received the Company Appellants' financial information, her accountant, Enriquez, discovered evidence of self-dealing transactions by Wes, Jr., such as failures to maintain internal controls, improper use of company funds and assets, and accounting deficiencies Enriquez believed could result in substantial IRS penalties and the loss of SignAd, Ltd.'s S-Corporation status.[73] The jury found that Wes, Jr. breached his fiduciary duties to SignAd, Ltd. in self-dealing transactions with ProIce which caused a loss of $750 for the fair market value of services provided to ProIce in the past, plus $300 per month for the value of services that, in reasonable probability, will be provided to ProIce in the

---

[73] Enriquez concluded that, in her opinion, the purported conduct did not comport with SignAd, Ltd.'s governing documents and could potentially put SignAd, Ltd.'s S-Corporation status "at risk," which might present a tax problem for SignAd, Ltd. sometime in the future. The Company Appellants argue that any risk to SignAd, Ltd.'s S-Corporation status was only a "theoretical possibility" because the Internal Revenue Service had not made any inquiries and no penalties had been assessed or paid.

future.[74]  The jury also found that Wes, Jr., Lee, and Stacey breached their fiduciary duties to SignAd GP, LLC, causing a loss of $461,193 for "lack of internal controls regarding fringe benefits," and $40,000 for selling company vehicles for less than fair market value.[75]  And the jury found that SignAd GP, LLC breached its fiduciary duties to SignAd, Ltd. by causing SignAd, Ltd. to pay $375,000 in non-business-related legal fees for Wes, Jr., Lee, Mark, and Stacey.  The jury further found that Wes, Jr., Lee, Stacey, and Mark knowingly participated in SignAd GP, LLC's breach of fiduciary duty and assigned a percentage of responsibility to each.[76]

Even if wrongful and detrimental to Lisa, we cannot, on the record before us, conclude that the alleged actions "created a serious risk of harm" to the entities or were "severe and create[d] exigent circumstances" for the Company Appellants as to constitute oppression.  *See Ritchie*, 443 S.W.3d at 867, 870–71 (defining what constitutes oppression and further holding that to qualify as type of "oppressive" conduct that justifies appointment of receiver, purported conduct must "create

---

[74]  As to this claim, we have already held that Wes, Jr. did not owe a fiduciary duty to SignAd, Ltd., and we are reversing the jury's finding on this cause of action.

[75]  We have already held that Lisa did not have standing to assert such a claim on behalf of SignAd GP, LLC, and we are reversing the jury's finding with respect to such derivative claim brought on behalf of SignAd GP, LLC.

[76]  We are affirming the portion of the Amended Final Judgment rendering judgment in favor of Lisa on this derivative cause of action filed on behalf of SignAd, Ltd., but we are reversing the portion of the Amended Final Judgment awarding Lisa one-sixth of the damages awarded for such claim.

exigent circumstances for the corporation"). While there is some evidence to support the alleged conduct on which Lisa relies, the conduct itself does not constitute oppression as a matter of law. *See id.* at 870–71 (defining oppression and holding that directors' refusal to meet with minority shareholder's potential buyers did not constitute oppression); *see also Argo Data Res. Corp.*, 380 S.W.3d at 265 (stating courts must exercise caution in determining what actions constitute oppressive conduct).

We sustain the Company Appellants' challenge to the sufficiency of the evidence supporting the jury's affirmative finding of oppression.

### E.  Injunctive Relief

The Company Appellants argue the trial court abused its discretion by awarding injunctive relief to Lisa. They argue there is no evidence of imminent harm or irreparable injury to Lisa. They also argue the issued injunction (1) grants relief Lisa did not request, (2) is not directed against any specific individual or entity, and (3) is impermissibly vague or prohibits otherwise lawful conduct. Finally, they argue there is no or insufficient evidence supporting the alleged wrongful acts upon which the injunctive relief was granted.

The injunctive relief granted by the trial court is set forth under Section 6 of the Amended Final Judgment. The trial court granted the injunctive relief based on the jury's findings that (1) Wes, Jr. breached his fiduciary duty to SignAd, Ltd. based

151

on transactions involving ProIce (Jury Question 15), (2) Wes, Jr., Stacey, Mark, and Lee knowingly participated in SignAd GP, LLC's breach of its fiduciary duty to SignAd, Ltd. involving payment of non-business-related legal fees (Jury Questions 24 and 26), (3) Wes, Jr., Stacey, and Lee breached their fiduciary duties to SignAd GP, LLC by failing to maintain internal controls on employee fringe benefits and selling company vehicles for less than fair market value (Jury Question 30), (4) Lee breached his informal fiduciary duty to Lisa (Jury Question 37), (5) nine of the Limited Partnerships and two General Partners engaged in oppression (Jury Question 47), and (6) the General Partners failed to provide Lisa with certain books and records (Jury Questions 8 to 9, 11 to 14).

As previously discussed, we are reversing the jury's findings as to claims (1), (3), and (5) above. With those holdings in mind, we address the Company Appellants' challenge to the trial court's issuance of injunctive relief.

### 1. Standard of Review and Applicable Law

We review a trial court's decision to grant or deny a permanent injunction for an abuse of discretion. *Operation Rescue–Nat'l v. Planned Parenthood of Hous. & Se. Tex., Inc.*, 975 S.W.2d 546, 560 (Tex. 1998); *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 642 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A trial court abuses its discretion when its decision is arbitrary, unreasonable, or without reference to any guiding rules or principles. *Downer v. Aquamarine*

152

*Operators, Inc.*, 701 S.W.2d 238, 241–42 (Tex. 1985); *Glattly*, 332 S.W.3d at 642.

A permanent injunction that is not supported by the pleadings or the evidence is an abuse of discretion. *See Webb v. Glenbrook Owners Ass'n*, 298 S.W.3d 374, 391 (Tex. App.—Dallas 2009, no pet.). There is no abuse of discretion if the trial court heard conflicting evidence and evidence appears in the record that reasonably supports the trial court's decision. *Glattly*, 332 S.W.3d at 642. We may not substitute our judgment for that of the trial court. *Id.*

To be entitled to a permanent injunction, a party must prove (1) a wrongful act, (2) imminent harm, (3) an irreparable injury, and (4) the absence of an adequate remedy at law. *Cypress Creek EMS v. Dolcefino*, 548 S.W.3d 673, 690 (Tex. App.—Houston [1st Dist.] 2018, pet. denied). To establish a probable, imminent, and irreparable injury, proof of an actual threatened injury, as opposed to a speculative or conjectural one, is required. *Texas Dep't of Public Safety v. Salazar*, 304 S.W.3d 896, 908 (Tex. App.—Austin 2009, no pet.). Fear or apprehension of possible injury is insufficient. *Id.* at 909. The question of whether a probable, imminent, and irreparable injury exists to warrant injunctive relief is a legal question for the court. *See Operation Rescue–Nat'l*, 975 S.W.2d at 554.

"Every order granting an injunction and every restraining order shall set forth the reasons for its issuance; shall be specific in terms; shall describe in reasonable detail and not by reference to the complaint or other document, the act or acts sought

to be restrained." TEX. R. CIV. P. 683. Thus, an injunction must be as "definite, clear, and precise as possible and when practicable it should inform the defendant of the acts he is restrained from doing. . ." *Computek Comput. & Office Supplies, Inc. v. Walton*, 156 S.W.3d 217, 220–21 (Tex. App.—Dallas 2005, no pet.). An injunction must also be narrowly drawn and "must not be so broad that it would enjoin a defendant from acting within its lawful rights"). *See TMRJ Holdings, Inc. v. Inhance Techs., LLC*, 540 S.W.3d 202, 212 (Tex. App.—Houston [1st Dist.] 2018, no pet.).

## 2. Sections 6(i)–(iii) — Acting Through Committees

Section 6(i) prohibits "the General Partners, the Limited Partnerships, the Individual Defendants, and their agents, servants, employees, representatives, and those acting in concert or participation with them, directly or indirectly" ("Enjoined Parties") from "conducting the business of any of the General Partners and Limited Partnerships through any committee in derogation of the responsibility of their respective Boards of Managers to manage SignAd." Section 6(ii) of the injunction prohibits the same parties from "conducting the business of any of the General Partners and Limited Partnerships through any committee without unanimous approval of all partners." And Section 6(iii) prohibits the same parties from "conducting the business of any of the General Partners and Limited Partnerships

154

through any committee without keeping accurate records of all actions taken by any committee."

Without further elaboration and in a single sentence, the Company Appellants argue the trial court committed error in granting this injunctive relief because there is no evidence that "SignAd (or any individual) was about to conduct SignAd business 'through any committee in derogation of responsibilities of their respective Boards' or 'without keeping accurate records.'"

### (a)  Wes, Jr., Lee, Stacey, and SignAd GP, LLC

The record reflects that SignAd GP, LLC has two committees: a Special Litigation Committee and an Executive Committee. In February 2014, Wes, Jr., Lee, and Stacey, in their capacity as SignAd GP, LLC's managers, passed a resolution creating a Special Litigation Committee to address Lisa's lawsuit against SignAd, Ltd. and SignAd GP, LLC and they appointed themselves to serve on the committee. Lisa voted against the resolution. Among other things, the resolution states, "[T]he Board believes that because [Lisa] is suing Company and Partnership, she has an irreconcilable conflict of interest with Company and Partnership with respect to the matters relating to the Lawsuit."

The resolution also amended Section 3.11 of SignAd GP, LLC's Regulations to allow a majority of the board to approve a resolution to create a committee. Previously, Section 3.11 required a "unanimous vote of the full Board of Managers"

to create a committee. The resolution further provides that "the Special Litigation Committee may, but shall not be required to make such reports to the Board with respect to its deliberations and recommendations"[77] and it indemnifies Wes, Jr., Lee, and Stacey "in the manner and to the fullest extent contemplated under the [Texas Business Organizations Code" and governing documents of Company and the applicable Partnership in effect as of the date of this meeting (collectively, the 'Current Documents') regarding indemnification and advancement of expenses to members of the Board against permitted items (as set forth in the Current Documents) arising out of the fact the Committee Member is a member of the Special Litigation Committee, regardless of whether the Current Documents are amended or modified in the future."

Lisa's expert, Enriquez, testified that in addition to relying on an accounts payable register, she also relied on the deposition testimony of Mike Phillips (SignAd, Ltd.'s controller) in concluding SignAd, Ltd. had used funds improperly to pay for the personal legal fees of Wes, Jr., Lee, Stacey, and Mark. According to Enriquez, Phillips testified that for fees concerning those individuals in their individual capacity, "[SignAd, Ltd.] pays for those expenses because the litigation committee had provided Mr. Wes Gilbreath, Jr. the right to essentially make that call." The jury found that SignAd GP, LLC had breached its fiduciary duties to

---

[77] Lisa continues to serve on SignAd GP, LLC's Board of Managers.

SignAd, Ltd. by causing SignAd, Ltd. to pay $375,000 in non-business-related legal fees for Wes, Jr., Lee, Stacey, and we are affirming that finding on appeal.

As concerns the SignAd GP, LLC's Executive Committee, Wes, Jr., Lee, and Brett served on that committee the purpose of which was to "examine real estate values and transactions for marketing purposes." According to the minutes from the March 2013 board meeting, the committee had not met since Brett resigned in 2011. During the March 2013 meeting, Wes, Jr., Lee, and Stacey, in their capacity as SignAd GP, LLC's managers, voted to appoint Stacey to fill Brett's former position.[78] Lisa voted against Stacey's appointment to the Executive Committee.

We have not found, and Lisa has not identified, any evidence that Wes, Jr., Lee, Stacey, and SignAd GP, LLC acted through the Executive Committee in "derogation of the responsibility of their respective Boards of Managers to manage SignAd." Nevertheless, the evidence demonstrates that Wes, Jr., Lee, and Stacey, as members of the SignAd GP, LLC Board of Managers and the Special Litigation Committee, authorized SignAd, Ltd. to pay for their personal legal fees because the Special Litigation Committee had given Wes, Jr. the right to authorize such payments. The jury's finding that SignAd GP, LLC, which can only act through its Board of Managers, breached its fiduciary duties to SignAd, Ltd. by causing it to pay such non-business-related legal fees demonstrates that Wes, Jr., Lee, and Stacey

---

[78]     Lisa characterizes their actions as reinstating a defunct committee.

operated SignAd GP, LLC's Special Litigation Committee "in derogation of the responsibility of their respective Boards of Managers to manage SignAd." The trial court could have inferred that Wes, Jr., Lee, and Stacey would continue to operate the Special Litigation Committee "in derogation of the responsibility of their respective Boards of Managers to manage SignAd" in light of the parties' ongoing disputes. Therefore, the trial court did not abuse its discretion by enjoining Wes, Jr., Lee, Stacey, and SignAd GP, LLC from engaging in the conduct prohibited by Section 6(i).

Although Section 3.11 of SignAd GP, LLC's Regulations previously required a "unanimous vote of the full Board of Managers" to create a committee, Wes, Jr., Lee, and Stacey voted in 2014 to amend Section 3.11 to require a vote from only the majority of the board to create a committee. Thus, because it is lawful for SignAd GP, LLC's Board of Managers to act "through any committee without unanimous approval of all partners" under the regulations, the trial court abused its discretion by enjoining Wes, Jr., Lee, Stacey, and SignAd GP, LLC from engaging in the conduct prohibited by Section 6(ii). *See TMRJ Holdings, Inc.*, 540 S.W.3d at 212 (holding injunction must be narrowly drawn and "must not be so broad that it would enjoin a defendant from acting within its lawful rights").

Unlike Section 6(ii), Section 6(iii) does not prohibit lawful conduct. SignAd GP, LLC's Regulations provide that while committees "shall serve at the pleasure

158

of the Board of Managers, and shall establish [their] own administrative and operational rules and procedures," they "shall be required to keep accurate records of all actions taken by [them]." Minutes from the March 2013 board meeting reflect that after Wes, Jr., Lee, and Stacey voted to appoint Stacey to the Executive Committee over Lisa's objection, Lisa insisted that the Executive Committee keep accurate records of its meetings or be disbanded. Lisa testified she was concerned Wes, Jr., Lee, and Stacey would use the committee to "circumvent" her. On November 18, 2015, Lisa prepared an addendum to the Limited Partners' meeting minutes in which she expressed her concerns about Wes, Jr., Lee, and Stacey's conduct, including the operation of SignAd GP, LLC's Executive Committee. Among her other grievances, Lisa asserted that "[n]o minutes or minimal minutes are kept from [the Executive Committee's] meetings and no notice is sent out to the board informing the board of the meeting dates."

Minutes from the Executive Committee's July 2013 meeting reflect the committee discussed "the real property assets to be sold and/or leased" and stated "[a] list of potential listings will be prepared for the committee." The minutes indicate the Executive Committee would evaluate whether to sell or lease some of SignAd GP, LLC's real property assets. Despite this anticipated action, the record does not contain minutes for any subsequent committee meeting or reflect any subsequent action taken by the Executive Committee. We further note that while

Wes, Jr., Lee, and Stacey established the Special Litigation Committee in February 2014, and conducted business through the committee, including authorizing Wes, Jr. to use SignAd, Ltd.'s funds to pay non-business-related legal fees, the record does not contain any meeting minutes for the committee. This is some evidence from which the trial court reasonably could have inferred that Wes, Jr., Lee, Stacey, and SignAd GP, LLC had conducted business through a committee in the past "without keeping accurate records of all actions taken by any committee" and they would continue to do so in the future unless enjoined. *See Schmidt v. Richardson*, 420 S.W.3d 442, 447 (Tex. App.—Dallas 2014, no pet.) (stating imminent harm is established by showing that party will engage in activity sought to be enjoined). Thus, the trial court did not abuse its discretion by enjoining Wes, Jr., Lee, Stacey, and SignAd GP, LLC from "conducting the business of any of the General Partners and Limited Partnerships through any committee without keeping accurate records of all actions taken by any committee," as set forth in Section 6(iii).

### (b)     Remaining Company Appellants

Except for SignAd GP, LLC, there is no evidence that the Board of Managers for any of the other Company Appellants conducted business through a committee, much less failed to keep accurate records. More importantly, there is no evidence from which the trial court could have inferred that any of the other Company Appellants will engage in such conduct in the future. We thus conclude there is no

160

evidence that Lisa will suffer imminent harm if these Company Appellants are not enjoined from engaging in the conduct prohibited by Sections 6(i)–(iii). Because there is no evidence of imminent harm with respect to the conduct set forth in sections 6(i)–(iii) as to SignAd, Ltd., Culcreuch West, LLC, Realty Acquisitions & Holdings LLC, Big Leasing, LLC, Ben Nevis West, Ltd., Big Eastex #1, Ltd., Big Signs & Leasing #1, Ltd., Big Signs & Leasing #2, Ltd., Big Signs & Leasing #3, Ltd., Big Signs & Leasing #4, Ltd., Big Signs & Leasing #5, Ltd., and Big Signs & Leasing #6, Ltd., the trial court abused its discretion by awarding Lisa injunctive relief as to those Company Appellants.

3.    **Section 6(iv) — Books and Records**

Section 6(iv) of the Amended Final Judgment prohibits the Enjoined Parties from "denying [Lisa] access to the books and records of the General Partners and Limited Partnerships as per the operative agreements and under Texas law until such time as an equitable buyout of Lisa Horan, Trustee's interests are bought out and fully paid for or she no longer serves on the boards of managers of any entity, whichever comes later."

The jury found that the General Partners—SignAd GP, LLC, Culcreuch West, LLC, Realty Acquisitions & Holdings LLC, and Big Leasing, LLC—failed to provide Lisa with the books and records she requested in violation of the Limited Partnership Agreements and the TBOC. As previously discussed, there is sufficient

161

evidence supporting the jury's findings. Among other things, the evidence demonstrates that Wes, Jr. told Lisa's lawyer in March 2013 that he would never allow Lisa to access the books and records, and it was ultimately necessary for Lisa to file suit to obtain the documents and information to which she was entitled, and even then, she did not receive everything she requested for another three years. The trial court could reasonably infer from this evidence that SignAd GP, LLC, Culcreuch West, LLC, Realty Acquisitions & Holdings LLC, and Big Leasing, LLC would continue to withhold the companies' books and records from Lisa in the future. We thus hold the trial court did not abuse its discretion by enjoining SignAd GP, LLC, Culcreuch West, LLC, Realty Acquisitions & Holdings LLC, Big Leasing, LLC, and their managers, Wes, Jr., Lee, and Stacey, from engaging in the conduct prohibited by Section 6(iv).

Lisa did not assert a similar cause of action against any of the Limited Partnerships and there are no findings that any of the partnerships breached an agreement or violated any statutory provisions relating to books and records. A party is not entitled to injunctive relief unless liability is established under a cause of action. *See Etan Indus., Inc. v. Lehmann*, 359 S.W.3d 620, 625 n.2 (Tex. 2011); *see also Valenzuela v. Aquino*, 853 S.W.2d 512, 514 n.2 (Tex. 1993) ("No final relief, including a permanent injunction, can be granted in a contested case without a determination of legal liability. . . ."); *Cooper v. Litton Loan Servicing, LP*, 325

S.W.3d 766, 769 (Tex. App.—Dallas 2010, pet. denied) (noting that "[a] permanent injunction is not a cause of action but an equitable remedy," and that "[t]o obtain an injunction a party must first assert a cause of action"). Because liability for the Limited Partnerships was not established, the trial court abused its discretion by enjoining the Limited Partnerships from denying Lisa access to the books and records as set forth in Section 6(iv).

### 4. Section 6(v) — Cash Reserves

Section 6(v) prohibits the Enjoined Parties from "retaining as cash reserves any more than 12% of each of the Limited Partnerships' net cash whether from operations or from the proceeds of capital transactions, without unanimous approval of the Board of Managers of each General Partner."

The Limited Partnership Agreements allow the General Partner for each of the Limited Partnerships to retain cash for cash reserves at its discretion and do not cap the amount that may be retained. SignAd, Ltd.'s Partnership Agreement states, "Net cash of the Partnership, if any, whether from operations or from the proceeds of capital transactions, shall from time to time, but not less often than once annually, be distributed to the Partners in the ratio of their Partnership Interests; provided, however, the Partnership may, as determined by the General Partner in its sole discretion, retain cash for cash reserves to insure the availability of funds for conducting operations of the Partnership and for paying any and all appropriate

163

expenses and obligations of the Partnership." The regulations for the other Limited Partnerships similarly provide in part that their respective General Partner "shall determine when, if ever, cash distributions shall be made to the partners, pursuant to the provisions and the tenor of this Agreement."

None of the governing documents require "unanimous approval of the Board of Managers of each General Partner." Thus, under the governing documents, it is permitted for the Enjoined Parties to retain "cash reserves [of] more than 12% of each of the Limited Partnerships' net cash whether from operations or from the proceeds of capital transactions, without unanimous approval of the Board of Managers of each General Partner." The trial court thus abused its discretion by awarding the injunctive relief set forth in Section 6(v). *See TMRJ Holdings, Inc.*, 540 S.W.3d at 212 (holding injunction must be narrowly drawn and "must not be so broad that it would enjoin a defendant from acting within its lawful rights").

### 5. Section 6(vi) — Modifying Governing Documents

Section 6(vi) of the injunction prohibits the Enjoined Parties from "attempting to further modify any of the governing documents of the Limited Partnership Defendants." SignAd, Ltd.'s Partnership Agreement, however, expressly allows its General Partner, SignAd GP, LLC to "amend or otherwise change" the partnership agreement, as long as more than 51% of the partners agree. The Limited Partnership Agreements for Ben Nevis West, Ltd., Big Eastex #1, Ltd., Big Signs & Leasing

164

##1–6, Ltd. also allow their respective General Partners to modify the partnership's governing document. Thus, it is lawful to "amend or otherwise change" the Limited Partnership Agreements. *See id.* (holding injunction must be narrowly drawn and "must not be so broad that it would enjoin a defendant from acting within its lawful rights"). The trial court thus abused its discretion by awarding the injunctive relief set forth in Section 6(vi).

### 6.   Section 6(vii) — "Devaluing" Assets

Section 6(vii) prohibits the Enjoined Parties from "devaluing the General Partners' and Limited Partnership Defendants' assets or interests." The Company Appellants argue the permanent injunction is impermissibly vague because it does not define the term "devaluing," provide a metric by which values should be determined, or otherwise specify the acts that would violate this particular injunction.

An injunction must be as "definite, clear, and precise as possible and when practicable it should inform the defendant of the acts he is restrained from doing. . . ." *Computek Comput. & Office Supplies*, 156 S.W.3d at 220–21. The term "devaluing" does not provide enough information to the Enjoined Parties to allow them, or this Court, to determine what conduct is prohibited. We further note that this injunctive relief is based in part on the jury's findings of breaches of fiduciary duties by Wes, Jr., Lee, Stacey, and SignAd GP, LLC and the jury's finding of

oppression. We are reversing the Amended Final Judgment awarding judgment in Lisa's favor on two of the causes of action for breach of fiduciary duty and the finding of oppression.

We thus remand this portion of the injunction to the trial court to (1) determine whether the requested relief is supported in light of our opinion, and if so, (2) to clarify with "definite, clear, and precise" language the specific acts and persons or entities to be enjoined under Section 6(vii).

### 7. Section 6(viii) — Payment of Personal Expenses

Section 6(viii) prohibits the Enjoined Parties from "using monies or assets from or generated by (or revenues generated by) any of the General Partners or Limited Partnership Defendants to pay personal expenses of or to unjustly enrich Wes, Jr., [Stacey] or Lee, including payment of individual legal fees not related to their agency for SignAd, Ltd. or its related entities." The Company Appellants argue that Section 6(viii) awards Lisa relief that she did not expressly plead for, namely, "including payment of individual legal fees not related to their agency for SignAd, Ltd. or its related entities."

"Persons seeking a permanent injunction must be specific in pleading the relief sought, and courts are without authority to grant relief beyond that so specified in the pleadings." *Livingston v. Livingston*, 537 S.W.3d 578, 588 (Tex. App.— Houston [1st Dist.] 2017, no pet.). "A pleading is sufficient if it gives the opposing

166

party adequate information to enable him to prepare a defense." *Id.* The "payment of individual legal fees not related to their agency for SignAd, Ltd. or its related entities" is one example of a personal expense the Enjoined Parties are prohibited from paying under this section of the injunction, and the improper payment of personal legal fees for Wes, Jr., Lee, Mark, and Stacey unrelated to their roles as managers of SignAd GP, LLC, is set forth in Lisa's pleadings and forms the basis of one of her derivative claims. Lisa's pleadings are sufficient to have put the parties on notice that she would be entitled to have such conduct enjoined. *See id.*; *see also Mendleski v. Silvertooth*, 798 S.W.2d 30, 33 (Tex. App.—Corpus Christi 1990, no writ) (holding trial court did not abuse its discretion in granting injunctive relief because "Appellant's petition as a whole did, however, allege facts which would permit an injunction against advertising the sale of prohibited food items.").

The Company Appellants further contend that the trial court abused its discretion by awarding Lisa the relief set forth in Section 6(viii) because there is no evidence of imminent harm. As previously discussed, there is evidence that SignAd GP, LLC breached its fiduciary duty to SignAd, Ltd. by causing SignAd, Ltd. to pay $375,000 in non-business-related legal fees for Wes, Jr., Lee, Mark, and Stacey. The trial court reasonably could have inferred that the Special Litigation Committee would continue to authorize SignAd, Ltd. to pay personal legal fees for Wes, Jr., Lee, Mark, and Stacey given the parties' ongoing disputes. Thus, there is some

evidence of imminent harm with respect to Wes, Jr., Lee, Stacey, SignAd GP, LLC, and SignAd, Ltd.

Except for SignAd, Ltd. and its General Partner, SignAd GP, LLC, there is no evidence that other limited partnerships ever used "monies or assets from or generated by (or revenues generated by) any of the General Partners or Limited Partnership Defendants to pay personal expenses of or to unjustly enrich Wes[,] Jr., [Stacey] or Lee," or that any of their General Partners authorized them to do so. There is also no evidence from which the trial court could have inferred that those entities will engage in such conduct in the future. Thus, the trial court abused its discretion by awarding Lisa injunctive relief against all parties other than SignAd, Ltd., SignAd GP, LLC, Wes, Jr., Lee, and Stacey under Section 6(viii). *See Schmidt*, 420 S.W.3d at 447 (stating imminent harm is established by showing that party will engage in activity sought to be enjoined).

### 8.      Section 6(ix) — Separate Business Endeavors

Section 6(ix) prohibits the Enjoined Parties from "using any personal property, personnel, or inventory of the SignAd entities in connection with separate business endeavors of [Wes, Jr.], [Stacey], and/or [Lee] without full disclosure and only after a unanimous vote by the partners that the transaction is fair to SignAd, Ltd. or any of the other General Partners and/or Limited Partnerships." This injunctive relief is based on the jury's finding that Wes, Jr. failed to "comply with

168

his fiduciary duty to SignAd, Ltd. with regard to the transactions with ProIce Solutions, LLC" and the jury's finding of oppression.[79] We are reversing the trial court's Amended Final Judgment awarding judgment in Lisa's favor on this breach of fiduciary duty cause of action and the finding of oppression. A party is not entitled to injunctive relief unless liability is established under a cause of action. *See Etan Indus., Inc.*, 359 S.W.3d at 625 n.2; *see also Valenzuela*, 853 S.W.2d at 514 n.2 ("No final relief, including a permanent injunction, can be granted in a contested case without a determination of legal liability. . . ."); *Cooper*, 325 S.W.3d at 769 (noting that "[a] permanent injunction is not a cause of action but an equitable remedy," and that "[t]o obtain an injunction a party must first assert a cause of action").

Because there is no finding of liability with respect to a cause of action that would support this injunctive relief, the trial court abused its discretion in awarding

---

[79] We note that the trial court also granted injunctive relief based on the jury's findings that (1) Wes, Jr., Stacey, Mark, and Lee knowingly participated in SignAd GP, LLC's breach of its fiduciary duty to SignAd, Ltd. by causing SignAd, Ltd. to pay non-business-related legal fees (Jury Question 24), (2) Wes, Jr., Stacey, and Lee breached their fiduciary duties to SignAd GP, LLC by failing to maintain internal controls on employee fringe benefits, and selling company vehicles for less than fair market value (Jury Question 30), (3) Lee breached his fiduciary duty to Lisa (Jury Question 37), and (4) the General Partners failed to provide Lisa with certain books and records (Jury Questions 8–9, 11–14). Unlike Wes, Jr., there is no evidence Lee or Stacey used SignAd Outdoor's personal property, personnel, or inventory in connection with any separate business endeavors and the jury's findings with respect to Lisa's books and records causes of action are unrelated to the injunctive relief awarded under Section 6(ix).

the injunctive relief under 6(ix).  *See Etan Indus., Inc*, 359 S.W.3d at 625 n.2; *see also Valenzuela*, 853 S.W.2d at 514 n.2.

### 9.  Section 6(x) — Distributions

Section 6(x) prohibits the Enjoined Parties from "withholding from Lisa Horan, Trustee and [sic] distributions of earnings until such time as the buyout of her interest in the SignAd entities is completed and she has received full payment of fair value for her interest."  We have not found, and Lisa has not directed us to, any evidence that any of the Company Appellants have withheld any distributions of earnings from her in the past or would continue to do so in the future unless prohibited.  Because there is no evidence of imminent harm with respect to the conduct prohibited in Section 6(x), the trial court abused its discretion by awarding Lisa injunctive relief on this basis.  *See Schmidt*, 420 S.W.3d at 447 (stating imminent harm is established by showing that party will engage in activity sought to be enjoined).[80]

### 10.  Section 6(xi) — Payment of Attorney's Fees and Damages

Section 6(xi) prohibits the Enjoined Parties from "paying any attorney's fees or damages of any of the Individual Defendants from income or accounts belonging to any of the General Partners or Limited Partnerships that constitute any part of the SignAd enterprise."  Although Lisa did not expressly plead for an injunction

---

[80]  We further note that Lisa did not plead for such relief.

precluding payment of attorney's fees for the individuals, Lisa pleaded that SignAd, Ltd. had improperly paid personal legal fees for Wes, Jr., Lee, Mark, and Stacey for non-business matters. This is sufficient to have put the parties on notice that she would be entitled to have such conduct enjoined. *See Livingston*, 537 S.W.3d at 588 ("A pleading is sufficient if it gives the opposing party adequate information to enable him to prepare a defense."); *see also Mendleski*, 798 S.W.2d at 33 (holding trial court did not abuse its discretion in granting injunctive relief that was not specifically requested because plaintiff's allegations and evidence otherwise supported propriety of relief).

We hold, however, that Section 6(xi) is overly broad because it prohibits payment of all attorney's fees and damages for Wes, Jr., Lee, and Stacey, even though they are entitled to indemnity under certain circumstances, such as when acting in their official capacities. *See TMRJ Holdings, Inc.*, 540 S.W.3d at 212 (holding injunction must be narrowly drawn and "must not be so broad that it would enjoin a defendant from acting within its lawful rights"). We remand this portion of the injunction with instructions to the trial court to modify the scope of the injunction under Section 6(xi) as to Wes, Jr., Lee, Stacey, SignAd, Ltd., and SignAd GP, LLC consistent with this opinion.

There is also no evidence that any Company Appellant other than SignAd, Ltd., through the SignAd GP, LLC Board of Managers and Special Litigation

171

Committee, ever paid attorney's fees or damages for any of the Individual Appellants or from which the trial court could have inferred that any of the other Company Appellants will engage in such conduct in the future. Because there is no evidence of imminent harm with respect to the conduct set forth in section 6(xi) for any parties other than SignAd GP, LLC, SignAd, Ltd., Wes, Jr., Lee, and Stacey the trial court abused its discretion by awarding Lisa injunctive relief against all other parties. *See Schmidt*, 420 S.W.3d at 447 (stating imminent harm is established by showing that party will engage in activity sought to be enjoined).[81]

## 11. Other Arguments

The Company Appellants argue that the permanent injunction is impermissibly vague because it enjoins the actions of the "General Partners, the Limited Partnerships, the Individual Defendants, and their agents, etc." but does not

---

[81] The Company Appellants contend there is no basis for enjoining SignAd GP, LLC's and Culcreuch West, LLC's activities because Lisa does not have any ownership interest in either entity. While that may be true, the argument is inconsequential. SignAd GP, LLC and Culcreuch West, LLC are the General Partners of two businesses that Lisa does have an ownership interest in—SignAd, Ltd. and Ben Nevis West, Ltd.—and SignAd GP, LLC and Culcreuch West, LLC are responsible for conducting the business of their respective limited partnership entities.

The Company Appellants also argue there is no evidence to support the trial court's findings that Wes, Jr., Stacey, and Lee breached their fiduciary duties to SignAd, Ltd., that Lee breached his fiduciary duty Lisa, or that the Company Appellants engaged in oppressive conduct or violated Lisa's rights to access the companies' books and records. As previously discussed, there is evidence supporting some of these findings and we have reversed some of the causes of action upon which the injunctive relief is based. We have addressed the impact of these issues with respect to the awards of specific injunctive relief.

identify those parties by name. The Amended Final Judgment, however, identifies the Company Appellants subject to judgment, including the injunction, and it identifies them as either a general partner or a limited partnership. This is specific enough to identify the companies subject to the injunction. We further note that although the Amended Final Judgment states that "The Court incorporates the Definitions attached as Exhibit A to this judgment as if fully set forth herein," no such document is attached to the final judgment. The Exhibit A, which is attached to the original judgment, expressly defines the terms "General Partners," "Limited Partnerships," and "Individual Defendants." Because we are already remanding the cause to the trial court to modify the injunction, we further instruct the trial court to attach Exhibit A to the modified permanent injunction. The trial court may also modify Exhibit A as necessary to effectuate the purpose of the injunction consistent with our opinion.

The Company Appellants also argue that the injunction refers generally to "SignAd," "the SignAd entities," and the "SignAd enterprise," but those terms are never defined. We agree that these statements are impermissibly vague, and we instruct the trial court to define or otherwise clarify the meaning of these terms, or delete or modify these terms, if appropriate, given the other modifications to be made to the permanent injunction on remand as identified in this opinion.

## 12. Conclusion

We hold that portions of the permanent injunction granted in the Amended Final Judgment are vague, overly broad, and prohibit lawful conduct. Lisa is also not entitled to other relief because there is no evidence of imminent harm or an absence of a finding of liability on an underlying cause of action that would support such relief. Finally, we are reversing two of the causes of action for breach of fiduciary duty and the finding of oppression that support the trial court's injunctive relief. We thus reverse the permanent injunction in part and remand the cause to the trial court with instructions to modify the injunction order consistent with this opinion.

## F. Appointment of a Receiver

The trial court appointed a rehabilitative receiver "to oversee the equitable buyout of Lisa Horan, Trustee's interests in the Limited Partnerships and General Partners in which she holds an interest" finding that such appointment "would avoid further damage to Lisa . . . and conserve the property and business of the entities." The Company Appellants argue that the trial court's appointment of a rehabilitative receiver under Section 11.404 of the TBOC was improper because (1) no evidence supports the requirements of Section 11.404(a) or (b), (2) no evidence supports non-statutory grounds for appointment of a receiver, such as the finding that Lee breached a fiduciary duty to Lisa, and (3) the scope of the appointment is overbroad.

174

The trial court appointed the rehabilitative receiver based on the jury's finding that (1) Lee breached his fiduciary duty to Lisa (Jury Question 37), and (2) nine of the Limited Partnerships and two General Partners engaged in oppression (Jury Question 47). We are reversing the jury's finding of oppression. With that holding in mind, we address the Company Appellants' challenge to the trial court's appointment of a receiver.

### 1.    Applicable Law

A receiver is an "officer of the court, the medium through which the court acts. He is a disinterested party, the representative and protector of the interests of all persons, including creditors, shareholders and others, in the property in receivership." *Akin, Gump, Strauss, Hauer and Feld, L.L.P. v. E-Court, Inc.*, No. 03-02-00714-CV, 2003 WL 21025030, at *4 (Tex. App.—Austin May 8, 2003, no pet.) (mem. op.) (quoting *Security Trust Co. of Austin v. Lipscomb Cnty.*, 180 S.W.2d 151, 158 (Tex. 1944)). When a court appoints a receiver, the court has determined that property should no longer be under the control of the parties but instead within the custody of the court. *Huffmeyer v. Mann*, 49 S.W.3d 554, 560 (Tex. App.—Corpus Christi 2001, no pet.) (quoting *Riesner v. Gulf, C. & S.F. Ry. Co.*, 36 S.W. 53, 54 (Tex. 1896)). The appointment of a receiver is thus a "harsh, drastic, and extraordinary remedy, to be used cautiously." *Benefield v. State*, 266 S.W.3d 25, 31 (Tex. App.—Houston [1st Dist.] 2008, no pet.). Whether authorized by a particular

statute or by equity, a receiver may not be appointed if another lesser remedy exists, either legal or equitable. *Id.*

Subsection 11.404(a)(1)(c)–(d) of the TBOC provides that "[s]ubject to Subsection (b), a court that has jurisdiction over the property and business of a domestic entity under Section 11.402(b) may appoint a receiver for the entity's property and business if: (1) in an action by an owner or member of the domestic entity, it is established that"

(A)  the entity is insolvent or in imminent danger of insolvency;

(B)  the governing persons of the entity are deadlocked in the management of the entity's affairs, the owners or members of the entity are unable to break the deadlock, and irreparable injury to the entity is being suffered or is threatened because of the deadlock;

(C)  the actions of the governing persons of the entity are illegal, oppressive, or fraudulent; [or]

(D)  the property of the entity is being misapplied or wasted.

TEX. BUS. ORGS. CODE § 11.404(a)(1)(c)–(d). Section 11.404(b) further states a court may appoint a receiver under Subsection (a) only if:

(1)  circumstances exist that are considered by the court to necessitate the appointment of a receiver to conserve the property and business of the domestic entity and avoid damage to interested parties;

(2)  all other requirements of law are complied with; and

(3)  the court determines that all other available legal and equitable remedies, including the appointment of a receiver for specific

property of the domestic entity under Section 11.402(a), are inadequate.

*Id.* § 11.404(b).

## 2. Analysis

The Company Appellants argue the trial court erred in appointing a rehabilitative receiver based in part upon the jury's finding of oppression because there is no evidence supporting the finding. Lisa counters that the appointment of the rehabilitative receiver was not erroneous because the relevant statute allows the trial court to appoint a receiver if there is a finding of oppression or the property of the entity is being misapplied or wasted. Lisa argues the jury found that "SignAd's governing persons . . . engaged in oppressive conduct" and further that several breaches of fiduciary duty occurred involving the waste or misapplication of company property.

Lisa's arguments do not support the appointment of a receiver. While the jury found that the governing persons of the entities identified in Jury Question 47 engaged in oppressive conduct, we have held there is no evidence to support the jury's finding of oppression. This is particularly significant because the only remedy for oppression is the appointment of a rehabilitative receiver. *See Ritchie*, 443 S.W.3d at 877.

Lisa's arguments regarding waste or misapplication of company property to support the appointment of a receiver also fail. Lisa contends waste is supported by

177

the jury's finding that (1) Wes, Jr. misused billboard space for his side busines ProIce (Jury Question 15), (2) SignAd GP, LLC misused SignAd, Ltd.'s funds to pay for personal legal fees (Jury Question 24), and (3) SignAd GP, LLC breached its fiduciary duty to SignAd, Ltd. because it failed to maintain internal controls on fringe benefits and sold company vehicles below market value (Jury Question 30). We are reversing the jury's findings as to claims (1) and (3) above. But more importantly, the trial court's appointment of a receiver was not based on any of the three causes of action listed above.

The trial court appointed a receiver based on only two grounds (1) "the governing persons of the General Partners and the Limited Partnerships engaged in oppressive conduct," and (2) Lee breached his informal fiduciary duty to Lisa. Because we are reversing the finding of oppression, the only remaining basis to support the trial court's appointment of a rehabilitative receiver is the jury's finding that Lee breached his informal fiduciary duty to Lisa (Jury Question 37). Lisa has not cited, nor have we found, any authority that such a breach of fiduciary duty authorizes a trial court, without more, to appoint a rehabilitative receiver, "one of the harshest remedies known to the law." *Jones v. Strayhorn*, 321 S.W.2d 290, 294 (Tex. 1959); *see also Benefield*, 266 S.W.3d at 31 (stating appointment of a receiver is "harsh, drastic, and extraordinary remedy, to be used cautiously" and receiver may not be appointed if another lesser remedy exists, either legal or equitable). Unlike

178

oppression, there are several remedies available for a breach of fiduciary duty claim. Indeed, Lisa already obtained injunctive relief based in part on Lee's breach of fiduciary duty.[82]

Because we are reversing the finding of oppression and Lee's breach of fiduciary duty does not support the trial court's appointment of a receiver under Section 11.404, we reverse the trial court's appointment of a rehabilitative receiver.

## G.    Expulsion

The Company Appellants asserted claims against Lisa for her expulsion from the Limited Partnerships under Section 152.501(b)(5)(C) of the TBOC.  Section 152.501(b)(5)(C) states that a partner may be expelled from a partnership by judicial decree "on application by the partnership or another partner, if the judicial decree determines that the partner" has "engaged in conduct relating to the partnership business that made it not reasonably practicable to carry on the business in partnership with that partner."  TEX. BUS. ORGS. CODE § 152.501(b)(5)(C).

At trial, the Company Appellants argued that Lisa should be expelled from the Limited Partnerships based primarily on her repeated disruptive and hostile conduct at board meetings and in interactions with other board members and the Company Appellants' management teams.  At the Company Appellants' request,

---

[82]    Lisa did not seek damages in connection with Lee's breach of fiduciary duty.

and without objection from Lisa, the trial court submitted a question to the jury (Jury Question 46) on the standard articulated in Section 152.501(b)(5)(C).

In response to Jury Question 46, the jury found that Lisa engaged in conduct relating to the business of each of the nine Limited Partnerships that made it not reasonably practicable to carry on the business in partnership with her.[83] The trial court, however, did not address this finding in the Amended Final Judgment or grant the Company Appellants' request for a decree of expulsion. The Company Appellants argue the trial court was not at liberty to disregard the jury's finding to Jury Question 46 and erred by failing to decree that Lisa should be expelled from the Limited Partnerships.

Lisa argues that Jury Question 46 is immaterial because Section 152.501 of the TBOC does not apply to limited partnerships, but only general partnerships. We disagree. While Chapter 153 governs limited partnerships and does not include a provision similar to Section 152.501, Section 153.003(a) provides that issues not addressed in Chapter 153 are controlled by "the provisions of Chapter 152 governing partnerships that are not limited partnerships." TEX. BUS. ORGS. CODE § 153.003(a). At least one court has determined that Section 152.501 applies to a limited partnership. *See Faulkner v. Kornman*, No. 10-301, 2012 WL 1066736, at *4

---

[83] Separately, under Jury Question 44, the jury found that Wes, Jr., Lee, Stacey, SignAd GP, LLC and the other General Partners had not engaged in such conduct.

180

(Bankr. S.D. Tex. Mar. 28, 2012) (applying Section 152.501(b)(6)(B) to limited partnership because "there is not a provision [of Chapter 153] which deals with withdrawal of a limited partner as a matter of law").

Lisa argues that the jury's finding in response to Jury Question 46 that she satisfied the criteria for expulsion was immaterial because the jury found multiple grounds supporting the appointment of a receiver and an equitable buyout, including oppression and breach of a fiduciary duty to Lisa. Lisa further contends that these separate jury findings support the receivership and equitable buyout ordered by the court, and the court could not simultaneously order an equitable buyout and expulsion. Lisa argues the court was not "required" to grant expulsion because that relief is equitable in nature and the court has discretion to decide upon the proper remedy in this case.

A question is immaterial when it should not have been submitted to the jury, or when it was properly submitted but has been rendered immaterial by other findings. *Spencer*, 876 S.W.2d at 157. In other words, "[a] jury question is considered immaterial when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict." *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex. 1995). A trial court is not at liberty to disregard a jury's answers to material issues. *See Harris Cnty. v. Garza*, 971 S.W.2d 733, 735 (Tex. App.—Houston [14th Dist.] 1998, no pet.) ("The judge may not

disregard answers to material issues, set aside findings and make contrary ones, hear additional evidence and make supplementary findings on material issues, or select from conflicting findings those which he approves.").

Given that the only remedy for oppression is the appointment of a rehabilitative receiver, the jury's finding of oppression in response to Jury Question 47 arguably rendered the jury's answer to Jury Question 46 immaterial. *See City of Brownsville*, 897 S.W.2d at 752 (holding jury question immaterial when its answer cannot alter verdict's effect); *see generally Ritchie*, 443 S.W.3d at 877 (stating only remedy for oppression is appointment of rehabilitative receiver). But even if the jury's finding that Lisa satisfied the criteria for expulsion under Jury Question 46 was rendered immaterial by the oppression finding, we are reversing the jury's finding of oppression and the trial court's corresponding appointment of a rehabilitative receiver. Under the circumstances, we believe it appropriate to remand the cause to the trial court to consider the jury's response to Jury Question 46 and the Company Appellants' request for a decree of expulsion under Section 152.501(b)(5)(C).

## H.    Attorney's Fees and Expenses

The Company Appellants argue the trial court abused its discretion by awarding Lisa $2,688,928.26 in attorney's fees and expenses because there are no legal or factual grounds to support the award. They also argue the trial court abused

its discretion in awarding attorney's fees against the General Partners "jointly and severally," because Lisa was required to segregate the fees owed by the different parties. The Company Appellants further contend the trial court abused its discretion by failing to award them their attorney's fees pursuant to the UDJA and Sections 153.404(e) and Section 101.461(b)(2) of the TBOC.

### 1.      Amended Final Judgment: Attorney's and Expenses

Section 9(a) of the Amended Final Judgment states:

(a) Derivative Claims: The Court determines that Plaintiff has met her burden to segregate fees pertaining to her derivative claims and that it is equitable and just that the sum of $1,162,318.49 as attorneys' fees and expenses in the amount of $682,028.43 ([$]598,205.86 in auditor's fees from Briggs & Veselka; $60,484.27 in fees from The Aguilar Group; $4,638.30 from Cornerstone Documents; and $18,700.00 for title searches) be awarded to Plaintiff under Tex. Bus. Com. Code [§] 153.405, and that it is equitable and just that these be paid by SignAd, Ltd.  The court finds that the proceedings resulted in substantial benefit to SignAd, Ltd. under Tex. Bus. Org. Code § 101.461(b)(1) and that Plaintiff Lisa Horan, trustee's derivative action was successful in whole or in part, under Tex. Bus. Org. Code § 153.405.

(b) Books and Records: The Court finds that Lisa Gilbreath Horan has met her burden to segregate fees related to her claim under Tex. Bus. Org. Code §§ 3.151 and 3.152 and awards to Lisa Gilbreath Horan the amount of $162,755,00 in reasonable and necessary attorneys' fees to be paid by the General Partners, jointly and severally.

(c) Non-segregable Fees and Expenses: The Court determines that the legal services provided to Plaintiff by counsel at trial advanced both recoverable and non-recoverable claims and can be considered so intertwined as to not require segregation and were reasonable and necessary. The Court also finds that certain expenses advanced both actions for which attorneys' fees were recoverable and those that were not. The Court also finds that the paralegal services provided by third

183

party contractor USLegal at the trial of this cause were of the type of work that would have necessarily have had to be performed by an attorney, performed under the supervision of an attorney, and were reasonable and necessary. The Court, therefore, orders that Plaintiff recover[] additional fees and expenses against the General Partners and SignAd, Ltd., jointly and severally, related to the pre-trial and trial of this matter as follow as:

| | |
|---|---|
| Crain Caton & James | $147,722.00 |
| The Cain Law Firm a/k/a Cain & Colabianci | [$]144,743.25 |
| USLegal | [$]28,780.00 |
| Total Non-segregable Fees | $321,242.25 |
| Total Non-segregable Expenses | $115,583.09 |

. . . .

(f)  Summary of Fees and Expenses:

| | |
|---|---|
| Fees after segregation related to derivative claims | $1,162,318.49 |
| Expenses related to derivative claims | [$]682,028.43 |
| Fees related to books and records | [$]162,755.00 |
| Non-segregable attorneys' fees | [$]321,243.25 |
| Non-segregable expenses and costs of court | [$]115,583.09 |
| Post-Trial | $35,000.00 |
| Appellate | $210,000.00 |

## 2.  Award of Attorney's Fees and Expenses to Lisa: TBOC §§ 101.461(b)(1) and 153.405

The trial court awarded Lisa $1,844,346.92 in attorney's fees and expenses in

connection with her three derivative claims to be paid by SignAd, Ltd. pursuant to Sections 101.461(b)(1) and 153.405 of the TBOC. *See* TEX. BUS. ORGS. CODE §§ 101.461(b)(1), 153.405. The Company Appellants argue the trial court abused its discretion because the plain language of Section 153.405 authorizes an award of fees and expenses to the derivative plaintiff out of any proceeds recovered by the plaintiff, and not as a separate award of fees and expenses in addition to the damages awarded. The Company Appellants also argue that Lisa cannot recover her fees and expenses under Section 101.461(b)(1) because this section applies only to derivative claims brought on behalf of a limited liability company. *See id.* § 101.461(b)(1) (stating "[o]n termination of a derivative proceeding, the court may order . . . the limited liability company to pay expenses the plaintiff incurred in the proceeding if the court finds the proceeding has resulted in a substantial benefit to the limited liability company"). "Whether a party is entitled to attorney's fees is a question of law." *Sunchase IV Homeowners Ass'n, Inc. v. Atkinson*, 643 S.W.3d 420, 422 (Tex. 2022).

The jury found for Lisa on three derivative claims: (1) one filed on behalf of SignAd GP, LLC against Wes, Jr., Lee, and Stacey (Jury Question 30), (2) one filed on behalf of SignAd, Ltd. against Wes, Jr. involving ProIce (Jury Question 15), and (3) one filed on behalf of SignAd, Ltd. against SignAd GP, LLC, Wes, Jr., Lee, Stacey, and Mark (Jury Questions 24 and 26) involving the payment of personal

legal fees. We are reversing the jury's finding with respect to derivative claims (1) and (2). The only remaining derivative claim is Lisa's claim filed on behalf of SignAd, Ltd. for payment of personal legal fees. We thus reverse the portion of the judgment awarding Lisa attorney's fees on derivative claims (1) and (2) above, leaving only Lisa's derivative claim stemming from the improper payment of personal legal fees for Wes, Jr, Stacey, Lee, and Mark. (Jury Questions 24 and 26).

The Company Appellants argue that Lisa cannot recover her fees and expenses under Section 101.461(b)(1) for her derivative claim because this section applies only to derivative claims brought on behalf of a limited liability company. *See* TEX. BUS. ORGS. CODE § 101.461(b)(1) (stating "[o]n termination of a derivative proceeding, the court may order. . . the limited liability company to pay expenses the plaintiff incurred in the proceeding if the court finds the proceeding has resulted in a substantial benefit to the limited liability company"). We agree that Section 101.461 applies only to derivative proceedings initiated on behalf of limited liability companies and because we are reversing the Amended Final Judgment on the derivative claim Lisa asserted on behalf of SignAd GP, LLC, Lisa is not entitled to recover her attorney's fees under Section 101.461(b)(1). Lisa can only recover attorney's fees for her remaining derivative claim under Section 153.405.

The Company Appellants argue the trial court abused its discretion because the plain language of Section 153.405, entitled "Expenses of Plaintiff," authorizes

186

an award of fees and expenses to the derivative plaintiff out of any proceeds recovered by the plaintiff, not as a separate award of fees and expenses in addition to the damages awarded. Lisa responds that Section 153.405 allows the trial court to award attorney's fees and expenses in addition to damages because it authorizes the award of attorney's fees and expenses even if there is no monetary recovery on the claim. She argues there is at least an open question as to whether attorney's fees and expenses in addition to damages are recoverable under the statute.

The version of Section 153.405 then in effect states:

> If a derivative action is successful, wholly or partly, or if anything is received by the plaintiff because of a judgment, compromise, or settlement of the action or claim constituting a part of the action, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct the plaintiff to remit to a party identified by the court the remainder of the proceeds received by the plaintiff.

TEX. BUS. ORGS. CODE § 153.405.[84]

In *CBIF Limited Partnership v. TGI Friday's Inc.*, No. 05-15-00157-CV, 2017 WL 1455407 (Tex. App.—Dallas Apr. 21, 2017, pet. denied) (mem. op.), the Dallas Court of Appeals addressed whether Section 153.405 provides an independent basis for the award of attorney's fees. The court stated:

> Section 153.405 of the business organizations code does not provide an independent basis for an award of attorney's fees to the [plaintiff] as against [the defendants]. TEX. BUS. ORGS. CODE ANN. § 153.405 (West

---

[84] Section 153.405 was amended and recodified as Section 153.411 of the Texas Business Organizations Code, effective September 1, 2019.

2012). Section 153.405 provides, "[i]f a derivative action is successful, wholly or partly, or if anything is received by the plaintiff because of a judgment, compromise, or settlement of the action or a claim constituting part of the action, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct the plaintiff to remit to a party identified by the court the remainder of the proceeds received by the plaintiff. *Id.* This statutory allocation of attorney's fees in derivative actions is analogous to the common-fund doctrine. *See, e.g., Dallas v. Arnett*, 762 S.W.2d 942, 954 (Tex. App.—Dallas 1988, writ denied) (the common fund doctrine is based on the principle that those receiving the benefits of the suit should bear their fair share of the expenses); *see also Bayoud v. Bayoud*, 797 S.W.2d 304, 315 (Tex. App.—Dallas 1990, writ denied) (attorney's fees are allowed in shareholder derivative suits where it is shown the suit has conferred substantial benefits on the corporation and its shareholders).

*Id.* at *6 n.7. We have not found any other Texas cases directly addressing this issue.[85]

Courts in other jurisdictions have addressed the issue with respect to similar statutes and reached differing conclusions. In *Little v. Cooke*, 652 S.E.2d 129 (Va. 2007), the Supreme Court of Virginia determined that the proceeds referred to in Section 50-73.65 of the Virginia Code were analogous to a "common fund." *Id.* at

---

[85] *Cf. Shannon Med. Ctr. v. Triad Holdings III, L.L.C.*, 601 S.W.3d 904, 918 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (trial court ordered defendant to pay plaintiff's and partnership's fees, expenses, and court costs, but defendant challenged only award of appellate attorney's fees on appeal); *DPRS 15th St., Inc. v. Tex. Skyline, Ltd.*, No. 03-11-00101-CV, 2014 WL 4058796, at *9–10 (Tex. App.—Austin Aug. 13, 2014, no pet.) (mem. op.) (trial court ordered defendant to pay attorney's fees to limited partnership under Section 153.405, but defendant argued on appeal only that limited partnership was not entitled to recover attorney's fees because fees had been paid by limited partner).

143. It held that attorney's fees and expenses are not recoverable in addition to the damages awarded to the partnership under the statute. *See id.* (interpreting similar statute and holding "circuit court erred by awarding reasonable attorneys' fees and expenses in *addition to* the other damages awarded to the Partnership" because statute, Section 50-73.65 of the Virginia Code, states "award of attorneys' fees and expenses must be paid from the 'common fund' received by the Limited Partners on behalf of the Partnership and the remainder remitted to the Partnership") (emphasis in original).[86] The court concluded that this view "is consistent with what is known as the 'common fund' exception to the 'American Rule' prohibiting the shifting of attorneys' fees to the losing party." *Id.* (citations omitted). "Instead, in accordance with the requirements of Code § 50–73.65, the award of attorneys' fees and expenses must be paid from the 'common fund' received by the Limited Partners on behalf of the Partnership and the remainder remitted to the Partnership." *Id.*

---

[86]    Section 50-73.65 of the Virginia Code states:

> If a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise or settlement of an action or claim, except as hereinafter provided, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct him to remit to the limited partnership the remainder of those proceeds received by him. On termination of the derivative action, the court may require the plaintiff to pay any defendant's reasonable expenses, including reasonable attorney's fees, incurred in defending the action if it finds that the action was commenced without reasonable cause or the plaintiff did not fairly and adequately represent the interests of the limited partners and the partnership in enforcing the right of the partnership.

VA. CODE ANN. § 50-73.65.

In *Fitzgerald v. Community Redevelopment Corporation*, 811 N.W.2d 178 (Neb. 2012), the trial court awarded attorney's fees to the plaintiffs in a derivative action and required the fees to be paid out of the general partner's and limited partner's own funds rather than out of the judgment. *Id.* at 202. The Nebraska Supreme Court affirmed holding that under the relevant statute, a derivative plaintiff can recover "expenses, including attorney['s] fees, as a separate component of the judgment." *Id.* Relying on the plain language of the statute, the court held that "the statute then requires that in a derivative action, the plaintiff may retain the portion of the judgment awarded as expenses, but any additional proceeds of the judgment that the plaintiff receives must be remitted to the partnership." *Id.* (citing NEB. REV. STAT. § 67-291) ("[W]e agree with the district court's determination that the attorney fees should be awarded in addition to the judgment rather than being taken out of the judgment.").[87]

We consider *Little* and *CBIF Limited Partnership* to be more persuasive and consistent with Texas jurisprudence. The Texas Supreme Court has adopted the

---

[87] Section 67-291 of the Revised Nebraska Statutes states:

> If a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise, or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct him or her to remit to the limited partnership the remainder of those proceeds received by him or her.

NEB. REV. STAT. § 67-291.

common fund doctrine, an equitable exception to the American Rule which provides that each litigant must bear his own attorney's fees, absent a statutory or contractual basis for an award of attorney's fees. *See Knebel v. Capital Nat'l Bank*, 518 S.W.2d 795, 799 (Tex. 1974); *see also Martin–Simon v. Womack*, 68 S.W.3d 793, 798 n.3 (Tex. App.—Houston [14th Dist.] 2001, pet. denied) ("The Texas Supreme Court has adopted a 'common fund' equitable exception to the general rule prohibiting recovery of attorney's fees absent contractual agreement or statute."). Under the common fund doctrine, a trial court may award reasonable attorney's fees to a plaintiff "who at his own expense has maintained a suit which creates a fund benefitting other parties as well as himself." *City of Dallas v. Arnett*, 762 S.W.2d 942, 954 (Tex. App.—Dallas 1988, writ denied) (citing *Trustees v. Greenough*, 105 U.S. 527 (1881); *Knebel*, 518 S.W.2d at 799–801). Any attorney's fees or expenses awarded must be paid from the common fund. *City of Dallas*, 762 S.W.2d at 954 (citing *Greenough*, 105 U.S. at 532–37; *Knebel*, 518 S.W.2d at 799). This is consistent with the common fund doctrine's underlying principle namely "that those receiving the benefits of the suit should bear their fair share of the expenses." *City of Dallas*, 762 S.W.2d at 954 (citing *Greenough*, 105 U.S. at 532–37; *Knebel*, 518 S.W.2d at 799). Although the common fund doctrine is often applied in class actions, Texas courts have also analyzed the equitable doctrine in derivative claims brought on behalf of corporations. *See Bayliss v. Cernock*, 773 S.W.2d 384, 386–

191

87 (Tex. App.—Houston [14th Dist.] 1989, writ denied) (discussing requirements for application of common fund doctrine for derivative claim on behalf of corporation).

Our holding is also consistent with the express language of Section 153.405 providing that "the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct the plaintiff to remit to a party identified by the court the *remainder of the proceeds* received by the plaintiff." TEX. BUS. ORGS. CODE § 153.405 (emphasis added). This suggests that an award of expenses under Section 153.405 must be paid out of recovered proceeds. Had the Legislature intended for a derivative plaintiff to recover expenses as a separate award under Section 153.405 it could have stated so. It did not.[88]

We thus hold that expenses and attorney's fees are not recoverable in addition to the damages awarded to the partnership under Section 153.405. Any award of

---

[88] In 2019, the Legislature amended Section 153.405. Unlike former Section 153.405, the new Section 153.411, also entitled "Payment of Expenses," now provides that on termination of a derivative proceeding, the court may order "the limited partnership to pay expenses the plaintiff incurred in the proceeding if the court finds the proceeding has resulted in a substantial benefit to the limited partnership." TEX. BUS. ORGS. CODE § 153.411(b)(1). We express no opinion as to the recovery of expenses under Section 153.411. We note, however, that unlike former Section 153.405, there is no provision under Section 153.411 providing that the "*remainder of the proceeds* received by the plaintiff" be remitted to a party identified by the court.

"reasonable expenses, including reasonable attorney's fees" to Lisa under Section 153.405 must be paid out of the proceeds she recovered on behalf of SignAd, Ltd.

We reverse the award of attorney's fees for Lisa's derivative claim stemming from the improper payment of personal legal fees for Wes, Jr., Stacey, Lee, and Mark (Jury Questions 24 and 26), and we remand for a new trial on the issue of attorney's fees and expenses with respect to this claim consistent with Section 153.405 and our opinion. *See* TEX. BUS. ORGS. CODE § 153.405.

The Company Appellants also contend that the award of attorney's fees for Lisa's derivative claims is excessive and that Lisa failed to segregate the attorney's fees relating to the derivative claims. Because we are reversing the trial court's Amended Final Judgment granting judgment in favor of Lisa on two of her derivative claims and remanding to the trial court for a new trial on the issue of attorney's fees, we need not address the Company Appellants' challenges to the attorney's fee award based on excessiveness or failure to segregate.

### 3. Award of Attorney's Fees and Expenses to Lisa: TBOC §§ 3.151 and 3.152

The trial court awarded Lisa $162,755.00 in attorney's fees and expenses in connection with her books and records claims to be paid by the General Partners, jointly and severally, pursuant to Sections 3.151 and 3.152 of the TBOC. *See* TEX. BUS. ORGS. CODE §§ 3.151, 3.152. The Company Appellants argue that the award of $162,755.00 in attorney's fees should be reversed because (1) Section 3.151 does

193

not authorize the recovery of fees, (2) Section 3.152 authorizes fees only in an action to compel access to books and records and Lisa did not file any such action, (3) Crain Caton & James' fees are not recoverable under Section 3.152 because the law firm did not represent Lisa in her capacity as a governing person, and (4) it was improper to award the fees against the General Partners jointly and severally.

Section 3.152 states:

(a) A governing person of a filing entity may examine the entity's books and records maintained under Section 3.151 and other books and records of the entity for a purpose reasonably related to the governing person's service as a governing person.

(b) A court may require a filing entity to open the books and records of the filing entity, including the books and records maintained under Section 3.151, to permit a governing person to inspect, make copies of, or take extracts from the books and records on a showing by the governing person that:

(1) the person is a governing person of the entity;

(2) the person demanded to inspect the entity's books and records;

(3) the person's purpose for inspecting the entity's books and records is reasonably related to the person's service as a governing person; and

(4) the entity refused the person's good faith demand to inspect the books and records.

(c) A court may award a governing person attorney's fees and any other proper relief in a suit to require a filing entity to open its books and records under Subsection (b).

(d) This section does not apply to limited partnerships. Section 153.552 applies to limited partnerships.

TEX. BUS. ORGS. CODE § 3.152. Section 3.151 sets forth the businesses'

194

record- keeping requirements.  *See id.* § 3.151.

### (a)    Sufficiency of the Evidence

Although Section 3.151 does not authorize an award of attorney's fees, Section 3.152 does.  Section 3.152(c) states that a "court may award a governing person attorney's fees and any other proper relief in a suit to require a filing entity to open its books and records under Subsection (b)."  *See id.* § 3.152(c).  The Company Appellants argue that Section 3.152 is inapplicable because Lisa did not bring a claim in this lawsuit in her capacity as a governing person to require a Company Appellant to "open its books and records" under Section 3.152(b).  They further argue there is "no evidence or factually insufficient evidence that Lisa satisfied the statutory conditions."

The Company Defendants do not dispute that Lisa is a governing person. With respect to the remaining requirements under Section 3.152(b), there is evidence Lisa demanded to inspect the books and records of the General Partners.  Lisa testified that she began making requests for copies of some of SignAd Outdoor's records in February 2013, and when her efforts were not fruitful, she hired an attorney, Reiner, to help her get access to the books and records.  The record also reflects that when Reiner called Wes, Jr. in March 2013 to demand access to the books and records, Wes, Jr. told him he would never provide Lisa with access to the requested documents.  As previously discussed, there is also sufficient evidence that

the General Partners failed to provide Lisa with the books and records to which she was entitled, and that Lisa had a proper purpose for demanding access to such books and records. There is also evidence that the General Partners did not provide Lisa access to all of the books and records to which she was entitled until well after she filed her lawsuit.

The Company Appellants argue that by the time Lisa asserted a claim under Section 3.152 she had already received the "complete books and records" and, therefore, she could not have sued to "open" their books and records, as required by Section 3.152(b) and (c). The only evidence they cite in support of their argument is the opening statement by Lisa's attorney indicating that Lisa had received all of the requested books and records before trial. Opening statements are not evidence. Moreover, whether Lisa had received all of the requested books and records by the time of trial does not discount the fact she filed suit to obtain such records, and that she filed a claim under Section 3.152. The trial court submitted a question to the jury on Lisa's claim against the General Partners under the statute. Jury Question 14 stated:

> Did the General Partners of which Lisa Horan was a governing person fail to provide:
>
> (1)   books and records of accounts;
>
> (2)   a current record of the name and mailing address of each owner or member of the filing entity;

(3) the General Partners' federal, state, and local information or income tax returns for each of the General Partners' six most recent tax years;

(4) the General Partners agreement and certificate of formation and all amendments or restatements; or

(5) other information regarding the business, affairs, and financial condition of the company that is reasonable for the person to examine and copy.

And the instructions under Jury Question 14 tracked the requirements of Section 3.152(b). The jury was instructed that in order "to find a General Partner failed to provide documents, you must find" that:

(1) [Lisa] is a governing person of the entity;

(2) [Lisa] demanded to inspect the entity's books and records;

(3) [Lisa's] purpose for inspecting the entity's books and records is reasonably related to [Lisa's] service as a governing person; and

(4) the entity refused [Lisa's] good faith demand to inspect the books and records.

The jury found that General Partners SignAd GP, LLC, Culcreuch West, LLC, Realty Acquisitions & Holdings, LLC, and Big Leasing LLC each failed to provide Lisa access to the books and records and the trial court entered judgment in Lisa's favor in accordance with the jury's findings.

Viewing the evidence and inferences in the light most favorable to the trial court's finding, we conclude there is more than a scintilla of evidence that (1) Lisa is a governing person who demanded to inspect the books and records of the General

197

Partners, (2) she had a proper purpose for doing so, (3) the General Partners refused her demand, and (4) Lisa sued the General Partners to force them to open their books and records. *See Kroger Texas Ltd.*, 216 S.W.3d at 793; *City of Keller*, 168 S.W.3d at 827 (stating appellate courts review evidence and inferences in light most favorable to jury's finding). Viewing all the evidence in a neutral light, we cannot say that the trial court's finding is "so contrary to the overwhelming weight of the evidence that the verdict is clearly wrong and unjust." *Mar. Overseas Corp.*, 971 S.W.2d at 406; *see generally Horner v. Heather*, 397 S.W.3d 321, 324 (Tex. App.— Tyler 2013, no pet.) (stating trial court's findings after bench trial may be reviewed for legal and factual sufficiency under same standards that are applied in reviewing evidence to support jury's answers).

### (b) Joint and Several Liability for Attorney's Fees

The Company Appellants argue that the trial court abused its discretion by awarding attorney's fees against the General Partners "jointly and severally" because Lisa was required to segregate the fees owed by the different parties. "A party seeking attorney fees has a duty to segregate nonrecoverable fees from recoverable fees, and to segregate the fees owed by different parties." *French v. Moore*, 169 S.W.3d 1, 17 (Tex. App.—Houston [1st Dist.] 2004, no pet.); *see also DMC Valley Ranch L.L.C. v. HPSC, Inc.*, 315 S.W.3d 898, 906 (Tex. App.—Dallas 2010, no pet.)

(stating segregation of attorney's fees between parties is required when different facts establish liability against different defendants).

Lisa contends that the requirement that fees be segregated between parties does not apply here because her books and records claims against the General Partners were essentially the same claim, based on the same course of conduct by the same decision-makers. *See French*, 169 S.W.3d at 17 (stating party is not required to segregate fees incurred "in connection with claims arising out of the same transaction, and are so interrelated that their prosecution or defense entails proof or denial of essentially the same facts"). Yet, in a separate portion of her brief, in response to the challenge to the appropriateness of the various questions on her books and records claims, Lisa argues that "[e]ach question was different because it involved different parties or different duties."

The General Partners are separate and distinct legal entities, each with their own respective books and records and corresponding obligations to provide or grant access to such records. As Lisa notes, each books and records question involved different entities and obligations under contractual or statutory grounds. Thus, Lisa was required to segregate the fees owed by the various entities.

We remand for a new trial on attorney's fees with respect to Lisa's books and records claims. Because we are remanding for a new trial on attorney's fees with

199

respect to these claims, we need not consider the Company Appellants' additional argument that Lisa did not properly segregate her attorney's fees.

### 4. Award of Attorney's Fees and Expenses to Lisa: Non-segregable Attorney's Fees and Expenses

The Amended Final Judgment awarded Lisa $436,826.34 in "non-segregable fees and expenses" to be paid by SignAd, Ltd. and the General Partners, jointly and severally. The trial court found that such amounts were based on "both recoverable and non-recoverable claims" and that certain expenses "advanced both actions for which attorneys' fees were recoverable and those that were not." The Company Appellants argue the trial court erred in awarding Lisa these fees and expenses because (1) the awards of attorney's fees and expenses on the derivative claims and books and records claims are improper, (2) the award is supported by insufficient evidence, (3) the amount of the fee award is disproportionate to the results Lisa sought and the results she obtained, and (4) there is no factual or legal basis for imposing the awards against SignAd, Ltd. and the General Partners "jointly and severally." Because we are reversing the award of attorney's fees for Lisa's books and records claims and her derivative claims, we reverse the award of non-segregable fees as well. We remand the cause to the trial court for a new trial on attorney's fees.

**5. Award of Attorney's Fees and Expenses to the Company Appellants: TBOC § 101.461(b)(2)**

The Company Appellants argue they are entitled to recover their attorney's fees under Section 101.461(b)(2) of the TBOC. *See* TEX. BUS. ORGS. CODE § 101.461(b)(2). The version of Section 101.461(b)(2) then in effect stated that on termination of a derivative proceeding brought on behalf of a limited liability company, "the court may order . . . the plaintiff to pay the expenses the domestic or foreign limited liability company or other defendant incurred in investigating and defending the proceeding if the court finds the proceeding has been instituted or maintained without reasonable cause or for an improper purpose." *Id.* "Whether a party is entitled to attorney's fees is a question of law." *Sunchase IV Homeowners Ass'n, Inc.*, 643 S.W.3d at 422.

The jury found for Lisa with respect to the sole derivative claim she asserted on behalf of a limited liability company, SignAd GP, LLC, and the trial court rendered judgment in her favor based on the jury's verdict (Jury Question 30). We are reversing the trial court's judgment on this claim finding that Lisa did not have standing to assert the derivative claim on behalf of SignAd GP, LLC and we are remanding to the trial court for a new trial on the issue of attorney's fees for the derivative claim Lisa asserted on behalf of SignAd, Ltd. (Jury Questions 24 and 26). On remand, the trial court is directed to determine whether SignAd GP, LLC is entitled to recover its expenses incurred in investigating and defending against Lisa's

derivative claim under Section 101.461(b)(1) of the TBOC. Tex. Bus. Orgs. Code § 101.461(b)(2).

### 6. Award of Attorney's Fees and Expenses to the Company Appellants: TBOC § 153.404(e) and Texas Civil Practice and Remedies Code § 37.009

The Company Appellants further contend they are entitled to recover their attorney's fees under Section 153.404(e) of the TBOC because Lisa's derivative claims are not supportable. Under the version then in effect, Section 153.404(e) states: "The court, on final judgment for a defendant and on a finding that [a derivative suit] was brought [on behalf of a limited partnership] without reasonable cause against the defendant, may require the plaintiff to pay reasonable expenses, including reasonable attorney's fees, to the defendant, regardless of whether security has been required." Tex. Bus. Orgs. Code § 153.404(e).

Lisa filed a derivative claim on behalf of SignAd, Ltd. asserting SignAd GP, LLC improperly directed SignAd, Ltd. to pay for the personal legal fees of Wes, Jr., Lee, Stacey, and Mark (Jury Questions 24 and 26). The jury found for Lisa on this claim and the trial court rendered judgment in her favor based on the jury's verdict. Because we are affirming the trial court's judgment with respect to this derivative claim, SignAd GP, LLC is not entitled to attorney's fees under Section 153.404(e).[89]

---

[89] Lisa also asserted a derivative claim on behalf of SignAd, Ltd. against Wes, Jr. involving certain transactions with ProIce. We are reversing the Amended Final

*See* TEX. BUS. ORGS. CODE § 153.404(e) (authorizing award of reasonable expenses, including reasonable attorney's fees to defendant "on final judgment for a defendant").[90]

The Company Appellants further argue that because Lisa cannot prevail under her claims for declaratory relief, they are entitled to fees under Section 37.009 of the Texas Civil Practice and Remedies Code for "defending the baseless action." Under the UDJA, a court "may award . . . reasonable and necessary attorney's fees as are equitable and just." TEX. CIV. PRAC. & REM. CODE § 37.009. Because we are affirming the trial court's judgment with respect to the award of declaratory relief in favor of Lisa, the Company Appellants argument for recovery of fees under the UDJA fails. We overrule the Company Appellants' challenge to the trial court's failure to award them attorney's fees under Section 37.009.

## Conclusion

We reverse the portions of the Amended Final Judgment rendered in favor of Lisa with respect to her (1) defamation claims against Wes, Jr. and Mark, (2)

---

Judgment in favor of Lisa on that claim. Wes, Jr. did not raise any issue on appeal claiming he is entitled to fees under Section 153.404(e).

[90] In one sentence and without further elaboration or citation to the record or legal authority, the Company Appellants argue in the alternative that they "established [their] right to the recovery of attorneys' fees as a matter of law when Lisa either non-suited or failed to submit claims on behalf of the other multiple SignAd entities named in her pleadings." This argument is waived due to inadequate briefing. *See* TEX. R. APP. P. 38.1(i) (requiring appellant's brief to contain clear and concise argument with appropriate citations to authorities and record).

derivative claim for breach of fiduciary duty filed on behalf of SignAd GP, LLC against Wes, Jr., Lee, and Stacey (Jury Question 30), and (3) derivative claim for breach of fiduciary duty filed on behalf of SignAd, Ltd. against Wes, Jr. (Jury Question 15). We render judgment that Lisa take nothing on these claims.

We also reverse the portions of the Amended Final Judgment appointing a rehabilitative receiver to oversee an "equitable buyout of Lisa Horan, Trustee's interests in the Limited Partnerships and General Partners in which she holds an interest" and the finding of oppression upon which the appointment of a receiver was based. In light of our opinion and the jury's response to Jury Questions 44 and 46, we remand to the trial court with instructions to consider the Company Appellants' request for a decree of expulsion under Section 152.501(b)(5)(C) of the TBOC.

We affirm the portion of the Amended Final Judgment rendering judgment in favor of Lisa on her derivative claim for breach of fiduciary duty filed on behalf of SignAd, Ltd. against SignAd GP, LLC, Wes, Jr., Lee, Stacey, and Mark stemming from the payment of individual legal expenses (Jury Questions 24 and 26), but we reverse the direct award of damages to Lisa on that claim.

We reverse the award of (1) attorney's fees to Lisa in connection with her books and records claims, (2) attorney's fees and expenses to Lisa in connection with her derivative claim for breach of fiduciary duty filed on behalf of SignAd, Ltd.

204

against Wes, Jr. (Jury Question 15), (3) attorney's fees and expenses to Lisa in connection with her derivative claim for breach of fiduciary duty filed on behalf of SignAd GP, LLC against Wes, Jr., Lee, and Stacey (Jury Question 30), (4) attorney's fees and expenses to Lisa in connection with her derivative claim for breach of fiduciary duty filed on behalf of SignAd, Ltd. against SignAd GP, LLC, Wes, Jr., Lee, Stacey, and Mark (Jury Questions 24 and 26), and (5) non-segregable attorney's fees and expenses to Lisa against SignAd GP, LLC, Culcreuch West, LLC, Realty Acquisitions & Holdings LLC, Big Leasing, LLC, and SignAd, Ltd., jointly and severally, and we remand to the trial court for a new trial on attorney's fees consistent with this opinion.

As part of the new trial on attorney's fees, the trial court is instructed to determine the amount, if any, of (1) reasonable attorney's fees Lisa is entitled to recover for her books and records claims, (2) reasonable expenses, including reasonable attorney's fees, Lisa is entitled to recover under Section 153.405 of the TBOC for her derivative claim filed on behalf of SignAd, Ltd. against SignAd GP, LLC, Wes, Jr., Lee, Stacey, and Mark stemming from the improper payment of personal legal fees for Wes, Jr., Stacey, Lee, and Mark (Jury Questions 24 and 26), (3) reasonable expenses, including reasonable attorney's fees, SignAd GP, LLC is entitled to recover under Section 101.461(b)(1) of the TBOC for Lisa's derivative claim for breach of fiduciary duty filed on behalf of SignAd GP, LLC against Wes,

Jr., Lee, and Stacey stemming from the failure to maintain internal controls on employee fringe benefits and selling of company vehicles for less than fair market value (Jury Question 30), and (4) non-segregable fees and expenses Lisa may recover.

We further hold that portions of the permanent injunction issued in favor of Lisa and against the Individual Appellants and the Company Appellants are overly broad, vague, and prohibit lawful conduct. Lisa is also not entitled to a portion of the issued injunctive relief because there is no evidence of imminent harm or there is an absence of a finding of liability on an underlying cause of action supporting such relief. Thus, we reverse the trial court's permanent injunction in part and remand the cause to the trial court with instructions to modify the injunction consistent with this opinion. We affirm the judgment in all other respects.


                                           Veronica Rivas-Molloy
                                           Justice


Panel consists of Justices Countiss, Rivas-Molloy, and Guerra.